UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

LEBOEUF, LAMB, GREENE & MACRAE LLP,

Plaintiff,

v. C.A. No. 06-501-L-DLM

DAVID STRACHMAN, as the Administrator of
the Estate of Yaron Ungar, et al.,

Defendants.

**MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION PURSUANT TO FED.R.CIV.P 12(b) TO DISMISS THE COMPLAINT**

**Introduction**

As shown below, the instant action is a frivolous abuse of process designed to harass the defendants, and should be dismissed in its entirety.

**BACKGROUND**

**a. The PA and PLO Refuse to Honor the Judgment of This Court**

The defendants ("Ungars") are the minor children, parents, siblings and estate of Yaron Ungar, an American teacher murdered along with his pregnant wife Efrat in a terrorist attack carried out in June 1996, by members of the Hamas terrorist group acting in concert with and under the command of the Palestinian Authority ("PA") and the Palestine Liberation Organization ("PLO").

In March 2000 the Ungars filed a civil action in this Court against the PA, PLO and Hamas pursuant to the Antiterrorism Act ("ATA") 18 U.S.C. §2331 *et seq*. Estates of Ungar et al. v. the Palestinian Authority et al., C.A. 00-105L. The PA and PLO refused to answer the

complaint or conduct discovery and, as this Court expressly found, made every effort to delay and hinder the progress of the case for over four years.

On July 13, 2004, this Court entered final judgment for plaintiffs against the PA and the PLO, jointly and severally, in the amount of $116,409,123.00 plus attorney fees. Ungar v. Palestinian Authority, 325 F.Supp.2d 15 (D.R.I. 2004). The judgment was affirmed on appeal, and the Supreme Court denied a petition for a writ of certiorari. Ungar v. Palestinian Authority, 402 F.3d 274 (1st Cir. 2005) cert. denied 126 S.Ct. 715 (2005).

In its decision ordering entry of final judgment, this Court emphasized the importance it attached to the judgment being honored and enforced:

> The PA and PLO … are responsible for and must bear the ultimate burden of providing compensation, which this Court fully acknowledges will never return to Plaintiffs the relationships and lives that existed prior to June 9, 1996. This Court hopes that in keeping with the ATA's purpose to deter acts of international terrorism, its judgment will "interrupt or at least imperil the flow of terrorism's lifeblood, money," and thus, prevent the PA and PLO from funding future terrorist acts such as the one that resulted in the Ungars' horrific deaths.

Ungar, 325 F. Supp. 2d at 25.

In the event, however, the PA and PLO have refused to satisfy the Ungars' judgment, and have informed the Ungars' counsel that they "will never pay" the judgment. This contumacious refusal is merely the encore to years of intentional delay created by the PA and PLO during the underlying suit. Ungar, 325 F. Supp.2d at 26, 62 (finding that the PA and PLO took "deliberate

actions to delay the completion of this litigation" and "sought to delay these proceedings as long as possible" and imposing sanctions).[1]

The PA and PLO are refusing to pay the Ungars' judgment because they do not recognize the authority of the courts of the United States, as they themselves have openly explained. In July 2005, the U.S. District Court for the Southern District of New York ordered the PA and PLO to pay discovery sanctions in the amount of some $19,000 previously imposed in Knox v. Palestine Liberation Organization, Civ. No. 4466(VM), and to answer the complaint in that action, by no later than August 15, 2005. Exhibit A. In response to that order, the PA and PLO informed the S.D.N.Y. that:

> [T]he defendants have instructed counsel to present only their position that U.S. courts have no jurisdiction over them and not to answer on the merits . . .
>
> This same position, that the Court has no jurisdiction over them, applies to the order for defendants to pay sanctions.

Exhibit B.

Thus, the PA and PLO are brazen scofflaws who now refuse to honor the judgment of this Court because they do not recognize the authority of the United States courts – despite the

[1] This conduct is part of a deliberate policy of intransigence employed by the PA and PLO in all civil actions pending against them under the Antiterrorism Act, for which they have been repeatedly sanctioned and castigated by the federal courts. See e.g. Knox v. Palestine Liberation Organization et al., 229 F.R.D. 65, 70 (S.D.N.Y. 2005) (Finding that the PA and PLO had intentionally "generat[ed] more than a year's delay and thousands of dollars in legal expenses," imposing monetary and estoppel sanctions and warning the PA and PLO that "The Court will not tolerate such practices in the future, and will consider any unexplained repetition of them sufficient grounds for imposition of sanctions on Defendants' counsel personally as well as on Defendants…"). Id.

