UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| DAVID STRACHMAN, ET AL., Plaintiffs, v. PALESTINIAN AUTHORITY, ET AL., Defendants, | Case No. 3:05-MC-00208 (PCD) New Haven, Connecticut November 29, 2006 |

STATUS CONFERENCE
BEFORE THE HONORABLE PETER C. DORSEY
SENIOR UNITED STATES DISTRICT JUDGE

APPEARANCES:

For the Plaintiffs: McIntyre, Tate, Lynch & Hold, LLP
By: DAVID STRACHMAN, ESQ.
321 South Main Street
Suite 400
Providence, RI 02903

For Movants: Cahill, Gordon & Reindel
By: ROBERT A. ALESSI, ESQ.
80 Pine Street
New York, NY 10005

For the Defendants: LeBoeuf, Lamb, Greene & McRae
By: THOMAS ROHBACK, ESQ.
225 Asylum Street
Hartford, CT 06103

Proceedings recorded by electronic sound recording.
Transcript prepared by transcription service.

BOWLES REPORTING SERVICE
P.O. BOX 607
GALES FERRY, CONNECTICUT 06335
(860) 464-1083

(Proceedings commenced at 11:04 a.m.)

THE COURT: Please be seated folks.

(Inaudible), you want to circulate that among counsel to get a listing of who's here and who they represent.

I'm not sure, counsel, what is the appropriate order of dealing with this matter today, so therefore, I know I have a number of matters pending but I -- I'm not sure what's the most effective way of dealing with the matter, from the respective points of view of each counsel is concerned.

Is this still being -- Patty, are we still carrying this as an MC case, as opposed to a CV case?

THE CLERK: Yes.

THE COURT: All right. Okay.

Well, that's because it's pursuant to an execution, an ancillary proceeding. So that's probably why they designated it that way.

Why don't I start with the plaintiff.

Who's going to represent the plaintiff?

MR. STRACHMAN: Morning, Your Honor. David Strachman for the --

THE COURT: Yes, Mr. Strachman.

You tell me, what do you think is the first thing we should take up?

MR. STRACHMAN: Thank you, Your Honor.

As you know, and as the Court just indicated, this is a ancillary matter. We obtained a judgment two years ago in Rhode Island. We registered the judgment here. We were in Rhode Island in a collection mode, if you will, discovery mode, post-judgment mode, when we obtained information from Cannan, a third-party garnishee, effectively a third-party who has held and invested funds on behalf of the Palestinian Authority's investment division, the Palestine Investment --

THE COURT: Now, don't skip too quickly, Mr. Strachman.

MR. STRACHMAN: Okay.

THE COURT: I'm not sure what the disclosure was, but the point is that there is a distinction to be drawn, the Palestinian Authority and the Palestinian Investment Fund.

If I understand correctly, what you are attempting to reach now is the Palestinian Investment Fund's investment in Canaan, or one of the Canaan subsidiaries, if that's the appropriate term, and if I understand correctly, what the judge in Rhode Island has done is to issue, in response to your creditor's bill, if I understand the term correctly, --

MR. STRACHMAN: Exactly.

THE COURT: -- in effect it has -- the order has divested the prior management, if you will, representing the ownership interest in the investment fund, from whoever was in that position previously, in the absence of a response or, in effect, in a default, and vested the Ungars, if I can lump them together without making any determination of anybody's respective particular interest, but has purported to vest, in effect, the ownership interest in the PIF, in the Ungars, and it is my understanding that you are attempting to reach, in the hands of Canaan, or one or more of its entities, the investment of PIF in Canaan, on the basis that the PIF is the alter ego, if you will, or constitutes an entity -- an asset owned by the Palestinian Authority.

Now -- And you move for a turnover order, in this court, in order to, in effect, attempt to liquidate the PIF investment in Canaan, or to -- if not to liquidate it, to obtain recognition, if you will, of the PIF investment in Canaan, for the purpose of satisfying the Rhode Island judgment.

Now, that's -- Obviously, all this material I have here doesn't cover all of the intricacies that are involved, nor, as I might say appropriate (phonetic), the intrigues that are involved, and in consequence, I

don't purport to necessarily exhaust the field by what I have suggested as my summary, but I just want to make sure that you recognize that I, in turn, recognize a distinction that has not necessarily been totally adjudicated between the Palestinian Authority and PIF.

MR. STRACHMAN: If I could, Your Honor, I --

THE COURT: Go ahead.

MR. STRACHMAN: -- in large measure agree with everything that you said, except for a couple minor -- some minor characterizations, including --

THE COURT: Well, please understand you're entirely entitled to disagree with anything that I say. I don't take offense.

I'm just trying to get a grasp on what's involved, so I can figure what the best way to proceed with the matter.

Go ahead.

MR. STRACHMAN: In large measure, Your Honor -- Well, first, we have not alleged an alter ego theory. The Canaan and others have come to court and have tried to get the -- this proceeding dismissed before we even filed a merits brief, and that was because we were precluded from doing that a year ago. We were told we are not filing a merits brief. We have not disclosed, we have not described our theories, if

you will. We understand the <u>Epperson</u> case, and we understand the issues, in terms of the jurisdiction of this court, and we've touched on them in our filings, but it's only Canaan and others who've come to court to say what it is we're alleging, because we haven't alleged that yet because we were precluded, last year, I think it was in November or December, from filing a merits brief, number one.

Number two, Your Honor, the identity of the PIF and the PA is incontrovertible.

First, in terms of the creditor's bill, the parties who can properly challenge or raise certain issues with respect to the PIF, namely, Palestinian Authority, and the PLO declined twice to provide a response to our creditor's bill.

Judge Lagueux gave them an extra opportunity in August, and ordered them to file a response to our creditor's bill after we asked for default. They refused to do that.

At the hearing on the issue, their counsel was there from Edwards & Angell, representing them, saying, "We take no position on this" --

THE COURT: Now, did Edwards & Angell, or any other attorney, or an attorney from that office actually enter an appearance on behalf of either the

Palestinian Authority or the PIF in the Rhode Island proceeding?

MR. STRACHMAN: Yes. During the entirety of the litigation, starting in March of 2000, all through the entry of the judgment, which is in July of 2004, two trips to the first circuit and then one attempt to go to the supreme court, both Ramsey Clark, Larry Schilling, and Edwards & Angell, several lawyers from that office, including Deming Sherman, represented them, entire -- during the entirety of that proceeding.

THE COURT: Now, is that true -- Was the representation both of the Palestinian Authority and the PIF?

MR. STRACHMAN: No. The Palestinian Authority and the PLO.

THE COURT: Okay.

MR. STRACHMAN: The initial suit was brought against the Palestinian Authority and the PLO. We obtained a judgment in July of 2004, against both of those entities. Through some 300 or 400 pleadings, and four -- I think three or four motions to dismiss, and discovery orders, and dozens of trips and arguments before Judge Legur and the magistrate judge, Judge Martin, at all times, both the PA and the PLO were represented by two separate law firms jointly, Edwards

& Angell as well as Ramsey Clark and Larry Schilling.

When it came time to filing the creditor's bill within the same case, same case number, as a post-judgment remedy, we filed the creditor's bill, the time expired for filing an answer, Judge Legur, on his own, ordered the PA and the PLO to provide a response, and I believe that was in August, and he gave them an additional 20 days, 30 days, and then he set the matter down for hearing. They declined to file a written response. Their attorney showed up at the court -- at the hearing in September, and actually, it may have been the first of August, excuse me, the first of October, and said that he takes no position. He couldn't take a position because in every description of the Palestinian Investment Fund, every single place where it is described, it is described by the PA and the PLO as their pool of fun (phonetic).

A brief one minute or two of history, Your Honor.

When the Palestinian Authority was created, there were a series of nations -- companies, in fact, that were giving Yasser Arafat an awful lot of money to develop the infrastructure of the Palestinian Authority.

When that money was stolen, the donor nations

and entities became very concerned about the whereabouts of those funds. They pressured the Palestinian Authority to take all their funds that they had acquired, both from the donations, since the Oslo Accords, and over the last 40 years, and to pool them in one single entity, and to take an -- create an entity called the "Palestinian Investment Fund," and to take all their assets from whatever source, and put them there.

Now, they were audited by Standard & Poor's, by an outfit called "The Democracy Council," by Ernst & Young, and the donor nations required that these three allegedly independent entities came in and were to describe where all their assets are. In fact, they published, and we provided to the Court, I think in several different fashions, their list of assets.

THE COURT: Was this under the auspices of the World Bank?

MR. STRACHMAN: I believe the World Bank was part of the pressure to the PA, --

THE COURT: Okay.

MR. STRACHMAN: -- but the -- it was Standard & Poors, The Democracy Council and Ernst & Young that did the independent reviews to confirm that Arafat and company took all of these assets from all these

separate companies, and put them in one entity and, in fact, they have a web site, and the web site says, virtually verbatim, "We, the Palestinian Authority, are taking all of our assets and are putting them into this one company, which we own one share of, where it's solely intended to gather our assets and to create transparency," and it goes one step further.