fact that they spent nearly six years aggressively invoking the authority of this Court, the Court of Appeals and the Supreme Court, in order to delay and attempt to dismiss the Ungars' suit. [2]

**b. The Ungars' Creditor's Bill**

Faced with the refusal of the PA and PLO to honor the judgment of this Court, on July 3, 2006, the Ungars filed a Creditor's Bill (docket[3] #370) in this Court against the PA, pursuant to §9-28-1 of the Rhode Island General Laws. That provision permits a judgment creditor to "reach and apply and subject to the payment and satisfaction of his or her judgment any equitable estate, any equitable assets, or any choses in action of the judgment debtor." R.I.G.L. §9-28-1.

The Creditor's Bill requested that the Court assign to the Ungars certain rights of the PA in respect to two PA-owned holding corporations, the Palestinian Commercial Services Company ("PCSC") and the Palestine Investment Fund Company ("PIF"). See Creditor's Bill, at ¶¶ 11-22.

Specifically, the Creditor's Bill sought a judgment assigning to the Ungars two distinct categories of rights belonging to the PA:

(1) The PA's ownership of the PCSC and the PIF; and

(2) The PA's rights in property, assets and credits titled and/or owed in the names of the PCSC and the PIF.

See id. at the *ad damnum* clause.

As exhibits to the Creditor's Bill, the Ungars attached certificates demonstrating that the PA is the sole owner of the PCSC and the PIF. See id. at internal Exhibits C, D and F.

---

[2] After spending over $300,000 on enforcement proceedings, the Ungars have managed to recover part of the post-judgment interest on the judgment. The current balance owed on the judgment, including post-judgment interest, is now in excess of $117 million.

[3] Unless otherwise indicated, all references to "Docket" refer to pleadings in Ungar v. Palestinian Authority, 00-105 L (D.R.I.).

Notably, while it cannot be disputed that all assets titled to the PCSC and PIF (which are simply holding companies for PA assets) are the property of the PA, the Creditor's Bill did not seek to have this Court make that determination. Rather, the Creditor's Bill simply requested assignment of "all rights, benefits and interests of the PA in all property, assets and credits, of any type, that are titled and/or owed to the PCSC and the PIF" (id.) – without defining the scope and extent of those "rights, benefits and interests."

The PA failed to answer the Creditor's Bill, and on August 1, 2006, the Ungars moved for entry of default and default judgment thereon. Docket # 375.

The Court then ordered the PA to respond to the Ungars' default motion by August 18, 2006, and scheduled a hearing on that motion for September 13, 2006. Id. Docket ## 375, 376.

The PA filed no response to the default motion. The PA's counsel, Deming E. Sherman, appeared at the hearing on the default motion but declined to take any position on the motion and offered no defense or opposition thereto. See hearing transcript, September 13, 2006, Exhibit C, at 2-3.

Attorney James Oswald also appeared at the September 13, 2006 hearing, on behalf of Canaan Equity Offshore, Canaan Equity II Offshore, and Canaan Equity III Offshore ("Canaan funds") which are Connecticut-based investment funds which hold funds titled to the PIF. See id. at 3.

Mr. Oswald appeared at the hearing to seek clarification about the impact of the Creditor's Bill on enforcement proceedings that the Ungars had initiated in Connecticut regarding Canaan. Id. passim.

In respect to the first prong of the Creditor's Bill (the assignment of the PA's ownership of the PCSC and the PIF), the Court explained at the hearing that the Ungars had proven that the

PA owned the PCSC and the PIF, and that the PA's "full ownership rights" of the PCSC and PIF would therefore be assigned to the Ungars:

> THE COURT: The proof of claim is, that the PA owns these two entities and, therefore, the interests of the PA are assigned to the plaintiffs. And then they can proceed to try to collect in Connecticut.
>
> MR. OSWALD: Whatever interests those happen to be are being assigned to the plaintiffs.
>
> THE COURT: It's ownership. Full ownership rights. That's what's been proven to me through the documentation in this case.

Id. at 17-18 (emphasis added).

In respect to the second prong of the relief sought in the Creditor's Bill (the PA's rights to assets titled to the PCSC and PIF) the Court explained that it was granting the relief as sought in the Creditor's Bill, i.e. that the PA's rights in such assets would be assigned to the Ungars, without making a determination about the extent of such rights:

> MR. OSWALD:…If they have an interest, it is being assigned. But the determination of whatever those interests are is ultimately being left to the Connecticut court.
>
> THE COURT: Well, the Connecticut court will have to decide some issues here. I'm deciding that whatever the PA owns in these two entities is assigned to the plaintiffs. Then the plaintiffs can proceed as they see fit.