In a series of lawsuits in (inaudible) filed by a terrorism victim in Israel, the Palestinian Authority and the PLO came to court to defend the actions, and to defend prejudgment attachment motions or restraining order motions, and in those motions they filed affidavits by individuals associated with the Palestinian Authority's finance ministry, pledging these very assets, and listing the exact list from their web site, which includes the Canaan fund, the investments in Canaan, and says, "These are part of the 600 million dollars of assets that we have. These Palestinian Investment Funds, that's our investment portfolio. It listed" numerous -- 20 or 30 different" issues -- "investments," one of which was investments in Canaan here in Connecticut, and said we don't -- "There's no need for a prejudgment attachment because these very assets can be utilized to pay terrorism victims' suits."

So not only are these assets clearly and incontrovertibly, and the PLO never objected to our characterization of these assets as PA assets, but they have specifically pledged these assets in a series of affidavits, and we've provided some of them to the Court, sworn by their own officials, that these assets can be used to satisfy terrorism judgments.

THE COURT: Was an action brought by the Ungars with respect to the death of the husband and wife, in the Israeli courts?

MR. STRACHMAN: Only a post-judgment, to domesticate this judgment.

THE COURT: Post the Rhode Island judgment, you're talking about?

MR. STRACHMAN: Right.

THE COURT: So it is the Rhode Island judgment that is the sole adjudication of the entitlement to damages from the PA and PLO, insofar as the deaths of the two Ungars are concerned?

MR. STRACHMAN: Correct, and, in fact, one of the -- the aspect of the case with respect to Yaron's wife was dismissed. She was not an American citizen. Yaron was an American citizen, so although the action was initially brought on behalf of both estates, and the heirs and relatives of both husband and wife,

mother and father, the case with respect to Efrat was dismissed early on, I believe in 2001, the summer of 2001.

THE COURT: So the judgment in Rhode Island is a judgment on behalf, or in the name of the estate of Jerome (phonetic) Ungar?

MR. STRACHMAN: About two and a half percent of the judgment is with respect to the estate. The remainder, 97 and a half percent of the judgment, is with respect to all of the other plaintiffs.

The statute in question, 18 U.S.C. 2333, allows cause of action for heirs and relatives directly, not simply heirs as takers from the estate. They have their own cause of action, so the overwhelming majority of the suit, for instance, is as a result of, for instance, the two children, and the two children, who are the orphans of the Ungars and, of course, the damages are trebled, so the -- when you have the whole -- you know, the brother, sister, parents and children, the damages are approximately 38 million dollars, that was trebled to the hundred and --

THE COURT: But I take it that Mrs. Ungar was not an adjudicated plaintiff because of her lack of American citizenship, --

MR. STRACHMAN: Exactly.

THE COURT: -- and not coming within the federal statute?

MR. STRACHMAN: Exactly.

THE COURT: Okay. All right. I think I understand.

Now, in relation to, therefore, the question of where do we go from here, I take it that on behalf of the judgment creditors created by the Rhode Island judgment, what you simply want to do is reach the assets in the name of the investment fund, in the Canaan entities, or one or more of them, for the purpose of satisfying that judgment?

MR. STRACHMAN: Effectively, yes, and we first were in Rhode Island following a subpoena sent to Canaan in the series of information that Canaan provided to us. We had proceedings going on in Rhode Island.

THE COURT: That's the clarification motion in Rhode Island?

MR. STRACHMAN: No, Your Honor. This was a -- I think a -- Initially, it was a request for a receiver, approximately a year ago, that was pending in Rhode Island. I think that was September of 2005.

Canaan first came to Rhode Island and demanded that the Rhode Island court determine whether,

in fact, it was subject to a restraining order that the -- that Judge Legur had issued, a nationwide restraining order with respect to all PA, PLO and affiliates' assets. They then asked this court to handle this matter, after we had filed and obtained from the court, executions against the PA and the PLO.

They came to court here. They asked to trifurcate these proceedings, after a conference -- Well, last year we -- it was -- I guess the Court issued an order indicating that we would proceed on that trifurcation issue, not allowing us to get to the merits of the proceedings, but dealing with, apparently, in a sense, a motion to dismiss, which was before we even laid out our case, which is sort of awkward, that they are telling the Court what we are going to argue, before we argue it, number one; and number two, the issues that were raised by Canaan in their motion are now moot, and they're moot for a couple reasons.

The two main reasons -- The two main issues that they raise, is this issue that the PIF and another entity, called Becont, should be joined into this proceeding. They've entered these proceedings. They've come to court. Becont filed a motion last week, and --

THE COURT: Well, but why is that necessary, and maybe this is a question more appropriately put to Canaan counsel, but Canaan has an investment, apparently, in one or more of the entities, or may have, in the name of the PIF and, if I understand correctly, they may also have an instruction that -- with respect to the PIF investment, that payments in the form of investment returns be made to an account that is in the name of Becont.

What I'm not convinced of, and I suspect is the more appropriate way to deal with the matter, is that -- is to treat Canaan, in effect, as a stakeholder, without it being obliged or entitled to litigate the question of whether the investment in the name of PIF is indeed an investment owned by, or reachable by the judgment creditors, by virtue of the reality of the PIF investment being reachable, because of the relationship between the Palestinian Authority and the PIF.

MR. STRACHMAN: As stakeholders, they should have no -- no dog in this fight, if you will. They should be responsive to whatever orders come from this court, and instead, what they initially did was effectively come to shield the PA and the PLO, the judgment debtors, from us reaching their assets. That

has become even more awkward, and now moot, because the entities have entered this court on their own.

Becont has made an appearance here.

The PIF is represented by Mr. Tolchin, pursuant to the order of Judge Lagueux, which transferred all of the interests of the Palestinian Authority, excuse me, of the Palestinian Investment Fund, to the judgment creditors. We have --

THE COURT: I don't see anybody who's appeared here today on behalf of either the PA or the PIF.

MR. STRACHMAN: Your Honor, Mr. Wright and Mr. Tolchin both represent the PIF. They have filed a joint pleading in this case, with the plaintiffs, I believe, and they have asked, you know, for a determination with respect to the PIF, but what we also have is --

THE COURT: Well, if I understand correctly, that's based upon the judgment, the final judgment entered in Rhode Island, which, in effect, at least on its face, purported to vest in the Ungars, the, in effect, ownership interest and management, among other things, of PIF.

MR. STRACHMAN: Exactly, and I just wanted to add, not only was the -- did the PA not object, the

Palestinian Authority not object to the transfer, if you will, or the entry of that order, it's not appealed that order, it's taken no action subsequent to the entry of the order, so we have the PIF here represented by Mr. Wright and Mr. Tolchin.

We also have a law firm coming to the Court and saying, "Hey, we were hired by the PIF previously" --

THE COURT: Well, I understand. LeBoeuf claims that it was retained to represent the PLAF, so therefore, there's a dual representation, if you will.

MR. STRACHMAN: But the issue, in terms of whether they're here, and the relationship with Canaan, is crucial.

Canaan, and the sort sword that Canaan is thrusting toward the plaintiff, as the Court, I think, sort of suggested a few minutes ago, is now inappropriate. The parties are here. They're here whether they were joined, whether they had to be joined, and we disagree with that because the Connecticut statute says they're only entitled to notice, and they were given notice, and we asked the clerk to give notice, although Canaan failed to ask, to the best of my knowledge, asked to give that notice. They know these proceedings, but more importantly,

they're here.

Becont came to court, filed an entry of appearance, filed a request for determination last week, so has the PIF, so Canaan's should sit passively as a stakeholder.

Along the last year and a half, what they have threatened to do is to dilute the interests of the Palestinian Investment Funds pursuant to their partnership agreement, which would create a greater ownership, if you will, in the partnership (inaudible) in the other partners of the PIF, but I -- we agree entirely with the Court's analysis.

THE COURT: All right. So that you're not -- From the plaintiffs' point of view; that is, the Ungar's point of view as the judgment creditors, you are not concerned with, or see any need for, from your point of view, for the adjudication of these various issues, including who's going to represent the PIF, and who -- and whether the adjudication appropriately reaches and adjudicates the ownership of PIF by the Palestinian Authority, so that you, on behalf of the judgment creditors, can reach that, as an asset to satisfy the judgment that has been rendered in the Rhode Island court.

You don't have any objection to that

procedure, I take it?

MR. STRACHMAN: Well, what -- we feel that the Canaan motions, for instance, that (inaudible) sort of driving force, if you will, following the conference we had with the PJO last year, are now moot, and those issues should be decided or denied, and the debt since then should be cleared, with respect to the stakeholder, and with respect to our motion, there has been a turnover motion filed, and a request for the appointment of a receiver.

In the interim, what has happened is the LeBoeuf firm has gone to Rhode Island and filed a lawsuit against the plaintiff's, a separate suit against the plaintiff, seeking to deal with the issues with respect to control of the PIF.

At the same time that that action was filed, I believe last week, a separate action, the original suit against Judge Legur, there's also a matter pending with respect to control of the PIF, because we've asked for the ability to disclose certain items that we received pursuant to a subpoena, and then a confidentiality agreement.

So engaged in two fashions in Rhode Island, is the issue of control of the PIF.

THE COURT: Well, the only thing that would

be accomplished in that respect, if I understand correctly, is that having been retained as they claim, by the parties that represent, in reality, the PIF, the LeBoeuf firm would contest the reachability of the funds in Canaan, by the judgment creditors, whereas the representation of the PIF, by virtue of the judgment -- final judgment in the Rhode Island court, by which Mr. Wright and Mr. Tolchin, if I understand correctly, claim to represent the PIF now, and have told LeBoeuf to get out, that representation would result in a -- in effect, an acquiescence in the Canaan funds, or investments of PIF being turned over to satisfy the judgment.