Id. at 13-14.

Accordingly, on September 19, 2006, the Court entered a final judgment on the Creditor' Bill, which assigned to the Ungars all of the PA's ownership rights in the PCSC and PIF, as well as any rights, benefits and interests of the PA in property, assets and credits that are titled and/or owed to the PCSC and PIF. See Exhibit D.

**c. The Management of the PIF Is Replaced and LeBoeuf Threatens the Ungars**

On October 17, 2006, the Ungars executed a resolution in their capacity as the owners of the PIF dismissing the existing PIF board of directors and appointing a new board of directors for the PIF, and on October 19, 2006, the new PIF board of directors convened, removed the PIF management, and appointed two new officers and signatories. See Declaration of Professor Meir Ungar and attached corporate resolutions, Exhibit E.

The new PIF management retained attorney Robert J. Tolchin of the New York firm of Jaroslawicz & Jaros to represent the PIF. See id.

On October 20, 2006, the Mr. Tolchin sent a letter to plaintiff LeBoeuf, Lamb, Greene & Macrae LLP ("LeBoeuf") (which had earlier claimed to have been in the process of being retained by the former management of the PIF) notifying LeBoeuf of the change in ownership and management in the PIF and informing LeBoeuf that the PIF had terminated any previous retention of LeBoeuf. Exhibit F.

Mr. Tolchin's letter to LeBoeuf included a copy of the judgment entered by this Court in the Creditor's Bill, as well as the PIF corporate resolutions. Id.

Lebeouf replied to the October 20 letter from Mr. Tolchin on October 24, 2006, by blithely ignoring the judgment entered by this Court in the Creditor's Bill and threatening to hold the Ungar children and Yaron's other family members personally liable if they did not immediately cease and desist from exercising the rights awarded them by this Court in that judgment. See Exhibit G.[4]

[4] The Ungars cannot take such threats lightly. The PA (acting through one of its financial arms) has twice brought nuisance suits against the Ungars in an effort to intimidate them into abandoning their collection efforts. See Palestine Monetary Authority v. David Strachman as Administrator of the Estates of Yaron Ungar and Efrat Ungar, et al., 05-cv-00261-L-DLM (D.R.I.); Palestine Monetary Authority v. David Strachman, as Administrator of the Estate of Yaron Ungar, Index No: 107777/05 (N.Y. Sup. Ct.).

On October 24, Mr. Tolchin replied to LeBoeuf, reiterating that the Ungars were acting pursuant to the judgment entered by this Court and cautioning LeBoeuf that further unlawful interference in the Ungars' legitimate enforcement proceedings would severely harm the Ungars and render LeBoeuf liable for their damages. Exhibit H.

**d. The Ungars Move With PIF's Consent to Modify the Confidentiality and Sealing Order Regarding PIF Documents Received From Canaan, and LeBoeuf Files the Instant Action**

On November 9, 2006, the Ungars filed a motion in the underlying action seeking to modify a confidentiality stipulation and sealing order previously entered, regarding PIF documents produced by Canaan pursuant to a subpoena served by the Ungars. See Ungar v. Palestinian Authority, 00-105L, docket #385-1 ("Motion to Modify").

That motion was accompanied by a letter from the PIF's counsel, Mr. Tolchin, consenting on behalf of the PIF to the removal of the confidentiality provisions. See id. at internal Exhibit F.

LeBoeuf then filed the instant action on November 17, 2006.

On November 27, Canaan filed an Objection (docket #386-1) to the Motion to Modify, stating that:

> Plaintiffs' Modification Motion is premised upon the contention that, by operation of this Court's September 19, 2006 Final Judgment, plaintiffs have become the sole owners and possess all the legal rights and obligations of the Palestine Investment Fund ("PIF"). (See Pl. Memorandum in Support [Docket No. 383] at 1.) Given the uncertainty surrounding plaintiffs' contention that has been raised in the Complaint for Declaratory Judgment filed with this Court on November 17, 2006 by

---

While the PA was forced to drop both of these utterly frivolous harassment suits, each such suit wastes the time and energy of the Ungars and their counsel, and diverts resources which could be dedicated to enforcement.