Am I correct about that?

MR. STRACHMAN: I believe so.

THE COURT: Because if I understand correctly, if I remember, it's Mr. Wright who has filed a -- an acquiescence in the turnover order.

MR. STRACHMAN: Correct, Your Honor. I believe that's correct. Right.

But we find, I think --

THE COURT: So therefore, the question of who represents legitimately, the PIF, that's got to be resolved before your claim to reach the PIF assets as, in reality, assets of the Palestinian Authority is a

precursor to your entitlement, because either you're going to face a contest from the one firm, as opposed to a -- an acquiescence in your entitlement from the other, which would be -- would necessarily require a determination, either of the true ownership of PIF by virtue of what Canaan has had represented to it, and on which the LeBoeuf firm relies, as opposed to the Rhode Island judgment that on default, the ownership interest in the PIF has been vested in the Ungars, if I can lump them together.

MR. STRACHMAN: We filed, Your Honor, a motion to strike the law firm's motion, here, several weeks ago. We find -- I think we can asense (phonetic) from our perspective, it would be helpful to take a half a step back, Your Honor, and to look at this in a sort of macro sense.

After six and a half years of litigation, trips to appellate courts, all kinds of motions to dismiss, 400 pleadings, these victims sued certain defendants and came to judgment.

We now find ourselves in a very simple, in a lot of ways, post-judgment collection proceeding, however, all muddied and marred up by the stakeholder on the one hand, and a law firm on another hand. It -- There's a certain, you know, absurdity to this

predicament.

THE COURT: Well, but there's a difference between the LeBoeuf posture and Canaan's posture. You may very well be correct that Canaan is going to perhaps extremes, in representing and defending its position, to try to make sure that if there's an adjudication that results in the application of the PIF investment to satisfy the judgment from Rhode Island, that it doesn't suffer repercussions elsewhere.

Frankly, my sense is that that can be relatively simply accomplished by either a determination of the interests, as per the motion that's pending, or by an interpleader which, for all intents and purposes, accomplishes and involves the same thing, because in either instance PIF, wherever it can lawfully be noticed, should be aware of, if it isn't already, that proceedings to reach the Canaan investment of PIF, and they have an opportunity to contest the question of whether that asset is truly an asset of the Authority, and therefore available to satisfy the judgment from Rhode Island.

MR. STRACHMAN: If I could speak to that for one --

THE COURT: Yeah.

MR. STRACHMAN: -- second, Your Honor.

When this -- When we initially obtained a ex parte injunction from Judge Lagueux, with respect to all of Palestinian Authority assets, I believe that was in April of 2005, and then subsequently a permanent injunction, and I believe that was (inaudible) of 2005, Canaan was obviously served a copy of the injunction, Canaan immediately notified its partner, Palestinian Investment, and told them -- and said that, "We have this restraining order. We can't make distributions to you. There are quarterly distributions from this partnership." So --

THE COURT: That was the letter to Mr. Walid somebody?

MR. STRACHMAN: Exactly, Walid Nija, and they were immediately notified of the restraining order and the affect that it had with respect to Canaan, and the way Canaan interpreted the restraining order.

That was 18 months ago. No action was taken by PIF in 18 months. I don't know for sure, but we have asked Canaan, and we did not get a response, as to whether they notified the PIF about this (inaudible) this Connecticut proceeding, as is required under the Connecticut statute for determination -- 52-356(c).

When we did not get a response, or didn't -- could not figure out whether they provided notice under

the statute, of the proceeding they started, this determination of interest and disputed property, we wrote to the clerk's office of this court, giving addresses of the PIF, saying the statute suggests that the clerk's office would notify the PIF. I don't know if that occurred because we never got a response from the clerk's office. That was -- it's got to be a year ago that we made that request.

So I presume that happened, but for sure, when the distribution was supposed to come in the spring or the summer of 2005, and Canaan felt the strain by Judge Lagueux's restraining order, to issue those funds, they were immediately notified. They were told, "Here's a restraining order. We cannot give you these funds because of this Rhode Island restraining order."

THE COURT: Now, to whom did you refer the clerk, for the purpose of giving notice to the PIF?

MR. STRACHMAN: I believe it was Mr. Najjab and Mr. Rashid, Your Honor. I don't have that letter in front of me, but I believe that's --

THE COURT: What's the other fellow's name? Rashid is one. He was the one that was involved in the transfer of the funds into the PIF, wasn't he?

MR. STRACHMAN: Exactly. Exactly.

THE COURT: Who's the other one?

MR. STRACHMAN: Mr. W-A-L-I-D N-A-J --

UNIDENTIFIED SPEAKER: J-J-A-B.

MR. STRACHMAN: Those are the PLO and PA's money men. Those are the men who run all of their finances, and all of their different investments in different --

THE COURT: That's -- If I recall correctly from the papers that I've reviewed, that's documented by their conduct and by their various statements, including in the -- in response to the banks, or the other Arab countries in the statement of assets, if I recall correctly, and in the effort to avoid a prejudgment remedy in the Israeli courts, they purported, in effect, to act in a representative capacity, as far as the PIF is concerned, but I take it, contrary to the way we do things in this country, when you want to find out who the true representative of a corporation is, you go to the secretary of state and you find out who's filed.

I would presume, from the chaos that I understand exists over there in the Middle East, that that sort of a procedure may very well not have been followed, and may not be available to you, so you're -- the question of who represents PIF is based upon the

things that I've referred to earlier?

MR. STRACHMAN: It's based on their own documents, --

THE COURT: Yeah.

MR. STRACHMAN: -- many of which we received -- I think 2,000 we received from Canaan (inaudible) of their own transfers of funds back and forth, about their own representations.

In fact, several weeks ago it was, I think, down or terminated, but they had a web site, and the web site described very proudly, in a very detailed fashion, and provided yearly audits -- --

THE COURT: The only trouble --

MR. STRACHMAN: -- purported audits of PIF funds.

THE COURT: The only trouble with web sites is that they can be penetrated and substituted for, in this day and age, electronically, by any number of skillful people, as far as computer use is concerned.

MR. STRACHMAN: Well, in this case, Your Honor, there's been no allegation of that. In fact, --

THE COURT: I understand.

MR. STRACHMAN: -- when we presented to Judge Lagueux, the information from their own web sites, from their own representations, that certainly was never an

issue.

THE COURT: Before I can get to a procedure by which the merits of your claim, that on behalf of the Ungars, you can reach the asset that's entitled in the name of the PIF, in the hands of Canaan, is there anything else, other than the question of who represents the PIF, that you think needs to be adjudicated, for the purposes of your accomplishing your purposes?

MR. STRACHMAN: I don't believe so.

THE COURT: Okay. All right.

Then let me find out if anybody else has any different thoughts.

MR. STRACHMAN: Thank you, Your Honor.

THE COURT: All right.

Maybe the best thing to do at the moment is -- I understand what the basis of the claim to represent the PIF that is made by Mr. Wright and Mr. Tolchin, but I'm not sure -- except for the recitation of a request to the LeBoeuf firm to represent the PIF, I don't know what -- the basis for that firm's concept that they have an obligation to the PIF.

Mr. Rohback, you tell me. In other words, who says so?

MR. ROHBACK: Fair enough, Your Honor. Thank

you.

THE COURT: And I'm sure you're not the PIF, but you're -- somebody called or wired, or did something.

MR. ROHBACK: Exactly, Your Honor.

May it please the Court, my name is Thomas Rohback, and I'm here today on behalf of LeBoeuf.

THE COURT: Well, let me stop you there for just a minute.

I have your motion to intervene.

Why is it necessary to get involved with your firm, as a party, as opposed to just purely being (inaudible)? In other words, why can't the dispute, and I understand what you -- you challenge the validity of the order by the judge in Rhode Island, by which you're getting competition in the representation of the PIF, but why couldn't that just simply be resolved by your entering either a personal appearance, if you're qualified to appear in this court, or as pro hac vice, if that's what's necessary because you're not a member of the Bar of this court, doesn't make any difference to me, one way or the other, how we handle it, but if you -- if an appearance is entered on the basis of your contention, which you're about to tell me about how it came about that you got sucked into this thing, and

noting that the conflict between your representation and the representation in the alternative, based upon the Rhode Island order, why can't that be resolved by a simple motion, maybe cross-motion, to strike the opposing appearance, on the basis that yours is bona fide, genuine, and not vitiated by the final judgment in Rhode Island, pursuant to which your opposition surfaces and contests your representation of the PIF, having in mind that the ultimate problem is going to be whether the PIF takes a dive on the question of its assets in the -- or investments in the -- Canaan can be used to satisfy the judgment against the Palestinian Authority, as opposed to your being obliged to contest that on the -- on whatever basis exists in the facts and the law, that would preclude the PIF investment being used to satisfy a judgment against the Palestinian Authority?

MR. ROHBACK: There are a lot of questions built into that one question.

THE COURT: Well, of course, of course.

MR. ROHBACK: Let me try to answer them.

Your Honor, I'm not sure any one way is the right way to address this. It's almost like a law school exam. It's a complicated situation.

THE COURT: I'm just trying to simplify it.

MR. ROHBACK: And I have no robe, Your Honor.

THE COURT: -- both in reality and as a practical matter, I don't pay any attention to threats.