> LeBoeuf, Lamb, Greene & MacRae LLP, No. 1:06-cv-00501-L-DLM (a copy of which is annexed hereto), Canaan respectfully opposes plaintiffs' request to modify the Confidentiality Agreement and Sealing Order referenced in the Modification Motion.

Id.

As Canaan correctly stated in its Objection, the Motion to Modify implicates the same issues as those raised in the instant action.

Accordingly, the Ungars and Canaan agreed to stay proceedings on the Motion to Modify until the disposition of the instant action is concluded, and notified chambers of this agreement. The Court then cancelled a hearing scheduled for December 12 on the Motion to Modify.

If the instant motion to dismiss is granted, the Motion to Modify can and should proceed forthwith.

**e. LeBoeuf Attempts to Intervene in the Ungars' Enforcement Proceedings**

The Ungars have two pending proceedings seeking to enforce their judgment from assets of the PA titled to the PIF that are subject to U.S. jurisdiction (1) the proceeding against Canaan in the District of Connecticut, Ungar v. Palestinian Authority, No. 05mc208 (PCD) (D.Conn); and (2) a proceeding in the Southern District of New York against a debt due the PA and nominally titled to the PIF which is owed by Orascom Telecom Holding. Ungar v. Orascom Telecom Holding, No. 05-CV-7765 (S.D.N.Y.).[5]

Following the change of PIF ownership and management, the PIF appeared (represented by Mr. Tolchin) in both the Canaan and the Orascom proceedings, to consent to the turnover relief sought by the Ungars.

[5] The Ungars have also brought a parallel state court turnover proceeding against Orascom. Ungar v. Orascom Telecom Holding, Index No. 108090 / 05 (N.Y. Sup. Ct.).

In response, LeBoeuf moved both in the Connecticut and New York federal courts for leave for *the LeBoeuf firm itself* (!!) to intervene as a party, in order to protect its interest in collecting future fees. See Ungar, (D.Conn) at docket #72; Ungar, (S.D.N.Y.) at docket #26.

LeBoeuf's motion was summarily denied by the S.D.N.Y upon the Ungars' motion, after that court found that what LeBoeuf actually seeks by it motion is to challenge is the Ungars' ownership and control over the PIF, and that any such challenge belongs exclusively in this Court. See Ungar v. Orascom, No. 05-CV-7765 (S.D.N.Y.), docket entries 11/02/2006 (Order) and 11/03/2006 (Memo Endorsement).

The Ungars also moved to strike LeBouef's motion to intervene in Connecticut, arguing that LeBoeuf had no standing to make it. See Ungar, (D.Conn) at docket #83

On November 29, 2006, the Connecticut federal court held a hearing on LeBoeuf's motion to intervene. At that hearing, Senior U.S. District Judge Dorsey asked counsel for LeBoeuf why the LeBoeuf firm had moved to intervene as a party, and why – if LeBoeuf believed that it represents the PIF – it did not file a notice of appearance on behalf of PIF as Mr. Tolchin had done, and moved to strike Mr. Tolchin's notice of appearance. Counsel for LeBoeuf replied that "the PIF, if it were to appear, might contest personal jurisdiction, and if the PIF were to intervene in its own name, it might place itself before the Court." Hearing transcript, November 29, 2006, Exhibit at I, at 37-38.

**In other words, LeBoeuf admitted to the Connecticut court that its claim to have its own interest in the proceedings is simply an artifice dreamt up by lawyers**.

Counsel for LeBoeuf also asked Judge Dorsey to rule that this Court should not have assigned the PA's ownership of the PIF to the Ungars. Id. at 43, 48.

Judge Dorsey declined this invitation, and decided that like the S.D.N.Y., he, too, would await the decision of this Court. Id. at 46.

Thus, as a direct result of LeBoeuf's meddling, the Ungars have to date been utterly stymied in their efforts to utilize the rights assigned to them pursuant to the Creditor's Bill.

## ARGUMENT

In the instant action, LeBoeuf seeks a declaratory judgment (a) vacating the judgment on the Creditor's Bill assigning the PA's ownership of the PIF to the Ungars (Complaint ¶¶ 56-62) and (b) voiding the Ungars' replacement of the directors of the PIF, the new directors' replacement of the officers of the PIF and the new officers' replacement of LeBoeuf and retention of Mr. Tolchin as counsel for the PIF (Complaint ¶¶ 63-87).