MR. ROHBACK: I appreciate that, Your Honor. I don't have that type of immunity, nor does my firm, and so when some member of the Bar --

THE COURT: Well, if you think you're right, you can ignore him.

MR. ROHBACK: Well, if you think you're right, you can ignore him, but this may be a safer way to do it, Your Honor, and I think what I wanted to do was to bring to the Court's attention, that there is a threshold issue, and that threshold issue is, "Who rightfully controls the PIF, so that that entity can hire or fire counsel, and choose to appear in this proceeding, or choose not to appear in this proceeding on its own behalf, to choose to contest a turnover, or to choose to just acquiesce to the turnover?"

The threshold question that we had, was we were asked -- my firm was asked to represent the PIF, and within a couple of days of my sending a letter to the Court saying, "We've now been contacted by the PIF. We want to be heard," that was just my way of simply letting the Court know, at that point, truly, Your Honor, and I said -- I think I said this, I didn't have

THE COURT: So your authorization and -- to proceed as counsel on behalf of the PIF, comes through your partner in the law firm who, in turn, was in communication with somebody who purported to act for the PIF, and requested the retention and the representation?

MR. ROHBACK: As of that (inaudible) I think he was the general manager of the PIF. So, this is a person who has that authority, or we certainly believe he has that authority.

At that point, I took a look at the transcript and tried to get a little look at what happened in Rhode Island. The PIF was not a party to the Rhode Island proceeding. It was not on notice of what was going on in Rhode Island, and what happened there, Your Honor, would be akin to the following.

If the Ungars filed a case against Bill Gates, and said, "We're suing you for a hundred million dollars" or "seventy-five thousand dollars," and Gates said, "I'm gonna default on that," the judge in Rhode Island could enter a default up to the amount of the judgment, $75,000. He could not say, "You now own MicroSoft." He went way too far and --

THE COURT: Well, of course that raises some serious questions as to the legal efficacy, including

MR. ROHBACK: I'm not -- The truth, Your Honor, is I'm not quite sure, and I think I said this in my letter -- my initial letter to (inaudible), I'm not quite sure --

THE COURT: Yeah.

MR. ROHBACK: -- the best way or how. I haven't had the opportunity to take time and say, "How should we proceed with this?" I've been fighting kind of a defensive situation right now, where I'm getting turnover orders and acquiescences and consents at the same time. What I'd like to be able to do is say, "Fine, let's figure out the best way for the PIF to appear in court too, as you can divine, say no, the assets that are within Canaan should not be turned over." Maybe they're not within the Court's jurisdiction. Maybe they are in the Netherlands Antilles.

You know, these are questions that are going to be raised, and PIF, in one forum, would want to raise those. I don't want to preclude any defense that the PIF may have, through a precipitous act, and therefore, I'd like to do that in a measured basis, having had a chance to consult with the PIF, but what we had intervening -- truly intervening, has been the Ungars, saying that they now are the PIF.

I look at the order from Rhode Island and say, you know, "There are a lot of problems with that."

THE COURT: Well, I understand, and I'm not suggesting that you should do anything particularly, that I might suggest, just simply because that is not a judgment that's based on a thorough and complete review and understanding of the potentials, as far as the PIF is concerned, so I'm perfectly content to leave that to you to decide how to do it. I just want to get to the thing as simply as possible.

MR. ROHBACK: And, Your Honor, I was hoping that even though it may be a bit different, a little bit unorthodox to have a law firm come in and move to intervene, it is a way for us to get this issue before the Court, as to who's the counsel, which goes to this -- the real question, "Who has the right to hire and fire counsel?", which goes to the question, "Did the Rhode Island court properly, and could it really transfer the entire ownership of the Palestine Investment Fund to the Ungars?"

THE COURT: Yeah, and, of course, one of things that you're going to have to deal with is the question of whether, having in mind the order that was entered, the judgment that was entered in Rhode Island, whether you can legitimately attack the effect of that

judgment on proceedings in this court, without going back to the Rhode Island court to challenge the validity of the order that was entered there.

MR. ROHBACK: Your Honor, you're absolutely correct and --

THE COURT: Because I may be -- I may have some obligation. I don't know. I haven't looked into it, but I may have some obligation to honor the judgment that was entered there, and leave you to your own devices to deal with that, even though you may legitimately raise some questions about its validity.

MR. ROHBACK: And, Your Honor, in that regard, I'm cognizant of the fact that courts in sister states, that sit within sister states, and the federal courts, in general, have an obligation to give full faith and credit to other decisions, but those are decisions that can be collaterally attacked, where a judge in one court looks at the decision of a judge in another court, and says, "You know what, he went too far. I'm not gonna do that," and if you look at the transcript of what happened in Rhode Island, the judge -- it's a very interesting transcript.

Judge Lagueux, in Rhode Island, was saying, "Look, I'm gonna issue this order, but this is for the judge in Connecticut to decide. These issues are for

the judge in Connecticut to decide," and at the end of the day, even though that was what he was saying, he was presented with an order on a default basis, when no one from the true PIF was there to say, "No, don't sign that piece of paper, Your Honor." He was presented with a piece of paper saying, "Please sign this order that gives us all of MicroSoft."

THE COURT: Well, he notes it as entered, in reality, against the Authority, because the Authority was the only party up there in Rhode Island, --

MR. ROHBACK: That's correct, Your Honor.

THE COURT: -- and the PIF was -- it's a little difficult to me, to see how you can default somebody that's not a party to a case.

MR. ROHBACK: Well then (inaudible) more part of the problem, Your Honor. He has the PA and the PLO before him. They default. The PIF is not before him, and yet somehow he's determined that the entire ownership of this corporate entity has changed.

THE COURT: Okay. Well, however it's to be resolved, I leave that to you, but I think that I ought to put some deadline in order to get the thing moving, and I --

MR. ROHBACK: Two ways we can do that, Your Honor.

I -- One is for this Court to decide, as a collateral attack issue, whether or not the Rhode Island decision is valid and enforceable, to the extent it purports to give control of the PIF to the Ungars. I think this court certainly has that authority. That will get a threshold issue cleared away, and we can deal with other issues that has to do with representing the PIF, and get on with it.

The other thing is the Rhode Island court can decide that, and we have filed -- as Mr. Strachman mentioned, we have filed the -- a case in the name of LeBoeuf, raising these same issues, before the very judge who did this because, once again, the Ungars are very aggressive in what they're doing. They've appeared before Judge Lagueux now, in Rhode Island, saying, "Well, we want now to have consent to open up some things" that are -- "that were filed under seal. Because we're the PIF now, we want to see them," and we're trying to get -- We also appeared --

They have a case in front of Judge McMahon in New York. We filed the same motion to intervene there because, again, things were moving very quickly. Judge McMahon in New York, said, "I'm not gonna let you intervene, although" I'm gonna let -- "I'm gonna give you permission to renew the motion, but nothing will

happen in this case until the relevant court decides who represents the PIF, or who owns the PIF."

So she took that tact. I believe she could have said, "I'm gonna decide as to whether or not the Rhode Island court went too far in its order, and not enforce that here, because I give full faith and credit to those orders that are valid, but not to those that have gone too far.

So I'm trying to do everything I can, as quickly as I can, to get this issue -- this threshold issue resolved.

THE COURT: Have you sought to expedite the resolution of the matter in the Rhode Island court, in the separate lawsuit that you've brought?

MR. ROHBACK: No, Your Honor. We filed it, I believe, November 17th. As I said, I'm trying to move as fast as I can on all these issues, but what I did not want to happen is for any court, this court, the court in New York, to issue an order where there is some type of Kubuki Theater going on, where a plaintiff comes in one day and says, "I'd like to have a turnover," and the same day the same lawyer comes in and says, "Yeah, I represent the defendant, and by all means, please take this -- take all my documents" --

THE COURT: Well, I -- I'm not sure that my

instinct is correct, but my instinct is that at least an effort should be made in Rhode Island, because then you can avoid -- if the -- the final judgment, to the extent that it involves PIF, can leave them standing, as far as anybody else is concerned, but as far as PIF is concerned, if the validity of that order, as reaching the ownership of the (inaudible) can get reviewed, it would avoid all of the problems of -- that would be -- I would have to confront, not the least of which is that I have to go to Rhode Island.

My son lives in Rhode Island and, you know, I don't want Judge Lagueux standing there at the border with a state policeman in hand, as I cross the border en route to make simply a social visit.

No, I'm only kidding.

MR. ROHBACK: No, I understand.

Your Honor, we haven't done anything to expedite it, didn't even think of that. I -- We've been -- We've truthfully been kind of hustling just to get papers filed.

THE COURT: Well, I think that in order to flag the question, and I don't know what the Rhode Island judge has in the way of an approach. He's a senior judge and there is less of an obligation to respond somewhat, as a practical matter. I'm not

suggesting any evasion on anybody's part, but if you need to be reinforced in the concept of the appropriateness of getting an early resolution of the issue that we've identified, you're certainly at liberty to point out that the matter is (inaudible) intrinsic to the case that I have here, and that in my view, in order to simplify the matter completely, or somewhat, that the earliest possible resolution in Rhode Island would certainly be of assistance to the parties, as well as to the Court here.

MR. ROHBACK: In that regard, Your Honor, we have done that, to the extent that our Rhode Island counsel has written a cover letter to the judge, letting him know that this is an issue, and also letting him know, as we put in our papers, that Judge McMahon, in the New York case, has held up and deferred and said, "We're gonna wait until we hear from the relevant Court," which, at this point, I assume is Rhode Island, but it well could be Connecticut.