All of LeBoeuf's arguments are utterly baseless on the merits, and the Ungars would have no trouble defending and defeating this action. Indeed, the Ungars would welcome that opportunity. Unfortunately, however, because the Court has no subject-matter jurisdiction over LeBoeuf's suit, and because LeBoeuf is not the real party in interest, the Ungars have no choice but to move for dismissal.[6]

## I. THERE IS NO DIVERSITY JURISDICTION

LeBoeuf purports to found subject-matter jurisdiction in this action on diversity. Complaint ¶¶ 4-5.

Diversity jurisdiction is absent here, however, because it is a matter of record that decedent Yaron Ungar was an American citizen domiciled abroad at the time of his death. See Ungar v. Palestinian Authority, 304 F. Supp. 2d 232, 262 (D.R.I. 2004).

---

[6] Dismissal of this action will not prevent the matters at issue from being heard. As noted, once this case is dismissed the Motion to Modify against Canaan (which arose from a subpoena issued in the Ungar v. Palestinian Authority action and so is unquestionably within the Court's original jurisdiction) can and should proceed.

It is well established that "United States citizens domiciled abroad are neither citizens of any state of the United States nor citizens or subjects of a foreign state, so that § 1332(a) does not provide that the courts have jurisdiction over a suit to which such persons are parties." Herrick Co., Inc. v. SCS, 251 F.3d 315, 322 (2nd Cir 2001) (internal quotations omitted).

In other words, an American citizen domiciled abroad destroys diversity jurisdiction.

LeBoeuf has attempted to skirt the problem of Yaron's domicile by bringing the action against David Strachman, as the Administrator of the Estate of Yaron Ungar, and pointing to Strachman's Rhode Island domicile. Complaint at ¶ 2. This gambit fails because 28 U.S.C. §1332(c)(2) expressly provides in relevant part that "the legal representative of the estate of a decedent shall be deemed to be a citizen only of the same State as the decedent." Thus, Yaron Ungar's domicile for diversity purposes is Israel, irrespective of the domicile of the administrator of his estate, and the presence of his estate in this action destroys diversity.

Furthermore, defendant Amichai Ungar (Yaron's brother) is also an American citizen who is and was domiciled abroad during the during the relevant time period. See Exhibit J.

Thus, Amichai Ungar's presence in this suit also destroys diversity.

The Court therefore lacks diversity jurisdiction over this action.

## II. THERE IS NO FEDERAL QUESTION JURISDICTION

LeBoeuf also seeks to base subject-matter jurisdiction in this case on federal-question jurisdiction. Complaint ¶¶ 4-5.

This argument is without merit. It is well-established that:

> The fact that a suit involves the construction or effect of a judgment of a federal court does not, for that reason, make it one arising under federal law. *Metcalf v. Watertown*, 128 U.S. 586, 9 S.Ct. 173, 32 L.Ed. 543 (1888); *Prairie Band of Pottawatomie*

> *Tribe of Indians v. Puckkee,* 321 F.2d 767 (10th Cir. 1963).

Brooks v. Nez Perce County, 394 F.Supp. 869, 875 (D.C.Idaho 1975). See also State of Oklahoma ex rel. Wilson v. Blankenship, 447 F.2d 687, 692 (10th Cir. 1971) ("the fact that the suit involves the construction and effect of a federal judgment does not make it one arising under the federal law").

Furthermore, only the First Cause of Action asserted by LeBoeuf relates to the force and effect of the judgment issued by this Court on the Creditor's Bill. The Second Cause of Action relates not to the judgment, but to the replacement of the directors and officers of the PIF, and by no stretch of the imagination could those issues constitute a federal question within the meaning of 28 U.S.C. § 1331.

## III. LEBOEUF LACKS STANDING TO BRING THIS ACTION

Even assuming *arguendo* that there was a statutory basis for subject-matter jurisdiction, this action would have to be dismissed because LeBoeuf lacks any standing to bring it. As the First Circuit recently had occasion to reiterate, "A federal court must satisfy itself as to its jurisdiction, including a plaintiff's Article III standing to sue, before addressing his particular claims, regardless of whether the litigants have raised the issue of standing … Standing involves a collocation of constitutional requirements and prudential concerns." Pagan v. Calderon, 448 F.3d 16, 26-27 (1st Cir. 2006).

Moreover, LeBoeuf is seeking declaratory relief under 28 U.S.C. § 2201(a), which permits such relief only "In a case of actual controversy within its jurisdiction" and only when sought by an "interested party". 28 U.S.C. §2201(a).