THE COURT: Well, I quite agree with Judge McMahon's view in that respect, and that's why I suggest that although I -- I'm a -- more of a believer in motions than letters, simply because letters tend to go astray, but motions are there as part of the court docket and (inaudible) to be dealt with --

MR. ROHBACK: Your Honor, I --

THE COURT: A motion for -- to resolve the matter, accompanied by a motion for an expedited hearing, would probably be the most appropriate way to achieve the earliest possible resolution, which would simplify the proceedings here.

MR. ROHBACK: That certainly is possible, Your Honor, --

THE COURT: And that's why I say I have no qualm about your communicating the thought here, that in deference to the Court in Rhode Island, as well as because of the fact that this matter has been dragged out as much as it has, that I'm somewhat anxious to move, in response to the interests of all of the parties, to get the matter resolved that's pending before me, and therefore, to accomplish that purpose, it would be helpful if the earliest possible determination is made on the challenge to the order, insofar as PIF is concerned.

MR. ROHBACK: We will move with alacrity, Your Honor, and I would be surprised if the Ungar's counsel isn't already preparing some sort of a motion that brings us before the judge quite quickly.

THE COURT: Okay. All right. Well, I'll leave that to you to work out.

Is there anything else that you think, Mr. Rohback, that I should deal with and resolve, in order to expedite the resolution of the matter before me?

MR. ROHBACK: The only thing that you could do to expedite, Your Honor, would be to rule that the Rhode Island decision went too far in conferring --

THE COURT: Okay.

MR. ROHBACK: -- this ownership interest on the PIF.

THE COURT: All right.

Well, I think I will defer on that for the moment. I've got the papers that both sides have submitted, and the question of whether the matter can get resolved up in Rhode Island earlier is one I'll wait and see on, but not inevitably, am I going to wait.

MR. ROHBACK: Very good.

THE COURT: Well, I just have the impression that -- and it's one of the things that always bugs me about the functioning of the courts, is this goes back to a death that occurred ten years ago, and it is not in keeping with my concept of justice. Whether the Ungars are entitled to anything or not, is not really the issue at the moment. They've got a judgment, but the point is that either allowing the parties to stall

on the matter, or for the Court itself to fail to respond expeditiously, and I think there's some problem in that respect, as far as I'm concerned, in this matter, because this matter's been pending here for over a year and has not gotten very much attention, for a number of reasons, but I'm going to correct that because I don't think it's appropriate.

MR. ROHBACK: Your Honor, I understand that. I respect that. I -- Certainly, the last thing that I'm looking to do is to slow down justice. I'm simply here, as I said at the outset, because we were contacted --

THE COURT: Oh, sure.

MR. ROHBACK: -- by the PIF.

THE COURT: Well, you're --

MR. ROHBACK: They're entitled to have their day in court --

THE COURT: Your situation is complex, but it's legitimate.

MR. ROHBACK: Thank you, Your Honor.

THE COURT: All right.

Now, let me find out from counsel representing Canaan, that's, I guess, Mr. Maslan and Mr. Alessi?

MR. ALESSI: Yes, Your Honor.

THE COURT: You've been sitting there quite patiently.

Why shouldn't, however, I regard Canaan's posture as simply a simple situation of a stakeholder, having in mind that it is ultimately my recognition that Canaan is somewhat more involved, by virtue of the complexities that may come to give rise to something other than the simple handing over of the asset as a stakeholder, to whoever is adjudicated to be entitled to reach it, whether that's the Ungars or whether that's the PIF?

MR. ALESSI: Your Honor, Robert Alessi from Cahill, Gordon on behalf of Canaan.

THE COURT: Go ahead.

THE COURT MONITOR: Your Honor, if he can go to the microphone.

THE COURT: Yeah, you want to get to the -- There's a microphone on the floor there someplace, but you can go to the podium if you want to, Counsel.

There is a microphone -- There are two, I think, sitting there on the floor. What they're doing on the floor, I don't know.

THE COURT MONITOR: (Inaudible.)

THE COURT: Oh, yes. Yeah. Okay.

Go ahead.

MR. ALESSI: Your Honor, if I may take a step back. I think it's important, for the sake of clarity, for this Court to understand how Canaan (inaudible) became involved in this, and how and why it's been mischaracterized.

April or May of 2005, Canaan is not a party to the underlying Rhode Island lawsuit. It is served with a -- I believe a temporary restraining order, followed by a notice of injunction, attached to which is an injunction.

At that point, Canaan responsibly, responding to a federal injunction, said, "We will" -- the way it was worded, at least in the notice, "We will freeze the distributions that we would otherwise make to three entities, to PIF, to Becont and to the Palestinian Pension Fund, which has since reached a settlement, and been dismissed from this proceeding.

Shortly thereafter, Canaan was served with a subpoena referenced by plaintiffs' counsel, for documents, and it complied with that subpoena, and it provided the documents.

Shortly thereafter, Canaan went into the Rhode Island court to make the request that it has made for the past year and a half in connection with this proceeding, which is to simply ensure that due process

is followed.

The initial question that Canaan raised for the Rhode Island court was, "Your Honor, please clarify that Becont, PIF and the pension fund, in fact, fall within the scope of your injunction. We don't want to run afoul of the federal injunction, but we would like some clarity."

Unbeknownst to Canaan, by the time that motion came up for a hearing, Mr. Strachman and his cocounsel had commenced this proceeding in this court.

Ultimately, the motion for clarification filed by Canaan in Rhode Island was withdrawn, so that all the issues could be adjudicated in one forum, this court.

In August of 2005, a writ of execution was attempted to be served upon Canaan.

Your Honor, at that point, I believe it was late August, or mid August 2005, a state marshal, Connecticut state marshal, I believe, appeared at Canaan's office and said, "We have a writ of execution. Turn over to us, the assets that you are holding in the name of Becont, PIF and the Palestinian Pension Fund," notwithstanding that none of those three entities were judgment debtors in the Rhode Island action.

At that point, or shortly thereafter, Canaan,

I believe on August 31, 2005, filed a motion for determination of interests. In that motion, Your Honor, the following requests were made:

One, that Becont, PIF and the pension fund be joined -- be deemed to be indispensable parties under Rule 19 and, in fact, be joined in this proceeding.

Alternatively, if this Court were to find, for whatever reason, personal jurisdiction issues -- subject matter jurisdiction issues, that it was not feasible to join those entities, that the proceeding be dismissed. All --

THE COURT: Why wouldn't the proceedings be somewhat, not vastly, simplified by the -- including your due process concern, by serving on the three: Pension fund, the investment fund and Becont, a copy of the execution writ, with whatever explanation you wanted to accompany it, to describe the status of the matter, which would thereby put the three Palestinian entities on notice that whatever investments they had in any of the Canaan (inaudible) were at jeopardy, which would thereby constitute the required notice of due process, and permit, perhaps with more intricacy than (inaudible) indicated, to comply with the Connecticut statute, to permit the three to take whatever action they wished, including request for

determination of their interests, if they saw fit, and thereby afford the second requirement of due process, to the three, to have a hearing to determine the very basic issue that's involved, and that is whether a judgment against the Authority can legitimately be levied against assets in the name of any one of the three.

Now, I understand, as far as the pension fund is concerned, that that's been resolved and out, and it may be that Becont is also out, if there is no asset in Becont's name insofar as Canaan is concerned, or any of the Canaan entities, and if that's true, whatever the PIF does, if it's the only one that pursues the matter, if there is an adjudication here, based on whatever is presented, whether it's a default on the part of PIF in failing to do anything, or whether it's a contest as to the propriety of a judgment against the Authority being levied against PIF's asset in Canaan's possession, if that matter is adjudicated in this court, in whatever form it is presented, why wouldn't that protect Canaan from any legitimate -- I can't insulate you against some other forum being used to attack Canaan's determination in that respect, including in the Netherland Antilles, if that's where they have to -- where they decide to go, but if you've got a judgment

that is entered here, in effect, authorizing and requiring Canaan to honor the judgment in Rhode Island, on the basis that what they are -- what Canaan is holding in the name of PIF is, in reality, subject to the Rhode Island judgment, by virtue of the Authority's relationship to PIF, why wouldn't that solve the problem?

MR. ALESSI: Your Honor, all along, since August 2005, Canaan has made that precise point. We have said the actual dispute -- the actual resolution of the underlying issue, is there a legal entitlement on the part of the plaintiffs, to reach the Canaan investments of Becont or PIF, is one to be determined, and it is one to be determined with Canaan sitting on the sideline, but there are a couple of procedural issues that Canaan raises for the Court, and needs to protect.

Your Honor, part of it is the way Canaan is structured. These are venture capital --

THE COURT: I understand.

MR. ALESSI: Okay.

THE COURT: It's --

MR. ALESSI: They are --

THE COURT: It's not like you standing there with PIF's money in your hands. It's -- I understand

the complexity of it.

MR. ALESSI: There are periodic, not quarterly, necessarily, but periodic distributions that are made, depending on when certain investments are liquidated, when there's an IPO in a portfolio company, or a company is sold and there will be a distribution.