LeBoeuf lacks both Article III and prudential standing, as well as standing to bring a declaratory judgment action, for multiple reasons:

***First***, LeBoeuf's Complaint fails to even allege (1) that the PIF itself ever opposed or disputed the assignment of the PA's ownership of the PA to the Ungars (2) that the directors and officers opposed or contested their dismissal, or that the PIF or (3) that the directors and officers opposed the dismissal of LeBoeuf as counsel.

The only conduct even vaguely attributed to the PIF anywhere in the Complaint is the following statement:

> On or about October 9, 2006, LeBoeuf was asked to represent the PIF in connection with the Connecticut action and another action in New York, where the Administrator was attempting to seize PIF assets in satisfaction of the default judgment against the PA.

Complaint ¶ 25.

This allegation does not state that the PIF disputed the assignment of the PA's ownership to the Ungars.

Furthermore, even assuming *arguendo* that the PIF did oppose the assignment of the ownership on October 9, there is no allegation that it continued to do so at the time that this action was filed.

Moreover, the former directors and officers were replaced between October 17-19, 2006 – i.e. <u>after</u> LeBoeuf was allegedly asked to represent the PIF on October 9.

Thus, the Complaint contains no allegation that the directors and officers – who were dismissed by the Ungars only subsequently – disputed their own dismissal, or that of LeBoeuf.

Clearly, LeBoeuf cannot dream of having standing to bring the instant action unless the PIF opposed the assignment of the PA's ownership rights, and unless the former directors and officers of the PIF contest their dismissal.

Yet, on its face, the Complaint contains no such allegation. For all the Court knows from reading the Complaint, the PIF and its former directors and officers have no dispute with the Ungars.

***Second***, LeBoeuf bases its challenge to the judgment assigning the PA's ownership of the PIF to the Ungars on the claim that it was previously retained by PIF. **But even the PIF itself had (and has) no standing to challenge the assignment of the PA's ownership of the PIF to the Ungars**, because it is hornbook law that "a corporation does not have standing to bring an action to enforce or redress the rights of its shareholders." 9 Fletcher Cyc. Corp. §4227 (2006). See also Minnesota Ass'n of Nurse Anesthetists v. Allina Health System Corp., 276 F.3d 1032, 1050 (8th Cir. 2002) ("a corporation has no standing to assert rights belonging to its shareholders") (citing Waseca Co. Bank v. McKenna, 21 N.W. 556 (Minn. 1884)).

Indeed, the facts of the Waseca decision cited by the Eighth Circuit are highly apposite to those underlying the Creditor's Bill. There, a banking corporation filed an action to prevent levy and sale of shares belonging to the stockholders of the bank, to satisfy a debt. The court held that the bank had no standing to interfere:

> The plaintiff is not in position to maintain this action … the only thing which the defendant as treasurer can do is to levy upon and sell the shares of stock of individual stockholders for the tax upon such shares. This is all that he threatens to do, and is what the action seeks to enjoin him from doing. Such sale would have the effect only to transfer to whomsoever should purchase at the sale the title to the stock sold. This would not affect the bank in any other way, nor be any more a wrong against it than would a transfer by the stockholders themselves. The wrong, if any, in making the levy and sale would be a wrong against the individual stockholders and not against the bank. It has, therefore, no legal interest in the matter.

Waseca Co. Bank v. McKenna, 21 N.W. 556 (Minn. 1884) (emphasis added).

Thus, the PIF, like the bank in Waseca, had no standing and no legal right to challenge the assignment of the PA's ownership rights of the PIF to the Ungars via the Creditor's Bill.

The only party with such standing was the (former) owner of the PIF, i.e. the PA itself. "Individual rights of shareholders and injuries against shareholders individually cannot be enforced or redressed in an action by the corporation, but the action must be by the shareholders individually." 12B Fletcher Cyc. Corp. §5934 (2006). In the event, of course, the PA intentionally defaulted the Creditor's Bill, and failed to appeal the judgment entered thereon.

Indeed, state and federal courts across the country levy and execute against judgment debtors' shares and ownership rights in corporations every single day, and the corporations themselves – the object of the ownership – have no standing to argue about who should own them.

Since the PIF itself had no standing to oppose the assignment of the PA's ownership rights to the Ungars, it is pellucid – *a fortiori* – that Lebeouf has no such standing.

Indeed, it would be absurd to conclude that a former service-provider for a corporation (like LeBoeuf) has standing to oppose the assignment of the ownership of the corporation, when the corporation itself does not.