There are contractual rights that Canaan have. I think I heard Mr. Strachman use the phrase, "Canaan threatened to dilute" --

THE COURT: Well, I understand that under the -- whatever terms and arrangements that were made when the investments were made with Canaan, that there were thereby created, certain contractual obligations and, of course, Canaan has the right, to the extent that the execution might affect those contractual rights, to get an adjudication of them in some form that would protect it, as far as its interests are concerned.

MR. ALESSI: May I respond, Your Honor?

THE COURT: Yes, go ahead.

MR. ALESSI: Yes and, in fact, as of this point in time, there are millions of dollars in capital contributions that have, for whatever reason, have not been made by PIF, and I believe Becont, but let's focus on PIF.

Under the partnership agreements, Canaan has

the right to dilute the investment interests in a limited partner that does not make those capital contributions. They are in default, therefore, Canaan is contractually able, and has the right that it negotiated for, to dilute those interests in the one fund, Canaan Equity III, I believe is the one that's not fully funded, to zero.

In addition, Canaan retains a contractual right to approve or disapprove the transfer of a limited partner's interest in Canaan, to some other partner. We are concerned, not as to the underlying decision, whatever this Court ultimately decides as to whether plaintiffs are entitled to those funds, Canaan will certainly abide by that decision, but it doesn't want its preexisting contract rights to be compromised in any way.

THE COURT: Well, you've got both a practicality involved, as well as a legal theory involved. Your -- Let's say, for the sake of discussion, Canaan is right now holding, let's say, ten million dollars of PIF funds, in the form of its limited partnership interest, and any accumulated distributions that have not been distributed as per the April letter that was sent, indicating that you were not gonna make those distributions. Okay, fine, and

Canaan, on its own behalf, determines to file a request for a determination of its interests in the funds that it holds, as opposed to having some obligation to turn them over if the plaintiffs, the Ungars, prevail, why wouldn't the opportunity to the PIF, assuming that it is given notice, as I've somewhat suggested already, and an opportunity to come in, and it's ultimately determined that the ten million dollars goes to the Ungars, but with a reservation that in no way does that determination by this Court constitute any release or discharge of the PIF, from any contractual obligations that it may have insofar as the Canaan investment contract is concerned, in which instance the ten million dollars goes to the Ungars, whatever retroactive obligations of the PIF for capital contributions that may be due and owing at the moment, and any that accrue in the future, are preserved, good luck to you in finding the money to satisfy them, but they're preserved, and you can pursue them to your heart's content because, in effect, what was decided here was in no way a release or a discharge of the PIF, of those contractual obligations.

Now, what I'm, in effect, saying, is it would seem to me very likely that a -- an -- a determination on the very simple fundamental issue of whether the

funds in Canaan's hands now, can be reached by virtue of the relationship between the Palestinian Authority and the PIF, but without in any way jeopardizing the contractual rights that Canaan has.

MR. ALESSI: And I think, Your Honor, if I understand your question, on balance, we would agree, the actual funds that are sitting with Canaan now, that but for the injunction would have been distributed to the limited partners --

THE COURT: That's okay.

Excuse me. I'm just responding to the next matter that I've got to deal with at 1:00 o'clock.

MR. ALESSI: To the extent that Canaan is sitting with actual funds that (inaudible) would have been distributed to PIF, for example, but for the injunction, if there's a -- an ultimate determination by this Court, a judicial finding that says plaintiffs are indeed entitled to that money, I agree that that's not where the contractual issues arise, it would be going forward because these funds have several-year lives.

There would then be Canaan, which has fiduciary obligations, Your Honor, not only to the limited partners who've appeared here in this court today, but to the other limited partners in those

funds, and in discharging those fiduciary obligations, it cannot permit a situation to occur, where a limited partner, either because plaintiffs have stepped into the stead of PIF, as the holder of the Canaan interests, to not pay capital contributions on the one hand, and not be diluted on the other.

So if we have what I believe is a -- are preexisting contractual rights, we probably can get (inaudible).

THE COURT: Well, I understand that you would have contractual rights that would not only be enforceable against PIF, but would be the obligation of Canaan in relation to its other investors but, of course, that would all be taken into consideration in the adjudication that I've suggested to you, and it may be that the end result is that some of the principal invested by the PIF with Canaan, some of the accrued distributions that have occurred, but not been distributed, the adjudication, if it requires the full turnover of all of those funds to the Ungars, okay, fine, there may be an appeal to see whether I was correct in what I decided, if that's what I did, but -- or it may just go by the boards, in which instance it may be that Canaan will be unable to satisfy the obligations that PIF may legitimately owe to it, out of

the funds that are in Canaan's hands at the moment, but like anything else, you know, win some or you lose some, and if you lose the opportunity to use any of the funds in Canaan's hands, from whatever source, whether investments or distributions, so be it. You had an opportunity to be heard, you were heard, and it was found that the priority of the execution prevailed or didn't prevail, or prevailed in part, you know, which -- there's various ways that things could be resolved.

I don't predict the way it will be resolved because I don't have the matter before me at the moment, and obviously haven't looked at it. I can just see, however, that those alternatives would exist.

MR. ALESSI: And, Your Honor, in your hypothetical, of course, if this Court were to determine -- it were to rule that the plaintiffs' counsel represents PIF, and that the plaintiffs have become PIF, then in that hypothetical, Canaan would be turning over the in-hand distributions to the plaintiffs' counsel, and then seeking from plaintiffs, as (inaudible), as PIF, the capital contributions going forward.

THE COURT: Well, I just think that the way that the end result of the adjudication process, with what I have and will have before me, can be tailored to

protect Canaan from its perfectly legitimate contractual entitlements. In other words, I don't know whether the execution takes effect as of the time it was served, and that subsequent distributions were not reached, although prior-determined distributions, but not made, would be subject to the execution. I don't know.

An execution is in a way, not like a garnishment, that reaches with a future application, and I've never had the question as to whether an execution, as a going-forward kind of thing, you know, you leave the execution to accrue whatever additional assets it may reach, until the full judgment is satisfied. I can see that could -- argument could be made, but on the other hand, I don't know whether it's efficacious or not. I just have no experience to go on, and I just can think of it in those terms, in a very theoretical way.

MR. ALESSI: So, Your Honor, just in summary then, that has been the reason while -- why Canaan has, we think properly so, insisted, every step of the way over the last 18 or so months, that due process be followed, that there not be shortcuts, that plaintiffs not go into the court in Rhode Island and seek to circumvent the proceeding that they commenced in this

court, that we want to make sure that Canaan is protected as to the underlying decision. We leave that, obviously, to Your Honor, and we leave it to the parties (inaudible) that not to present to Your Honor, whatever evidence the Court wants.

THE COURT: Is there anything you can think of that -- short of my coming to deal with the ultimate issue of the ability of the Ungars to reach the PIF titled assets as in reality the property of the Authority, that should be dealt with before we actually get to the merits of the execution?

MR. ALESSI: Your Honor, off hand I can't think of anything other than, of course, that we have always viewed this issue as to the mechanics to be the last issue that this Court would never reach, if ultimately its decision is that the plaintiffs are not entitled to reach the Canaan Investment or PIF or Becont.

THE COURT: Okay. All right. I'm just trying to figure whatever should be dealt with preliminarily, in order to, in effect, have a clean slate (inaudible) as far as the merits are concerned. Okay.

MR. ALESSI: Thank you.

THE COURT: All right. Thank you.

Now, --

MR. TOLCHIN: Your Honor?

THE COURT: Yes.

MR. TOLCHIN: May I say a --

THE COURT: Well, I want to see whether there's anybody that -- among -- Let me just be sure. No, I guess I have exhausted the other interests that may be involved, and you are?

MR. TOLCHIN: I'm Robert Tolchin.

THE COURT: Yes, Mr. Tolchin, you're the author of all of those threatening letters that Mr. Rohback is so concerned about.

MR. TOLCHIN: There's only one threatening --

MR. MINCHELLA: Your Honor, just for the record, Anthony Minchella's here for Becont, and a lot -- a --

THE COURT: Yeah.

MR. MINCHELLA: -- a lot of the issues that have already been --

THE COURT: No, I didn't mean to shut you out, Mr. --

MR. MINCHELLA: That's fine, Your Honor. However you want to --

THE COURT: -- Minchella. You represent

Becont, and if I understand correctly, at the moment there's nothing pending that necessarily involves your client, but on the other hand -- and I don't know, have you filed a request for determination?

MR. MINCHELLA: Yes, Your Honor, along with a motion to dismiss for lack of subject matter jurisdiction, and then sort of on the heels of the motion for claim of determination of interest, a motion for a bond.

THE COURT: What was the third one? You got the motion to dismiss, the motion for a bond?

MR. MINCHELLA: And the claim for determination of interest in disputed property.

THE COURT: Well, is there anything of those that can't be resolved, and may very well be because, as I understand it, the question of whether the plaintiffs intend to pursue the assets in Canaan's possession, as properly being subject to the reach of the judgment in Rhode Island has, at the moment, not been actively put before the Court, and while there's been some suggestion that that suggests that a waiver of any further claim, in that respect, has taken place, which obviously the plaintiffs have not acquiesced in, but it may suggest that, in point of fact, you've got nothing to worry about.

MR. MINCHELLA: Unfortunately, I can always find something to worry about, --

THE COURT: Well, of course, of course.