***Third***, even assuming, purely *arguendo*, that the PIF itself had some standing to oppose either the assignment of the PA's rights to the Ungars or the replacement of PIF's directors and officers, LeBoeuf would still have no standing to bring this action because its claims would be entirely derivative of those of the PIF. That is because even when Article III standing exists, federal courts will not grant standing to persons claiming a derivative injury:

> North Shore has standing in the Article III sense-it would derive a benefit if it won the suit, mainly

because the construction of the new slip may increase the cost of cleaning up the new Superfund site and North Shore may be socked with that cost. …

However, two other concepts of "standing" may apply here. The first, perhaps ill-named but well established in antitrust and other legal contexts and deeply rooted in the common law, is the idea that not everyone injured by the violation of a statute will be permitted to sue to redress the violation. Suppose Corporation A incurs a loss in sales as a result of a violation of the antitrust laws by B, and Mr. C, an employee of A, loses a bonus as a result of his employer's sales loss. The law has been violated and C has been hurt as a result, but he will not be allowed to sue. *In re Industrial Gas Litigation,* 681 F.2d 514 (7th Cir. 1982); see also *Associated General Contractors of California, Inc. v. California State Council of Carpenters,* 459 U.S. 519, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983); cf. *O'Bannon v. Town Court Nursing Center,* 447 U.S. 773, 788-89, 100 S.Ct. 2467, 2476-77, 65 L.Ed.2d 506 (1980). It just is too difficult to trace out all the ramifications of a violation of law to justify allowing every person conceivably injured by eddies of illegal conduct to bring suit. Pollution can cause all manner of indirect injury. Manufacturers of brass fittings for yachts may incur business losses because sales of yachts decline in northern Illinois as a consequence of pollution in Waukegan Harbor, but it would be absurd to allow them to invoke the environmental laws in an effort to enjoin a measure that they think might aggravate that pollution. Plaintiffs would be tripping over each other on the way to the courthouse if everyone remotely injured by a violation of law could sue to redress it. An important purpose of rules of standing is to identify the best-placed plaintiff and give him a clear shot at suit-and by doing so to cut down on the number of suits, which is no trivial consideration in this age of swollen federal caseloads. On both points see *People Organized for Welfare & Employment Rights (P.O.W.E.R.) v. Thompson,* 727 F.2d 167, 172-73 (7th Cir. 1984).

> An additional consideration is that derivative losers tend to be offset by derivative gainers, who to prevent overdeterrence would have to be forced to make restitution to the violator-which of course is infeasible. *Grip-Pak, Inc. v. Illinois Tool Works, Inc.*, 694 F.2d 466, 473-74 (7th Cir. 1982). In our hypothetical case, the loss to the manufacturers of brass fittings would be offset by gains to suppliers of the inputs into the clean up. What we are calling derivative losers and gainers are persons linked financially to the immediate injurers and victims, and such financial ramifications of an accident or other disaster tend to be offsetting and can therefore safely be ignored.

North Shore Gas Co. v. E.P.A., 930 F.2d 1239, 1242-1243 (7th Cir. 1991) (emphasis added).

This analysis is perfectly apposite to the facts of the instant case. LeBoeuf is analogous to "Mr. C." in the hypothetical presented by the Seventh Circuit, it is no more than a "person[] linked financially to the immediate [alleged] victim" of the events complained of, and is therefore not "the best-placed plaintiff" (id.) and lacks standing to bring this action.

In other words, while LeBoeuf's dismissal as counsel for the PIF makes it one of the "derivative losers" of the change of ownership and management in the PIF (along with the other former service-providers), those "derivative losers" are "offset by derivative gainers" such as Mr. Tolchin, who was hired as a result of that change in ownership and management. Thus, LeBoeuf's challenge to that change in ownership and management "can therefore safely be ignored" by the law, by denying LeBoeuf prudential standing to assert it.

Similarly, in Frierdich v. U.S., 985 F.2d 379, 382 (7th Cir. 1993) the Court of Appeals held that "the right to sue" should be granted only "to the person who has the greatest interest in the outcome of the suit, rather than allowing someone with a tenuous interest to gum up the

works by suing also or instead." Under LeBoeuf's own theory of the case, the person with the greatest interest is not LeBoeuf.

Indeed, in Pagan v. Calderon, 448 F.3d 16, 30 (1st Cir. 2006), the First Circuit expressly held that the agent of a corporation – in that case a consultant – does not have standing to sue for any injury that is derived from an injury to the corporation. That same rule would obviously apply to the former attorney for the corporation.