MR. MINCHELLA: -- that's why we filed our papers last week, because checking the docket, we saw that the status conference was scheduled, and I think just to quickly address, because I understand Your Honor has a 1:00 o'clock proceeding, what I was thinking of is because of Your Honor's comments to Attorney Rohback concerning getting the issue expedited, as to who represents the PIF, and that that would permit then, this Court to get to the merits of the case, I think that in the interest of judicial economy, because getting to the merits is where Becont is going to be involved, that that has to be resolved, first as to who represents the PIF, and there's no need to really proceed with anything that Becont has filed, but then at that point I think the first thing that the Court would need to address, is whether or not there's actually subject matter jurisdiction over this ancillary proceeding, because Mr. Strachman started his comments out by saying, "This is an ancillary proceeding."

So that once we decide who represents who, and I certainly have a retainer agreement with Becont,

to represent it, we have to decide whether Your Honor has subject matter jurisdiction. If you decide that you do, I think the next step, and I'm not sure what Mr. Rohback is going to do, vis-a-vis the PIF, if it's determined that LeBoeuf represents the PIF, is to determine whether a bond should be put in place before Becont has to sit here and defend a claim that, you're right, hasn't even been articulated, as to why Becont's assets should be subject to the execution, and then if a bond is in place, we can go forward on the merits of the determination of the interest in the property.

THE COURT: Well, I'll tell you, my instinctive reaction was that the motion to dismiss really does not have merit. My inclination, further, is that a bond is not appropriate to require at the moment, and therefore, my inclination is to think that once the preliminary matters we've talked about with other counsel are resolved, we can get to the merits of the case, and without any further significant involvement on the part -- on your part, on behalf of Becont, because it may very well be that your petition to determine its interest is going to be resolved without any adverse consequences to your client.

MR. MINCHELLA: Well, that would be fantastic, Your Honor, but I --

THE COURT: Well, I know.

MR. MINCHELLA: -- can't sit -- sit here and just hope that that occurs, because there has to be some determination.

If Becont is a limited partner in two of the Canaan entities, certainly with the creditor's bill in Rhode Island, Mr. Strachman didn't mention Becont, or seek anything as far as --

THE COURT: I'm aware of that. That's why I was thinking of --

MR. MINCHELLA: I hope that that -- But I just need to be certain that Becont's interests are protected.

THE COURT: Well, you might very well approach plaintiffs' counsel and see if that can be formalized as a position. In relation to your client, that would vastly simplify the matter.

MR. MINCHELLA: I agree, and I'll do that, Your Honor.

THE COURT: All right.

MR. MINCHELLA: Thank you.

THE COURT: Okay. All right.

Now, Mr. Tolchin?

MR. TOLCHIN: I have a couple of very concise points that --

THE COURT: Yeah.

MR. TOLCHIN: -- I wanted to bring up.

To -- Mainly just to respond to a couple of things that were said, that I believe are misconceptions.

I apologize. I just got over a very bad cold.

What happened in Rhode Island mechanically, or schematically, was that the judge gave to the Ungars, the ownership interest that the judgment debtor, PA, had in the PIF. Whatever it was that the PA had, now belongs to the Ungars.

Now, --

THE COURT: But wouldn't that, Mr. Tolchin, be limited to the judgment (inaudible) -- wouldn't that be limited to the judgment that was entered on behalf of the plaintiffs?

MR. TOLCHIN: You mean the dollar extent to which --

THE COURT: Yes, as opposed to the, as Mr. Rohback referred to it earlier, as the entire ownership of the PIF, which may be substantially more than the amount in the judgment --

MR. TOLCHIN: You know, that's an argument for who to make? That's an argument for the

Palestinian Authority to make.

Say this PIF is worth a trillion, gazillion dollars, and by operation of Judge Lagueux's order, the PA has now lost this entity -- it's ownership of this entity that's worth fabulous amounts. It's the Palestinian Authority, the judgment debtor, that's aggrieved by that, not the entity which is owned.

The entity which is owned, the PIF, has no say in who owns it. The PIF is owned by somebody. It's owned by its shareholder. It has one share existing in the world. That share belongs to the PA, and now belongs to the Ungars. It is a misconception that I hope to correct, that the PIF has the owned, the onique (phonetic) party that is owned. It's a misconception that it has a say in who owns it.

The dispute was between the Ungars and the Palestinian Authority, about who owns this asset, just like when the marshal comes to seize a television from a judgment debtor's house to satisfy a judgment, the television doesn't get to appear, it doesn't get counsel. It is the stake. It's not even a stakeholder. It's just the stake.

THE COURT: But why wouldn't the PIF, as a entity, be, in effect, in something of a fiduciary capacity --

MR. TOLCHIN: Fiduciary to who?

THE COURT: -- to its shareholder, to preserve the shareholder's interests, above and beyond the amount of the judgment?

MR. TOLCHIN: Judge, I can answer that.

If I incur debts and a judgment is entered against me, and the marshal, or the sheriff comes to collect my stock portfolio, and I happen to own a hundred shares of IBM, the federal marshal will come, he will take my hundred shares, and he'll sell it on the courthouse steps to the highest bidder. IBM doesn't put in an appearance, doesn't get put on notice. IBM is not part of the proceeding. The dispute is between my creditor and the debtor. The company that's owned has nothing to do with that dispute of who owns the company.

So, I agree with Your Honor, and things that have been said, that the question of whether Judge Lagueux went too far or not, should be put to Judge Lagueux in the first instance, but ultimately, I'm telling you, we believe that it is a logical fallacy and a misconception to think that there's something wrong with what Judge Lagueux did, merely because the Palestinian Investment Fund, the party that's owned, wasn't on notice and wasn't a (inaudible). It has

nothing to do with (inaudible).

Now, what's --

THE COURT: I'm not sure that you're right about that, Mr. Tolchin, because conceptually, what was before the judge in Rhode Island was an entitlement of the plaintiffs, to the extent that the judgment was entered there.

What you're suggesting is that without regard to whatever value may have been involved, as far as the PIF investment is concerned, that the plaintiffs were entitled to reach the entire asset that was involved, i.e. the PIF, and all of what assets it possessed, --

MR. TOLCHIN: Say two things right there.

THE COURT: -- even if that investment vastly exceeded the amount of the judgment that the plaintiffs were entitled to collect.

MR. TOLCHIN: Three points, Judge.

Number one, again, that's the Palestinian Authority's axe to grind. The Palestinian Authority is the entity that lost this asset, and if the Palestinian Authority thought that this asset was worth vastly more than the judgment, than it was the business of the Palestinian Authority to direct its counsel, who was there, after all, to say, "Judge Lagueux, wait a minute, let's look at how much it's worth." They

didn't do that. The lawyer stood there, folded his hands, and said, "I have no position."

So that might have been a valid argument for them to make. They didn't make it and they waived it. That's number one.

THE COURT: Well, that's --

MR. TOLCHIN: Number two, --

THE COURT: The unfortunate part is that that argument, while it has some efficacy as far as the Palestinian Authority is concerned, in it's ability to present its position, but on the other hand, when it comes to a jurisdictional question, the jurisdiction of the Rhode Island court extended to the judgment that was entered for the plaintiffs, and its authority to facilitate the satisfaction of that judgment, and I think there's a very serious question as to whether it had the authority extended carte blanche, if you will.

MR. TOLCHIN: Judge, that's a question, but it's a question that's for another day, simply because Judge Lagueux's order went further and said that for questions of satisfying the judgment, whether the judgment shall be deemed satisfied, it's only when the Ungars actually get cash in hand, that the judgment is satisfied. In other words, there's no diminution of the outstanding value of this judgment by reason of

this creditor's bill. This creditor's bill was a mechanism that was given to the Ungars to try to obtain the assets that are titled in the name of the PIF.

So, the judgment is still out there. The judgment is still outstanding, and perhaps once the Ungars have gotten their hundred sixteen million dollars, plus all the accrued interest, in other words once the judgment is satisfied, if the PIF still has assets, then the conversation becomes relevant. Right now, there isn't -- there hasn't been a dollar paid by the PIF.

THE COURT: Well, you're suggesting, as is somewhat implicit, if not explicit in Mr. Wright's, in effect, acquiescing in the complete allocation of the Canaan investment, --

MR. TOLCHIN: Uh-huh.

THE COURT: -- to the mechanics of a liquidation process satisfying the plaintiffs' judgment --

MR. TOLCHIN: But it won't satisfy the judgment. It will be just a drop in the bucket.

THE COURT: Well, I don't know whether that's true or not, and I'm not going to make any assumptions (inaudible) I don't know what Canaan is holding. I mean, you know, they may be successful in investing and

and have developed a gold mine. I don't know.

On the other hand, if they have some of the fakers that have been wandering around in the venture capitalism field, there may be nothing down there.

There was one that just folded -- one or two that just folded down there in Fairfield County, if I recall correctly.

So, I don't know the answer to that question. You may be right. You may be right.

MR. TOLCHIN: Judge, I -- the third response to your original question is, you know, who -- you (inaudible) out the idea of a fiduciary duty, the PIF perhaps may have a fiduciary duty. The question is to who? It's a -- The management of a company, the board of directors of a company is answerable to the owners of the company, to the shareholders, and if the shareholder status is changed by operation of Judge Lagueux's order, then the PIF's fiduciary duty is no longer to whomever it might have been before, to the PA, it's now to the Ungars.