***Fourth***, at the November 29 hearing in Connecticut, counsel for LeBoeuf admitted on the record that LeBoeuf itself (rather than the former management of the PIF) is appearing to thwart the Ungars' enforcement proceedings, in order to shield the former management of the PIF from coming before the Court. Exhibit at I, at 37-38.

Thus, LeBoeuf has effectively admitted that it has no real interest of its own in this case, and that it is abusing the process of the federal courts by filing baseless proceedings such as the instant action, in an effort to assist the former management of the PIF.

That alone is grounds to dismiss this case and impose sanctions on LeBoeuf.

## IV. LEBEOUF IS NOT THE REAL PARTY IN INTEREST

Rule 17(a) of the Federal Rules of Civil Procedure requires that "Every action shall be prosecuted in the name of the real party in interest."

LeBoeuf purports to be a creditor of a corporation acting to vindicate rights derived from the rights of the corporation. But the creditor of a corporation is not a real party in interest to bring such an action.

In Weissman v. Weener, 12 F.3d 84 (7th Cir. 1993), Weissman, a shareholder and guarantor of A.H.L corporation, brought an action for damages caused to the corporation by

attorney Weener. The district court ruled that the corporation, not Weissman, was the real party in interest, and dismissed the case. The Seventh Circuit affirmed, explaining that:

> We agree with the district court that A.H.L., not Weissman, is the real party in interest here. A.H.L. needed a loan, and hired Weener to serve as a loan broker. It is alleged that as a result of Weener's misrepresentations and malpractice, A.H.L. was injured. If Weissman's claims are true … then he also suffered. A.H.L. went bankrupt, and Weissman, as an A.H.L. shareholder, lost his investment in the corporation. He was also a guarantor of A.H.L.'s previous debt (the loan from First Midwest Bank), and may eventually be called upon to make good on that guarantee.
>
> But because Weissman's injuries are all derivative-they derive from the fact that A.H.L. suffered a loss-he is not the real party in interest, and therefore cannot maintain an action in his own name. The rule is similar to, though distinct from, the requirement that the plaintiff have standing to sue, in that both standing and real party in interest "are used to designate a plaintiff who possesses a sufficient interest in the action to entitle him to be heard on the merits." 6A Charles Alan Miller et al., *Federal Practice and Procedure* § 1542 (2d ed. 1990).
>
> Thus, our analysis in *Mid-State Fertilizer Co. v. Exchange Nat'l Bank of Chicago*, 877 F.2d 1333 (7th Cir.1989), a case that dealt with similar facts, though in the standing context, is informative here. We noted there the important purpose served by the rule denying standing to sue to those who suffer only derivative injury.

Weissman, 12 F.3d at 86 (emphasis added).

Significantly for the instant case, the Court of Appeals made clear that a creditor of a corporation – like plaintiff LeBoeuf – has even less right than a shareholder to bring an action in these circumstances:

> It is thus beyond cavil that Weissman is not entitled, merely by virtue of being a shareholder of A.H.L., to sue Weener for the wrongs he allegedly committed against the corporation. But Weissman contends that the fact that he is the guarantor on A.H.L.'s debt makes his injury more direct. In fact, precisely the opposite is true. As we explained in *Mid-State*, the shareholders are most directly affected by injury inflicted on the corporation, since their investment is wiped out. Second come creditors, who end up holding the bag if the corporation cannot pay the money it owes them. Guarantors are only contingent creditors.

Id. (emphasis added).

Thus, even assuming purely *arguendo*, as LeBoeuf asserts, that the PIF has the right to challenge the assignment of the PA's rights to the Ungars and/or the replacement of PIF's directors and officers, that would make the PIF, and not LeBoeuf, the real party in interest. For this reason, too, LeBoeuf's claims must be dismissed.

## V. CONCLUSION

The instant motion should be granted.

Defendants, by their Attorney

/s/David J. Strachman
David J. Strachman
McIntyre, Tate, & Lynch LLP
321 South Main Street, Suite 400
Providence, RI 02903
(401) 351-7700
(401) 331-6095 (fax)
djs@mtlhlaw.com

CERTIFICATION

I hereby certify that on the 20th th day of March, 2007, a true copy of the within was sent via ECF to counsel of record:

Matthew F. Medeiros
Little, Medeiros, Kinder, Bulman & Whitney
72 Pine St.
Providence, RI 02903

/S/ David J. Strachman