THE COURT: Well, I may be too much of a -- of an old line thinker on the subject, which is rapidly being destroyed by the way corporate management seems to have the concept of their entitlement to pilfer corporations, including a $6,000 shower curtain. I

can't conceive of, you know, where could you buy a $6,000 --

MR. TOLCHIN: I'll take you to the --

THE COURT: -- shower curtain?

MR. TOLCHIN: Next time you come to Manhattan, I'll take you shopping.

THE COURT: No. No. No.

MR. TOLCHIN: I'll bring you to my sister.

THE COURT: Maybe that's one more reason why I don't want to go to Manhattan.

MR. TOLCHIN: I could (inaudible) with $25,000 toilet bowl carved out of a single piece of alabaster.

THE COURT: For the purposes of visiting a bathroom for the usual purposes, notwithstanding the fact that (inaudible) being what it is, you visit more frequently, the fact remains that $25,000 for the purpose of -- just boggles my mind, but I say notwithstanding my -- I'm something of a traditionalist, I do think that there is a (inaudible) as far as the PIF ownership is concerned, from the assets that you may be entitled to reach, --

MR. TOLCHIN: The point --

THE COURT: -- and I don't begrudge you the entitlement to reach. I perfectly understand the

concept by which the plaintiffs have recovered the judgment under the Terrorism Act, and the somewhat less than straightforward approach that has been taken insofar as the assets are concerned, something akin to the shell game that may very well be thwarting your client's entitlement, I don't question that at all, but on the other hand, I think there are some niceties that the law requires because there are competing interests, whether you regard them as legitimate or not.

MR. TOLCHIN: I'm happy (inaudible) use those words, Judge. It's the niceties the law requires.

I was floored when Mr. Rohback said that his basis for believing that he represents the Palestinian Investment Fund is that he got a phone call from a partner, whose name he doesn't even know accurately, who put somebody else on the phone, whose name he doesn't know, who said, "Tom, go represent the Palestinian Investment Fund," and in the more than a month that has passed since then, in which time he's found the time to file papers in the Southern District of New York, before Judge McMahon, they've commenced a lawsuit in Rhode Island, they filed papers here, but they never saw fit to draft up a retainer agreement, and they are a Connecticut firm.

THE COURT: Mr. Tolchin, let me put it this

way to you. Maybe we're old fashioned, but this is Connecticut and not New York, and it's not Rhode Island. When a lawyer makes a representation to me, as far as I'm concerned, it stands as valid. It's subject, of course, to the question of whether or not it is legitimately found to be valid.

MR. TOLCHIN: I have no doubt that somebody said to Mr. Rohback, what he says they said. Somebody said it, but for purposes of determining whether, as a matter or law, Mr. Rohback represents Palestinian Investment Fund, it's important to know who that somebody is, --

THE COURT: I don't --

MR. TOLCHIN: -- what his authority is.

Is he willing to put his name down on paper in writing?

THE COURT: I don't question that for a moment, and ultimately that may very well be an issue that is going to have to be litigated. I'll deal with that when it's presented to me, and I am in a position to do so.

MR. TOLCHIN: The last misconception I want to clear up was Your Honor asked Mr. Rohback why he can't just put in a notice of appearance, file a motion to strike my appearance, I would file a motion to

strike his appearance, and Your Honor could decide, or Your Honor could defer, to see what the Court in Rhode Island decides before making that determination.

Mr. Rohback's answer was that he was worried about doing that because he didn't want to intervene on behalf of the PIF, thereby making them a party, and thereby vitiating whatever (inaudible) absent subject matter jurisdiction he -- they might have had.

Now, there's a very simple answer to that. The PIF is already a party. Mr. Rohback would not need to move to intervene on behalf of the PIF. They're here. We sued them. The question is, who represents the PIF? Is it me or is it him?

By putting in, as Your Honor suggested, competing appearances, no rights are --

THE COURT: Well, you say that, Mr. Tolchin, and you may be right, I don't know, but I'm not going to regard the concept that there may be subtleties or complexities that I don't happen to think are particularly significant, that he may, and I'm not going to --

MR. TOLCHIN: Well, --

THE COURT: -- foreclose him from having the opportunity to adjudicate whatever needs to be adjudicated in order to resolve those questions.

MR. TOLCHIN: Correct, --

THE COURT: It may be there are none.

MR. TOLCHIN: But the proper way to adjudicate what he's put in right now, is to dismiss it. He has -- LeBoeuf, Lamb has no standing, it has no horse in this race, and the only thing he can say as to what the interests of the LeBoeuf firm is, is the continued right to bill.

THE COURT: He hasn't said that.

MR. TOLCHIN: He said it in papers. The right to bill and the amorphous right that -- who people should have, attorneys (inaudible).

THE COURT: (Inaudible) refer to the billing as reflective of some documentation of the representation, and again, I'm not going to foreclose him from having a full opportunity to adjudicate whatever rights may exist, as far as the PIF is concerned, if he is indeed established as legitimately the lawyer to function on its behalf.

MR. TOLCHIN: I suppose the last thing I would say is that the -- if anyone has a gripe about what Judge Lagueux ordered, that gripe should be taken, in the first instance, to Judge Lagueux, not brought in other courts, potentially resulting in -- you know, if everything they filed would be taken to its conclusion,

we would have three determinations from Judge McMahon in New York, from Your Honor, and in Rhode Island. This shouldn't be brought up in multiple places.

THE COURT: Well, the unfortunate part is that we've got a situation in which the judgment that was entered in Rhode Island has not been satisfied, and there's been a disclaimer, a somewhat defiant disclaimer that Judge Lagueux was somewhat offended by, and for -- not, perhaps, without some justification, by the suggestion that they were never -- that the PA and PLO were never going to satisfy the Ungars' judgment, okay, fine, but the fact remains that there's no assets in Rhode Island that you could reach, so therefore, you've got to come to Connecticut, and if the Connecticut court has the jurisdiction over the execution process in Connecticut, and so therefore, whether you like it or not, you're here.

MR. TOLCHIN: No question that --

THE COURT: I guess it is -- I guess the same thing is true in New York, where there may be some assets, I don't know.

MR. TOLCHIN: That's why there's --

THE COURT: I presume that's what's --

MR. TOLCHIN: That's why there's litigation in New York, very similar to here, but the asset that

was in Rhode Island is whatever the PA directly had, the share certificate, and that, Judge Lagueux issued a creditor's bill about, and if there's anything -- if anyone wants to quibble that Judge Lagueux shouldn't have issued that creditor's bill, or it should be modified, or it's too broad or whatever, that issue should be taken to Judge Lagueux in the first instance, rather than coming before Your Honor or the New York judge to say, "Second guess what another judge already quite recently ordered."

THE COURT: Well, as Judge McMahon has apparently indicated, you may very well be correct on that score, and that may be the position that I think I should take also, and somewhat tentatively, that disposition I have suggested, but there again, I'm going to deal with what is presented before me, with the idea that -- as quickly as I can, not for the least of it being your client's interests.

You know, this is --

MR. TOLCHIN: Not my client (inaudible) well, (inaudible) depends which court I'm in.

THE COURT: Which court you're in.

MR. TOLCHIN: (Inaudible) my client (inaudible).

THE COURT: One of your clients. I mean, you

know, representing PIF, you've got your two hands in two buckets of water, one hot and one cold, and --

MR. TOLCHIN: Oh, it's even more funny than that because the Ungars -- some of the Ungars are now the board of the PIF.

THE COURT: Oh, I understand. The conflict potential is very real.

I'll -- If there's nothing else, Counsel, I'll take the papers and you let me know what you do as far as Judge Lagueux is concerned, and then you, Mr. Tolchin or Mr. Strachman, can tell me, when you're in a position to do so, that I should proceed with what's presented to me here, i.e. the determination of the respective interests.

MR. STRACHMAN: Your Honor, I'm sorry, so we'll assume then, that we're not responding now to the Becont papers, we're waiting for --

THE COURT: No, you don't have to, and what I would suggest, as I suggested to Mr. Minchella earlier, that the question of whether you're gonna pursue the claim, as far as Becont is concerned, is something that might simplify the proceedings here, --

MR. STRACHMAN: Thank you.

THE COURT: -- although it would deprive me of having Mr. Minchella come in and educate me.

MR. MINCHELLA: Thank you, Your Honor.

THE COURT: All right. I'll take the papers and I'll wait until I hear from counsel, and if there's anything further that you think I should do at any time, I'm open to suggestions.

MR. MINCHELLA: When you say, "Take the papers," there's nothing to be adjudicated.

THE COURT: No, I've got the motions that -- the several motions that have been filed, including yours, and I'm not going to deal with them at the moment --

MR. MINCHELLA: Okay.

THE COURT: -- until such time as it becomes appropriate and necessary, as you tell me.

MR. MINCHELLA: Thank you, Your Honor.

THE COURT: All right.

Now, if I -- I noticed I've got the appearances of all counsel but there's a -- there's two young ladies that are here that I don't see listed.

Now, what I want to know is -- I don't want to have anybody suggest that I tolerate discrimination, so therefore, if you want to add your names to the list, you're welcome to do so, even if it's only for the purpose of going back to a client and telling them you were here, and therefore you should get paid for

being here.

UNIDENTIFIED SPEAKER: Thank you, Your Honor.

THE COURT: All right. Okay.

We'll stand in recess as far as this case is concerned.

(Proceedings concluded at 1:12 p.m.)

## CERTIFICATE

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.

Stephen C. Bowles — December 6, 2006

STEPHEN C. BOWLES