**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

LEBOEUF, LAMB, GREENE & MACRAE LLP,

Plaintiff, C.A. No. 06-501 L

v.

DAVID STRACHMAN, as the Administrator of The Estate of Yaron Ungar; DVIR UNGAR, Minor, By his Guardians and Next Friend; YISHAI UNGAR, By His Guardians and Next Friend; JUDITH UNGAR; MEIR UNGAR; URI DASBERG and JUDITH DASBERG, in their Capacity as Legal Guardians of Dvir Ungar and Yishai Ungar; MICHAL COHEN; AMICHAI UNGAR, and DAFNA UNGAR,

Defendants.

**PLAINTIFF'S OBJECTION TO DEFENDANTS' MOTION TO DISMISS**

Plaintiff, LeBoeuf, Lamb, Greene & MacRae LLP ("LeBoeuf"), hereby objects to defendants' Rule 12(b) motion to dismiss the Complaint. In support of this Objection, LeBoeuf submits the accompanying Memorandum of Law, exhibits, Declarations of Dr. Mohammed Mustafa and Thomas G. Rohback, Esq., and Appendix of Authorities.

The Court should deny defendants' motion because multiple independent grounds exist for subject matter jurisdiction in this case:

- The Court has federal question jurisdiction over this action because LeBoeuf is seeking a declaratory judgment that the RICO claim that defendants have threatened to bring against LeBoeuf is meritless (see Memorandum at 15-19);
- The Court also has federal question jurisdiction over this action because it asks the Court to vacate a portion of the Final Judgment that the Court entered on September

19, 2006 in Estate of Yaron Ungar v. Palestinian Authority, C.A. No. 00-105L (see Memorandum at 19-20);

- The Court also has federal question jurisdiction over this action because LeBoeuf alleges that the provision of the Final Judgment that purported to assign to the Ungars ownership of a foreign corporation that was neither a party to the action nor within the Court's jurisdiction exceeded the Court's authority under Article III of the United States Constitution (see Memorandum at 20-21);
- The domiciles of Yaron Ungar and Amichai Ungar have never been litigated and LeBoeuf needs the opportunity to conduct discovery on those issues, followed by an evidentiary hearing, before the Court can rule on whether diversity of citizenship exists (see Memorandum at 22-24);
- Alternatively, even if the Administrator and Amichai Ungar are non-diverse to LeBoeuf, LeBoeuf has the right to dismiss them as parties in order to preserve diversity jurisdiction (see Memorandum at 24-27); and
- LeBoeuf has standing to assert the claims set forth in the Complaint (see Memorandum at 27-31).

Accordingly, LeBoeuf requests that the Court deny defendants' motion to dismiss.

/s/ Matthew F. Medeiros
Matthew F. Medeiros (#1856)
Little, Medeiros, Kinder, Bulman &
Whitney, P.C.
72 Pine Street
Providence, Rhode Island 02903
Telephone: 401-272-8080
Fax: 401-521-3555
mfm@lmkbw.com

Counsel for Plaintiff

Dated: May 9, 2007

**CERTIFICATE OF SERVICE**

I hereby certify that on this 9th day of May, 2007, a true copy of the within Plaintiff's Objection to Defendants' Motion to Dismiss was sent via ECF to counsel of record:

David J. Strachman, Esq.
McIntyre Tate & Lynch, LLP
321 South Main Street
Suite 400
Providence, RI 02903
Telephone: 401-351-7700
Fax: 401-331-6095
djs@mtlhlaw.com

/s/ Matthew F. Medeiros

F:\MFM\PALESTINE INVESTMENT FUND\Objection to Motion to Dismiss\Objection to Motion to Dismiss.DOC

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

LEBOEUF, LAMB, GREENE & MACRAE LLP,

Plaintiff, C.A. No. 06-501L

v.

DAVID STRACHMAN, as the Administrator of The Estate of Yaron Ungar; DVIR UNGAR, Minor, By his Guardians and Next Friend; YISHAI UNGAR, By His Guardians and Next Friend; JUDITH UNGAR; MEIR UNGAR; URI DASBERG and JUDITH DASBERG, in their Capacity as Legal Guardians of Dvir Ungar and Yishai Ungar; MICHAL COHEN; AMICHAI UNGAR, and DAFNA UNGAR,

Defendants.

**PLAINTIFF LEBOEUF, LAMB, GREENE & MACRAE LLP'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE COMPLAINT**

> "[I]f anyone has a gripe about what Judge Lagueux ordered, that gripe should be taken, in the first instance, to Judge Lagueux . . . ."
>
> - Robert Tolchin, Counsel to the Administrator.[1]

Notwithstanding his stated desire to have this Court decide the issues presented, the Administrator of the Estate of Yaron Ungar (the "Administrator") has moved to dismiss the Declaratory Judgment Complaint filed by LeBoeuf, Lamb, Greene & MacRae LLP ("LeBoeuf"), which seeks a declaration as to whether LeBoeuf can represent the Palestine Investment Fund (the "PIF"). LeBoeuf's ability to represent the PIF has been compromised because the Administrator's counsel has threatened to sue LeBoeuf under the Racketeer Influenced and

---

[1] *See* Transcript of Status Conference in Connecticut proceeding at 80 (attached as Exhibit I to Defendants' Memorandum in this action).

Corrupt Organizations Act ("RICO") if LeBoeuf attempts to represent the PIF. That RICO threat is based on a Final Judgment entered by this Court in Estate of Yaron Ungar v. Palestinian Authority, No. 00-105L (D.R.I.). The Administrator asserts that the Ungars now own the PIF and that the Ungars have discharged LeBoeuf and replaced LeBoeuf with the Administrator's counsel, Robert Tolchin. This memorandum of law is submitted in opposition to the Defendants' Motion Pursuant to Fed. R. Civ. P. 12(b) to Dismiss the Complaint filed by LeBoeuf.

## INTRODUCTION

LeBoeuf appears before this Court as a party. It is truly the real party in interest. LeBoeuf agreed to represent the PIF and had begun to do so in two separate actions filed by the Administrator. In the course of that representation, the Administrator's counsel threatened to sue LeBoeuf (and one of its lawyers personally) for $350,000,000 under RICO if LeBoeuf continued to represent the PIF which, according to the Administrator's counsel, had fired LeBoeuf and retained him. Faced with a multi-million dollar lawsuit or the prospect of abandoning a client that was relying on LeBoeuf to defend its interests, LeBoeuf sought guidance from the courts.

As the Administrator has observed, two separate federal court judges have deferred making any decision on the Ungars' claims against the PIF until this Court has had an opportunity to consider the validity of its Final Judgment assigning the PA's ownership of the PIF to the Ungars, which determination is necessary for, and intertwined with, the determination of whether LeBoeuf can represent the PIF without exposing itself to a RICO lawsuit: "Judge Dorsey declined this invitation, and decided that like the S.D.N.Y., he, too, would await the decision of this Court." Memorandum in Support of Defendants' Motion Pursuant to Fed. R. Civ. P. 12(b) to Dismiss the Complaint ("Administrator's Br.") at 11. Indeed, at the Connecticut hearing, counsel to the Administrator reiterated that "if anyone wants to quibble that Judge

Lagueux shouldn't have issued that creditor's bill, or it should be modified, or it's too broad or whatever, that issue should be taken to Judge Lagueux in the first instance . . . ." Transcript of Status Conference in Connecticut proceeding at 82 (Administrator's Brief, Exhibit I). Based on the Administrator's position before other federal courts, one would have assumed that the Administrator would agree to have this Court decide this case on its merits. Instead, the Administrator has raised a barrage of obstacles -- many of which are more prudential than jurisdictional -- to prevent this Court from deciding this case: "Unfortunately, however, because the Court has no subject-matter jurisdiction over LeBoeuf's suit, and because LeBoeuf is not the real party in interest, the Ungars have no choice but to move for dismissal." Administrator's Br. at 11. Obviously, if this Court decides that it lacks jurisdiction, the issue can be resolved by a judge in Connecticut or New York where the Administrator has invoked the jurisdiction of those courts. Nevertheless, the issue is now presented to this Court in the first instance.

## FACTS

### The Court's Order Regarding The PIF

In Estate of Yaron Ungar v. Palestinian Authority, No. 00-105L (D.R.I.), this Court entered a default judgment against defendant Palestinian Authority ("PA") in the approximate amount of $116,000,000. Since then, the Administrator collected millions of dollars against this $116,000,000 default judgment.

On or about July 3, 2006, the Administrator once again invoked the jurisdiction of this Court and presented a Creditors' Bill, asking this Court to convey ownership of two separate legal entities which the Administrator represented to be assets of the PA; namely, the Palestine Commercial Services Company and the PIF. The PIF was not a party to that proceeding. During oral argument, the Court noted that these entities were not present in Rhode Island:

> If I enter a judgment assigning to the plaintiffs all the rights that the PA has in these two entities, that's the limit of the order of the Court, the judgment of the Court, then that has to be executed somewhere where these two entities are doing business. They're not doing business in Rhode Island. As I said from the very beginning, there's no way I'm going to supervise the collection of this judgment because there are no assets in this jurisdiction of the PA and the PLO.

Transcript of September 13, 2006 Argument at 10-11 (Administrator's Br., Ex. C).

On September 19, 2006, the Court entered Final Judgment providing the relief requested by the Administrator:

> all of the Palestinian Authority's ownership rights in the Palestine Investment Fund Company…that are evidenced by the certificate attached hereto as Appendix 3, and
>
> all rights, benefits and interests of the Palestinian Authority in all property, assets and credits, of any type, that are titled and/or owed to…the Palestine Investment Fund Company…,
>
> are hereby assigned, transferred and conveyed to The Estate of Yaron Ungar, Dvir Ungar, Yishai Ungar, Judith Ungar, Meir Ungar, Michael Cohen, Amichai Ungar and Dafna Ungar.

Final Judgment, p. 2 (Administrator's Br., Ex. D).

In its Declaratory Judgment Complaint, LeBoeuf alleged that, while the Administrator could seek to enforce a default judgment against the PA for up to $116,000,000 (less amounts already collected), the PIF had total assets far in excess of $116,000,000. The Complaint alleged that this Court could not properly convey complete ownership of an entity outside the Court's jurisdiction, with total assets in excess of the value of the judgment.

**<u>Leboeuf Is Retained By The PIF And "Fired" By The Administrator</u>**

On or about October 9, 2006, LeBoeuf was asked to represent the PIF in connection with two separate federal court actions filed by the Administrator. One action was in New York, and one was in Connecticut. On October 16, 2006, Thomas G. Rohback ("Rohback") from LeBoeuf

submitted a letter to the Court in the Connecticut action informing the Court that LeBoeuf had been asked to represent the PIF and wished to be heard on its behalf. LeBoeuf requested permission to file papers on behalf of the PIF relating to Canaan Partners' pending motion in that action, reserving all rights, including the right to contest jurisdiction. A copy of that letter is attached as **Exhibit 1**.

On October 20, 2006, LeBoeuf received a letter from counsel to the Administrator, Robert Tolchin ("Tolchin"), stating that the Ungars now owned the PIF, that he now represented the PIF, and that LeBoeuf had been discharged. *See* Administrator's Br., Exhibit F. According to Tolchin, after seeing the Rohback letter of October 16, 2006, the Ungars claim to have held a meeting without notice at an undisclosed location in "Khabla" on October 19, 2006. According to Tolchin, the Ungars elected themselves to be the new directors of the PIF, discharged the existing directors for cause, hired Tolchin as counsel, and discharged LeBoeuf. Attached to the letter of October 20, 2006, Tolchin included what purported to be minutes of the new board of directors meeting. In those minutes, the Ungars purported to waive advance notice of their October 19, 2006 board of directors meeting. While the PIF's Articles of Association permit the existing directors of the PIF to waive advance notice of a Board of Directors meeting, the Ungars purported to waive advance notice of the meeting at which they appointed themselves to become the "new directors." A copy of the Articles of Association is attached as **Exhibit 2**.

In addition to the October 20, 2006 letter to LeBoeuf, the Administrator's counsel also faxed a letter to the directors and officers of the PIF on October 20, 2006. *See* Declaration of Dr. Mohammed Mustafa ("Mustafa Declaration"), Exhibit A. In that letter, Tolchin notified the directors and officers directly -- and not through LeBoeuf, which he knew at the time was

representing the PIF -- that they had been dismissed. In addition, counsel to the Administrator ended each letter with a threat:

> I would caution you in the strongest terms, in light of your close relationship with the former owner of the PIF, the Palestinian Authority, that any interference by you with the new owners' and the new directors' control and management of the PIF, and/or any attempt by you to withdraw, transfer or secrete assets, or property, will render you <u>personally liable under the laws of the United States</u> for the full amount of new owners' judgment against the Palestinian Authority, which exceeds $116 million dollars, plus treble damages. *See, e.g. Wooten v. Loshbough*, 649 F. Supp. 531 (N.D. Ind. 1986); *Cadle Co. v. Schultz*, 779 F. Supp. 392 (N.D. Tex. 1991).

Tolchin letter dated October 20, 2006, Mustafa Declaration, Exhibit A (emphasis in original). For good measure, the Administrator's counsel punctuated his threat with a footnote: "Such conduct may also potentially subject you to criminal prosecution in the United States." *Id.*

**<u>Threatened RICO Action</u>**

On October 24, 2006, Rohback wrote back to Tolchin explaining that LeBoeuf could not simply abandon a legal representation that it had been asked to undertake and that LeBoeuf's intention was to obtain guidance from the Court. *See* Administrator's Br., Exhibit G. In response to that letter, Tolchin sent a letter to Rohback dated October 24, 2006 in which Tolchin threatened $350,000,000 in trebled RICO damages against LeBoeuf if it filed any papers with any Court on behalf of the PIF. *See* Administrator's Br., Exhibit H. In this letter, Tolchin stated that LeBoeuf's "claim to continue to represent the PIF is absolutely fraudulent." Tolchin then threatened "if you or LeBoeuf Lamb takes any further action purporting to act on behalf of the PIF (including without limitation filing any court papers purporting to be from the PIF), the Ungars and the PIF will take all measures the law permits against you and your firm" including seeking $350,000,000 in RICO damages. Based on this threat to sue LeBoeuf for RICO

damages if it filed any papers on behalf of the PIF, LeBoeuf's ability to represent the PIF was substantially chilled. Indeed, based on the Administrator's RICO threat, LeBoeuf has not filed any papers on behalf of the PIF even though it believes that it has an obligation to represent the PIF's interests. *See* Declaration of Thomas G. Rohback dated May 4, 2007, ¶¶ 8, 9.

**Counsel To The Administrator Appears As Counsel To Both Plaintiff And Defendant In The New York Action**

On October 24, 2006, Tolchin filed a Notice of Appearance on behalf of the PIF in an action he had previously filed on behalf of the Ungars, captioned The Estate of Yaron Ungar v. Orascom Telecom Holding S.A.E., No. 05-CV-7765 (CM) (S.D.N.Y. filed Sept. 2, 2005) ("Ungar v. Orascom action"). A copy of that Notice is attached as **Exhibit 3**. In that case, Tolchin also filed an Answer on behalf of the PIF to the complaint he had filed on behalf of the Ungars. A copy of that Answer is attached as **Exhibit 4**. In that Answer, Tolchin, claiming to be representing the PIF, purported to admit all the allegations that required an answer by the PIF and consented "to all the relief sought by the Plaintiffs in the First Amended Complaint" -- the very pleading that Tolchin had filed on behalf of the plaintiffs in that action in January 2006.

**In The New York Action, The Ungars File An Answer On Behalf Of An Entity They Deny Exists**

In the First Amended Complaint in the Ungar v. Orascom action, dated January 19, 2006, signed by Tolchin, the Ungars alleged that "THE PALESTINE INVESTMENT FUND has no legal existence separate from judgment-debtor PA." First Amended Complaint, ¶ 4, a copy of which is attached as **Exhibit 5**. Further, the Ungars alleged that "any separate legal personality and/or corporate identity formally or nominally enjoyed and/or claimed by any of the Aliases and Shell Funds is artificial and/or fraudulent and so not legally cognizable." *Id.*, ¶52.

Notwithstanding the allegations that the PIF did not exist, Tolchin filed an Answer on behalf of the PIF. In that Answer, Tolchin admitted that any claim that there is a separate legal entity is "fraudulent." *See* Answer, ¶¶ 4, 52, 59. On October 26, 2006, Tolchin filed both an Offer to Allow Judgment Pursuant to Fed. R. Civ. P. 68 on behalf of the PIF and a Notice of Acceptance of Offer to Allow Judgment Pursuant to Fed. R. Civ. P. 68 on behalf of the Ungars in the Ungar v. Orascom action. Copies of the Offer to Allow Judgment and Notice of Acceptance of Offer to Allow Judgment are attached as **Exhibits 6 and 7**, respectively. Tolchin has now filed appearances and pleadings on behalf of, and purports to represent, both the Plaintiffs and one of the Defendants in the Ungar v. Orascom action.

**Wright Claims To Represent The Ungars And The PIF In Federal Court In Connecticut**

On October 25, 2006, Stephen Wright ("Wright"), the Administrator's Connecticut counsel, with Tolchin, filed on behalf of the Ungars a Motion for a Turnover Order and Appointment of a Receiver to Sell Partnership Interests of the PIF in the Canaan Funds in the Connecticut action, captioned Strachman v. Palestinian Authority, 05-mc-00208-PCD (D. Conn. filed June 29, 2005) ("Strachman action"). A copy of that Motion is attached as **Exhibit 8**. On October 25, 2006, on behalf of the PIF (which supposedly does not exist), Wright, with Tolchin, filed a "Statement of the Palestine Investment Fund" in which he stated that the PIF "consents to all the relief sought in Plaintiff's Motion for a Turnover Order and Appointment of a Receiver to Sell Partnership Interests"-- the very motion that he filed on the same day on behalf of the Plaintiffs. A copy of that Statement is attached as **Exhibit 9**.

On October 26, 2006, Wright and Tolchin filed a Motion for Determination of Interests with the U.S. District Court for the District of Connecticut in the Strachman action. A copy of that Motion is attached as **Exhibit 10**. In that motion, they requested that the Court enter an

order consistent with the Statement they had previously filed on behalf of the PIF in which they had represented that the PIF consented to all the relief sought in the Ungars' Motion for a Turnover Order and Appointment of a Receiver to Sell Partnership Interests -- the motion that Wright and Tolchin had filed on behalf of the Ungars on October 25, 2006. On October 26, 2006, Rohback sent a letter to the Court in the Strachman action requesting a conference with the Court as soon as possible to discuss how to proceed.

**Leboeuf Files Motions To Intervene**

Given the Administrator's threatened RICO claims, LeBoeuf was unwilling to expose itself to a $350,000,000 lawsuit by filing any papers in any of these actions on behalf of the PIF, even though LeBoeuf believes that it has an obligation to represent the PIF. On October 27, 2006, LeBoeuf filed motions to intervene on its own behalf in the Ungar v. Orascom and Strachman actions to determine who is counsel to the PIF. Copies of those motions are attached as **Exhibits 11 and 12**, respectively. On November 1, 2006, Judge McMahon held a telephone conference in the Ungar v. Orascom action. Judge McMahon denied LeBoeuf's motion to intervene without prejudice and subject to renewal at an appropriate time, after LeBoeuf was afforded an opportunity to present its position to this Court. In an Order dated November 2, 2006, Judge McMahon stated that "The Court has advised the parties that NO final judgment will be signed until the RELEVANT courts have sorted out the corporate control matters." Order at 1 (emphasis and capitalization in the original), a copy of which is attached as **Exhibit 13**.

LeBoeuf filed a similar motion in the Strachman action in Connecticut. An exchange between LeBoeuf's counsel and the Court in that action reflects the issue:

> MR. ROHBACK: * * * The PIF was not a party to the Rhode Island proceeding. It was not on notice of what was going on in Rhode Island, and what happened there, Your Honor, would be akin to the following.

> If the Ungars filed a case against Bill Gates, and said, "We're suing you for a hundred million dollars" or "seventy-five thousand dollars," and Gates said, "I'm gonna default on that," the judge in Rhode Island could enter a default up to the amount of the judgment, $75,000. He could not say, "You now own MicroSoft." He went way too far and --
>
> THE COURT: Well, of course that raises some serious questions as to the legal efficacy, including the binding quality of a sister district court, as to which I'm open to a discussion, because although I obviously respect the judge up there in Rhode Island, I'm not bound to agree with him, let's put it that way.
>
> MR. ROHBACK: Absolutely, Your Honor, and in truth, I say this with great respect and with some trepidation, because I'm sure that my words will be quoted back to me in a few weeks if I appear before Judge Lagueux in Rhode Island by Mr. Strachman, but nothwithstanding --
>
> THE COURT: Just go around Rhode Island --
>
> MR. ROHBACK: I'm gonna say the same thing eventually, if I appear before him, as I will say to the Court here. He went too far. That is an improper order --
>
> THE COURT: Okay, Well, that will go to the merits of the question of the alternative representation.
>
> MR. ROHBACK: Exactly.

Transcript in Connecticut action at 33-34 (Exhibit I to Administrator's Brief). After fully exploring the various issues, Judge Dorsey determined that he, too, would wait for this Court to address the representation of the PIF issue that stems from this Court's prior order.

**The Ungars' Counsel's Pending Motion In This Court**

On November 8, 2006, the Ungars, through Attorney Strachman, filed a motion with this Court in Estate of Yaron Ungar v. Palestinian Authority, No. 00-105L (D.R.I.), asking the Court to modify the confidentiality stipulation between the Ungars and Canaan Equity Offshore and its affiliates to remove documents generated by the PIF and any documents to which the PIF is a

party or a signatory from the provisions of that stipulation. A copy of that motion is attached as **Exhibit 14**. In the memorandum in support of the motion, Strachman represented that "counsel for the PIF has notified counsel for the Ungars that the PIF agrees that the Ungars may use these documents without restriction." Attached to the memorandum is a letter to Strachman from Tolchin in which Tolchin advises Strachman that he is "writing on behalf of the PIF to inform you that the PIF authorizes the Ungars to make free use of copies of any documents in their possession (whatever their origin) which were generated by the PIF (e.g. internal PIF instruments) and/or to which the PIF is a party or signatory (e.g. agreements and correspondence sent or received by the PIF)."

**The Scope Of Ungar Litigation**

Despite their assertion of a lack of jurisdiction, the Ungars and the Administrator are no strangers to the courts in this country. They have filed numerous suits, including the following: Estate of Yaron Ungar v. Palestinian Authority, 00-cv-105-L (D.R.I. filed March 13, 2000); Yaron Ungar v. Palestinian Authority, 04-mc-90 (D.D.C. filed Feb. 24, 2004); Estate of Yaron Ungar v. Morgan Stanley/Morgan Stanley DW, Inc., 05-cv-3710 (S.D.N.Y. filed April 11, 2005); Estate of Yaron Ungar v. Palestinian Authority, 05-mc-180 (D.D.C. filed May 9, 2005); Strachman v. Palestinian Authority, 05-mc-208 (D. Conn. filed June 29, 2005); Estate of Yaron Ungar v. Orascom Telecom Holding S.A.E., 05-cv-7765 (S.D.N.Y. filed Sept. 2, 2005); Estate of Yaron Ungar v. Orascom Telecom Holding, S.A.E., 07-cv-2572 (S.D.N.Y. filed March 28, 2007); Estate of Yaron Ungar v. Palestinian Authority, No. 105521/2005 (N.Y. Sup. Ct. N.Y. County, filed April 21, 2005); Estate of Yaron Ungar v. Orascom Telecom Holdings S.A.E., No. 108090/2005 (N.Y. Sup. Ct. N.Y. County, filed June 9, 2005).

**Citizenship**

In his motion to dismiss LeBoeuf's Complaint, the Administrator declares that he "is to be deemed a citizen only of the same state as the decedent." Administrator's Br. at 12, *quoting* 28 U.S.C. § 1332(c)(2). However, the initial case was filed in Rhode Island because the Administrator alleged that he was a resident, and domiciliary, of Rhode Island. *See* Complaint in Estate of Yaron Ungar v. Palestinian Authority, No. 00-105L (D.R.I.) at ¶ 3 ("The district for Rhode Island is the proper venue pursuant to 18 U.S.C. Sec. 2334(a)[2] since this action is brought by and in the name of the administrator of the estates of Yaron and Efrat Ungar, who is domiciled in this District."); ¶ 4 ("The Estate of Yaron Ungar and the Estate of Efrat Ungar are represented in this action by a court-appointed administrator, attorney David Strachman, a resident and domiciliary of the State of Rhode Island."); Amended Complaint in Estate of Yaron Ungar v. Palestinian Authority, No. 00-105L (D.R.I.) at ¶¶ 3, 4 (same). Copies of that Complaint and Amended Complaint are attached as **Exhibits 15 and 16**, respectively.

**ARGUMENT**

Under the American legal system, a lawyer has an ethical duty to represent the interests of its client, within the bounds of the law, with zeal and loyalty. That ethical duty is in no way diminished because the client may be politically unpopular. Nor is that ethical duty discharged by an adversary's overreaching assertion that the representation has ended. In this regard, LeBoeuf has an absolute obligation to continue to represent the interests of the PIF with zeal and loyalty. Indeed, it would be entirely inconsistent with that ethical imperative for LeBoeuf to

[2] 18 U.S.C. § 2334(a) provides that "Any civil action under section 2333 of this title [18 USCS § 2333] against any person may be instituted in the district court of the United States for any district where any plaintiff resides or where any defendant resides or is served, or has an agent."

abandon a client based on the assertion, demand, or threat of a party with a decidedly adverse interest.

In this case, LeBoeuf has been threatened with RICO claims if it persists in its representation of the PIF. LeBoeuf has filed this declaratory judgment action to avoid being sued in federal court for alleged RICO violations. Tolchin's demand presents LeBoeuf with a dilemma: either abandon its ethical obligations or be sued in federal court for RICO claims. Unwilling to invite a $350,000,000 RICO case, and unwilling to abandon its ethical obligation, LeBoeuf has filed this action to have this Court determine whether LeBoeuf has been replaced as counsel to the PIF or whether LeBoeuf can continue to represent the PIF without being inhibited by the threat of a RICO lawsuit. As if he needed to underscore the seriousness of that threat, the Administrator cites Knox v. PLO, 229 F.R.D. 65, 70 (S.D.N.Y. 2005) (in which the Administrator served as counsel for the Knox plaintiffs), discussing the "imposition of sanctions on Defendants' counsel personally . . . ." Administrator's Br. at 3 n. 1 (emphasis added). *See also* Administrator's Br. at 3 and Exhibit B. This type of threat is echoed by the Administrator in papers filed in the Connecticut proceeding. *See* Ungars' Memorandum in Opposition to the Motions to Dismiss on Jurisdictional Grounds in the Connecticut action at 8 n.11 ("The PA/PIF are hereby cautioned that if they file papers in this matter contradicting the sworn affidavits filed by the PA in the Israeli proceedings, the Ungars will (1) seek all available sanctions under Fed.R.Civ. P. 11 and (2) deliver copies of such contradictory papers to the chambers of the Israeli judges before whom the PA filed the sworn affidavits."). A copy of that memorandum is attached as **Exhibit 17**.

While the Administrator argues that the PIF, and not LeBoeuf, is the real party in interest, (Administrator's Br. at 21), that assertion assumes that the PIF will be able to have effective

representation by counsel that will defend the PIF's interests. Here, it is obvious that counsel to the Ungars -- who also claims to represent the PIF -- has but one interest; viz., removing money from the PIF and transferring that money to his true clients, the Ungars. This issue was reflected in a colloquy between Judge Dorsey and counsel to the Administrator:

> THE COURT: One of your clients. I mean, you know, representing PIF, you've got your two hands in two buckets of water, one hot and one cold, and --
>
> MR. TOLCHIN: Oh, it's even more funny than that because the Ungars -- some of the Ungars are now the board of the PIF.
>
> THE COURT: Oh, I understand. The conflict potential is very real.

Transcript at 82-83 (Administrator's Br., Exhibit I).

As will be explained herein, jurisdiction is proper on several grounds. First, under the Declaratory Judgment Act, 28 U.S.C. § 2201, LeBoeuf seeks a declaratory judgment concerning an actual controversy as to whether LeBoeuf has been discharged by the PIF or whether it can continue to represent the PIF free from the threat of a RICO violation. Second, there is federal question jurisdiction under 28 U.S.C. § 1331 in that LeBoeuf seeks to vacate or modify the federal court order that provides the basis for the Administrator's counsel's claim to represent the PIF. Third, the question of citizenship under 28 U.S.C. § 1332 is far from clear and requires discovery. Among other things, the Administrator venued the Ungars' case in Rhode Island based on his being a resident and domiciliary of Rhode Island. *See* Complaint in Estate of Yaron Ungar v. Palestinian Authority, No. 00-105L (D.R.I.) at ¶ 3 ("The district for Rhode Island is the proper venue pursuant to 18 U.S.C. Sec. 2334(a) since this action is brought by and in the name of the administrator of the estates of Yaron and Efrat Ungar, who is domiciled in this District."); Amended Complaint in Estate of Yaron Ungar v. Palestinian Authority, No. 00-105L (D.R.I.) at

¶ 3 (same). *See also* Estate of Yaron Ungar v. Palestinian Authority, 304 F. Supp. 2d 232, 248 (D.R.I. 2004) ("The Estate of Yaron Ungar is represented by a court-appointed administrator, plaintiff Strachman, a resident and domiciliary of the State of Rhode Island."); Estate of Yaron Ungar v. Palestinian Authority, 153 F. Supp. 2d 76, 85, 99, 95 (D.R.I. 2001) (same; "and that all parties, with the exception of plaintiff Strachman, appear to be domiciled in either Israel or in territories controlled by the PA defendants." * * * "venue is proper because plaintiff Strachman is a resident of the State of Rhode Island."). Now, however, when he is sued, he claims to be a domiciliary of Israel. Fourth, this Court's Order regarding the ownership of the PIF exceeded this Court's Constitutional authority by awarding ownership of an entire entity, not before the Court, with assets in excess of the judgment at issue. Then, in an absolute perversion of Due Process, the Ungars argue that only the PIF -- which the Ungars purport to own as a result of the Order -- and not LeBoeuf can challenge the constitutionality of the Order. This Court should have the inherent power to amend or clarify its own orders when it becomes apparent that a party is attempting to exploit the language of the Court's Order in a fashion not envisioned by the Court when it issued such Order.

## I. Federal Court Jurisdiction Is Proper Based On The Administrator's RICO Claim.

The Declaratory Judgment Act provides that federal courts have jurisdiction to declare the legal rights or relations between parties in an underlying dispute which could, itself, have been filed in federal court:

> In a case of actual controversy within its jurisdiction . . . any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought. Any such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such.

28 U.S.C. § 2201. In a declaratory judgment action, "'it is the character of the threatened action, and not of the defense, which will determine whether there is federal-question jurisdiction in the District Court.'" *Esso Standard Oil Co. v. Zayas*, 352 F. Supp. 2d 165, 168 (D.P.R. 2005), *quoting Franchise Tax Board v. Construction Laborers Vacation Trust for Southern California*, 463 U.S. 1, 16 (1983). As the District Court in *Esso* went on to explain:

> The Supreme Court further recognized that "federal courts have regularly taken original jurisdiction over declaratory judgment suits in which, if the declaratory judgment defendant brought a coercive action to enforce its rights, that suit would necessarily present a federal question." The First Circuit has followed this logic, assuming jurisdiction pursuant to 28 U.S.C. § 1331 over a declaratory action brought by an employer under ERISA based on the federal nature of the underlying controversy. Am. Airlines. Inc. v. Cardoza-Rodriguez, 133 F.3d 111 (1st Cir. 1998).

*Esso*, 352 F. Supp. 2d at 168-69 (internal citation omitted) (finding court had subject matter jurisdiction over declaratory judgment action where the anticipated claim arose under the federal Petroleum Marketing Practices Act, stating "had the declaratory judgment defendant brought suit . . . said suit would necessarily present a federal question"). Similarly, in *American Airlines, Inc. v. Cardoza-Rodriguez*, 133 F.3d 111, 115 (1st Cir. 1998), American Airlines brought a declaratory judgment action under ERISA seeking a declaration of its obligations and the obligations of certain employees under a retirement plan in light of a release entered into by those employees. The employees counterclaimed for age discrimination under the Age Discrimination in Employment Act ("ADEA") and the Older Workers Benefits Protection Act ("OWBPA"). *Id.* The Court of Appeals for the First Circuit found that there was subject matter jurisdiction over the declaratory judgment action because "the underlying controversy, whether characterized as the employees' right to sue under American's retirement plan [under ERISA] . . . or as a claim under the ADEA and OWBPA, clearly presents a wholly federal question. As a

result, American's request for a declaratory judgment 'arises under' 28 U.S.C. § 1331." *Id.* at n.1 (quoting *Franchise Tax Board* for proposition that "Federal courts have regularly taken original jurisdiction over declaratory judgment suits in which, if the declaratory judgment defendant brought a coercive action to enforce its rights, that suit would necessarily present a federal question.").

Other courts of appeal and courts in this Circuit have found there to be federal question jurisdiction over declaratory judgment actions in cases such as this one, where the declaratory judgment defendants could have brought a coercive action against the declaratory judgment plaintiff in federal court under a federal statute. *See, e.g., Standard Ins. Co. v. Saklad*, 127 F.3d 1179, 1181 (9th Cir. 1997) (finding district court had jurisdiction over declaratory judgment action, stating "'if . . . the declaratory judgment defendant could have brought a coercive action in federal court to enforce its rights, then we have jurisdiction . . . .' In other words, in a sense we can reposition the parties in a declaratory relief action by asking whether we would have jurisdiction had the declaratory relief defendant been a plaintiff seeking a federal remedy."); *Cardtoons, L.C. v. Major League Baseball Players Ass'n*, 95 F.3d 959, 964-65 (10th Cir. 1996) (affirming that district court had federal question jurisdiction, explaining "It is the character of the impending action, not the plaintiff's defense, that determines whether there is federal question jurisdiction. Thus, federal question jurisdiction exists in a declaratory judgment action if the potential suit by the declaratory judgment defendant would arise under federal law. * * * Because [the declaratory judgment defendant] could have brought a federal Lanham Act claim as part of a well-pleaded complaint against [the declaratory judgment plaintiff], the district court had federal question jurisdiction over this declaratory judgment action.") (citations omitted); *GNB Battery Technologies, Inc. v. Gould, Inc.*, 65 F.3d 615, 619 (7th Cir. 1995) ("In declaratory

judgment cases, the well-pleaded complaint rule dictates that jurisdiction is determined by whether federal question jurisdiction would exist over the presumed suit by the declaratory judgment defendant.") (citations omitted); *Metropolitan Life Ins. Co. v. Rivera*, 204 F. Supp. 2d 273, 277 (D.P.R. 2002) ("Federal courts may properly take jurisdiction over declaratory judgment suits such as the present action 'in which, if the declaratory judgment defendant brought a coercive action to enforce its rights, that suit would necessarily present a federal question.'"); *see also Texaco Ref. and Mktg., Inc. v. Davis*, 835 F. Supp. 1223, 1231 (D. Or. 1993) ("It is well established that federal question jurisdiction exists in declaratory judgment actions where the plaintiff's action anticipates the defendant's federal question claims.").

In *Hudson County News Co. v. Metro Assocs., Inc.*, 141 F.R.D. 386, 389 (D. Mass. 1992), the court, in its discretion, declined to exercise jurisdiction based on what the court viewed as a RICO threat which was not serious. *Hudson County News* at 391 (threat is "insufficiently substantial where the [declaratory judgment] defendant's communication of the possibility of a lawsuit to the plaintiff is phrased in the equivocating language of potentialities or is susceptible to varying interpretations"). Moreover, in *Hudson County News*, the party making the "insufficiently substantial" threat had withdrawn it and had elected to pursue only state law claims. *Id.* at 392. Nevertheless, the court in *Hudson County News* expressly noted that a declaratory judgment action would be appropriate where the threat of a federal action would chill a party's exercise of rights or duties: "It is only where the potential lawsuit by the declaratory judgment defendant is likely to chill a plaintiff's activities that courts will require a less substantial showing of reasonable apprehension to find the dispute ripe." *Id.* at 391, *citing Societe de Conditionnement en Aluminium v. Hunter Eng'g*, 655 F.2d 938, 944 (9th Cir. 1981) ("An action for a declaratory judgment that a patent is invalid, or that the plaintiff is not

infringing, is a case or controversy if the plaintiff has a real and reasonable apprehension that he will be subject to liability if he continues to manufacture his product.").

Here, the Administrator's unconditional threat, and his proven track record of aggressively litigating his various cases, have chilled LeBoeuf's ability to represent the PIF. Indeed, the Administrator's counsel has declared that he has replaced LeBoeuf as counsel to the PIF based on this Court's prior Order. Accordingly, LeBoeuf has sought a declaration from the court as to these relationships:

> Declaratory relief is appropriate when a declaratory judgment will serve a useful purpose in clarifying and settling the legal relations in issue, and terminate and afford relief from the uncertainty, insecurity, and controversy giving rise to the proceeding.

12-57 Moore's Federal Practice-Civil § 57.42[1] (3d ed. 2007). Even the court in *Hudson County News* went on to state that a court "should determine 'whether a judgment will serve a useful purpose in either clarifying and settling legal relations or finally ending the controversy giving rise to the proceedings.'" *Hudson County News* at 392. Here, there is a clear need for "clarifying and settling legal relations" so that either the Administrator's counsel or LeBoeuf will be able to represent the PIF in the various actions the Administrator has brought.

## II. **<u>Federal Court Jurisdiction Is Proper Based On A Request To Vacate A Federal Court Judgment.</u>**

While the Administrator argues that a suit to enforce a federal court order does not provide a basis for federal jurisdiction, there is authority for the proposition that federal jurisdiction exists when a person seeks to vacate that order. In *Johnson v. Alexandria Scrap Corp.*, 445 F. Supp. 1171 (D. Md. 1977), the court addressed this very distinction and found federal jurisdiction. In *Johnson*, the court upheld the defendant's removal to federal court because the issue involved the federal court's ability to correct a previous decision:

> Plaintiff's reliance on decisions holding that a suit to enforce a judgment rendered by a federal court is not one arising under the laws of the United States is misplaced. No litigation of any federal issue is involved in such a case. On the other hand, actions to vacate federal judgments have been held to arise under the laws of the United States.

*Id.* at 1174-75, *citing* 7 Moore's Federal Practice para. 60.38[1], at 645-47 (2d ed. 1975) ("an action to enjoin or otherwise obtain relief from a federal judgment involves the validity of the judgment as a continuing obligation; the substantive principles of the action are federal; and, we believe, presents a general federal question."). *See also Crane v. Buckley*, 105 F. 401, 402 (N.D. Cal. 1900) (denying motion to remand case to state court, stating "The action under consideration is based upon proceedings in the United States circuit court acting under authority conferred by a law of the United States and a rule of the circuit court of appeals . . . . It therefore presents a question arising under the laws of the United States, and so within the jurisdiction of this court."). Here, as in *Johnson*, it is this Court's prior order regarding the ownership of the PIF "which provides the starting point from which plaintiff commences its quest for relief in this case." *Johnson* at 1174. Indeed, LeBoeuf comes to this Court on the belief that "a federal district court has jurisdiction in the same case or in a subsequent case to correct its own errors . . . ." *Id.* at 1173.

**III. <u>Federal Court Jurisdiction Is Proper Based On A Constitutional Challenge</u>.**

It is beyond dispute that federal question jurisdiction exists when a party challenges the constitutionality of a law enacted by Congress or by an action taken by the Executive Branch. So too, a federal question is raised when a party brings a suit challenging the constitutionality of a court's decision.

Here, LeBoeuf has clearly stated its position that this Court's Order in <u>Estate of Yaron Ungar v. Palestinian Authority</u> exceeded the constitutional jurisdiction of this Court. The

Complaint expressly stated that the case "involves the scope and authority of a federal court to issue orders under Article III of the Constitution." Complaint, ¶ 5. In essence, the Court's Order has been used by the Administrator to assert that this Court adjudged the ownership of a foreign corporation which was not a party to the case and which was not within this Court's jurisdiction. In this case, the Court's Order is challenged because it conveyed to the judgment-creditors assets in excess of the amount of the judgment. That Order exceeded this Court's power under Article III of the Constitution and, if allowed to stand, would result in the denial of Due Process.

To be sure, the Administrator has argued that the PIF is the only party with standing to contest that ruling. The Administrator's argument, however, ignores reality. The PIF cannot challenge the constitutionality of that order because the Administrator now claims, by virtue of the very order being challenged, to represent the PIF. As the beneficiary of that constitutionally defective order, the Administrator has no interest in challenging the order. To the contrary, he has threatened LeBoeuf if it tried to do so on behalf of the PIF. Therefore, the Administrator has used (or misused) a default judgment against one party to purportedly obtain ownership over a separate legal entity which was never before the Court, and has threatened anyone who tries to challenge that result. The Administrator's gamesmanship has caught up with him. First, he represented to this Court that the PIF was <u>not</u> a separate legal entity. Then, he claimed ownership of this entity and had his counsel represent this separate legal entity -- the existence of which he had previously denied. Now, he would argue that this supposedly non-existent entity is the "real-party-in-interest."

## IV. Diversity Jurisdiction Is Proper Or Can Be Made So.

### A. Determination of a Person's "Domicile" Requires a Factual Inquiry.

The Administrator contends that there is no diversity jurisdiction in this case because the domicile of Yaron Ungar, rather than the domicile of the Administrator, is controlling and Yaron Ungar was an American citizen domiciled abroad at the time of his death. In addition, the Administrator claims that Amichai Ungar's presence destroys diversity because he is an American citizen domiciled abroad. Administrator's Br. at 11-12. The Administrator's challenge to the invocation of diversity jurisdiction is troubling. While the Administrator now says that he is, by law, considered to have the same domicile as the decedent, the Administrator brought his action in Rhode Island under the Antiterrorism Act on the grounds that he was the plaintiff, and he was "domiciled in this District." *See* Complaint in Estate of Yaron Ungar v. Palestinian Authority, No. 00-105L (D.R.I.) at ¶ 3 ("The district for Rhode Island is the proper venue pursuant to 18 U.S.C. Sec. 2334(a) since this action is brought by and in the name of the administrator of the estates of Yaron and Efrat Ungar, who is domiciled in this District."); ¶ 4 ("The Estate of Yaron Ungar and the Estate of Efrat Ungar are represented in this action by a court-appointed administrator, attorney David Strachman, a resident and domiciliary of the State of Rhode Island."); Amended Complaint in Estate of Yaron Ungar v. Palestinian Authority, No. 00-105L (D.R.I.) at ¶¶ 3, 4 (same). If the Administrator is correct in now asserting that he must be deemed a domiciliary of Israel, the jurisdictional basis for the underlying action may be called into question.

The determination of a person's domicile requires a fact-intensive analysis. A key factual issue in determining domicile is where the person "has his true, fixed home and principal establishment, and to which, whenever he is absent, he has the intention of returning.'"

*Rodriguez-Diaz v. Sierra-Martinez*, 853 F.2d 1027, 1029 (1st Cir. 1988). Other factors that are considered in determining a person's domicile include his "current residence; voting registration and voting practices; location of personal and real property; location of brokerage and bank accounts; membership in unions, fraternal organizations, churches, clubs and other associations; place of employment or business; driver's license and other automobile registration; [and] payment of taxes . . . ." *Garcia Perez v. Santaella*, 364 F.3d 348, 351 (1st Cir. 2004), *quoting* 13B Wright, Miller & Cooper, Federal Practice and Procedure § 3612 (2d ed. 1984). "No single factor is dispositive, and the analysis focuses not simply on the number of contacts with the purported domicile, but also on their substantive nature." *Garcia Perez*, 364 F.3d at 351. Here, there is no evidence in the record in the case establishing that Yaron Ungar was domiciled in Israel at the time of his death. There is no record evidence as to how long he lived in Israel, whether he intended to return to the United States or even where he lived in the United States. The Court can only resolve the issue of Yaron Ungar's domicile based on a full record, which includes written discovery and depositions as well as an evidentiary hearing. It is possible that third party discovery will also be required depending on the information that is produced by the Ungars. Accordingly, LeBoeuf requests the opportunity to serve written discovery on the Ungar defendants, and to take depositions, including but not limited to the depositions of the other Ungar defendants, to obtain testimony regarding Yaron Ungar's intentions and actions reflecting his true domicile. LeBoeuf also requests that the Court hold an evidentiary hearing on this issue.

As to Yaron Ungar, it is not established that he was, in fact, domiciled in Israel. While the Administrator states that "it is a matter of record that decedent Yaron Ungar was an American citizen domiciled abroad at the time of his death," (Administrator's Br. at 11), there is nothing in the record in this case or in the case cited by the Administrator, Ungar v. Palestinian

Authority, 304 F. Supp. 2d 232, 262 (D.R.I. 2004), that establishes that Ungar was domiciled abroad at the time of his death. The case cited by the Administrator states only that Ungar was "an American citizen living in Israel" and that "Plaintiffs' complaint alleges that Yaron Ungar is a United States citizen." *See* Ungar v. Palestinian Authority, 304 F. Supp. 2d at 244, 248. These statements and allegations do not establish Yaron Ungar's domicile at the time of his death.

Likewise, the Administrator's submissions, including the Declaration of Amichai Ungar, fail to establish that Amichai Ungar is domiciled outside of the United States. In his Declaration, (Administrator's Br., Exhibit J), Amichai Ungar makes the conclusory statement that he has "been resident and domiciled exclusively in Israel" since the filing of the underlying action. Ungar Declaration, ¶ 4. He further states only that from March 2000 through March 2007, he did not reside in the United States and did not own or rent real property in the United States." *Id.* These conclusory statements, which are untested by discovery, are insufficient to establish that Amichai Ungar is legally "domiciled" in Israel. As with Yaron Ungar, the determination of the true domicile of Amichai Ungar requires an analysis of numerous facts, including but not limited to the location of his "true, fixed home," his voting registration and voting practices, the location of brokerage and bank accounts, place of employment or business, driver's license and other automobile registration, and payment of taxes. The Court can only resolve the issue of Amichai Ungar's domicile based on a full record, which includes written discovery and depositions, including possible third party discovery, as well as an evidentiary hearing. Accordingly, LeBoeuf requests the opportunity to serve written discovery on Amichai Ungar, and to take depositions, including but not limited to the deposition of Amichai Ungar, to obtain testimony regarding his intentions and actions reflecting his true domicile. LeBoeuf also requests that the Court hold an evidentiary hearing on this issue.

B. Non-Diverse Parties Can Be Dismissed.

Even if the presence of the Administrator and Amichai Ungar were viewed as defeating diversity jurisdiction, "it is well settled that Rule 21 [of the Federal Rules of Civil Procedure] invests district courts with authority to allow a dispensable nondiverse party to be dropped at any time, even after judgment has been rendered." *Newman-Green, Inc. v. Alfonzo-Larrain*, 490 U.S. 826, 832 (1989); *see also* Fed. R. Civ. P. 21 ("Misjoinder of parties is not ground for dismissal of an action. Parties may be dropped or added by order of the court on motion of any party or of its own initiative at any stage of the action and on such terms as are just."). Specifically, district courts have the authority "to dismiss dispensable, non diverse parties to cure defects in diversity jurisdiction." *Casas Office Machines, Inc. v. Mita Copystar America, Inc.*, 42 F.3d 668, 675 (1st Cir. 1994), *citing Newman-Green*, 490 U.S. at 832. Here, the Administrator and Amichai Ungar are neither "necessary" nor "indispensible" parties under Rule 19 of the Federal Rules of Civil Procedure given that there are eight other defendants who are representing the same interest as the Administrator and Amichai Ungar and who can represent that interest without the Administrator and Amichai Ungar. *See* Fed. R. Civ. P. 19; *Pujol v. Shearson American Express, Inc.*, 877 F.2d 132, 135 (1st Cir. 1989) (concluding that subsidiary of appellee corporation was not an indispensible party where its interests in the case were "virtually identical" to that of the corporation and the corporation's counsel could adequately protect the interests of the subsidiary).

The Supreme Court has emphasized that Rule 19 requires a pragmatic approach rather than a formulaic one. *Provident Tradesmens Bank & Trust Co. v. Patterson*, 390 U.S. 102, 121 n.16 (1968) ("the error made by the Court of Appeals was precisely its reliance on formulas extracted from [the] contexts [of other cases] rather than on pragmatic analysis"); *see also*

*Provident*, 390 U.S. at 118 n.12 (decision whether to proceed or dismiss in absence of a party "must be made on the basis of practical considerations, and not by 'prescribed formula' . . . .") (internal citation omitted). The Court of Appeals for the First Circuit has explained that, "In applying Rule 19 . . . we must keep in mind the fact that this Rule aims to achieve a practical objective." *Pujol*, 877 F.2d at 134. Rule 19 is concerned with "the practical realities of joinder" and "requires the court to face squarely the pragmatic considerations which properly should be controlling." *Isdaner v. Beyer*, 53 F.R.D. 4, 5 (E.D. Pa. 1971) (citation omitted). Under Rule 19, "a realistic analysis of the facts of the case, rather than the conceptual classifications of 'indispensible,' 'neccessary' and 'proper,' should govern the Court's determination." *Isdaner*, 53 F.R.D. at 5, *quoting Provident Tradesmens Bank & Trust Co. v. Patterson,* 390 U.S. 102 (1968). As this Court has stated, "The rules relating to indispensability, as a creature of equity jurisprudence, are not inflexible standards but must be viewed with an eye towards doing justice as among the parties that are before the court." *Soar v. National Football League Players' Ass'n*, 65 F.R.D. 531, 536, 539 (D.R.I. 1975) (citations omitted) (concluding that nonjoined Retirement Board was not an indispensible party and stating that it "[did] not find the Retirement Board to represent any interest distinct from that represented by the defendants presently subject to the jurisdiction of this Court").

The Ungar defendants do not need Amichai Ungar and the Administrator to be parties. Nor do the interests of the Ungar defendants suffer if these two individuals are dropped. Rule 19(a) asks courts to consider whether the absentee is "a person [who] claims an interest relating to the subject of the action" and "is so situated that the disposition of the action in the person's absence may . . . a practical matter[,] impair or impede [their] ability to protect [their] interest." Fed. R. Civ. P. 19(a)(2)(i). Here, each member of the Ungar group (including Strachman in his

capacity as Administrator and Judith and Uri Dasberg in their capacity as guardians) has fundamentally the same interest in the subject matter.

Even if the Court were to conclude that Amichai Ungar or the Administrator were necessary parties, they are not indispensable parties under Rule 19(b). Amichai Ungar and the Administrator cannot argue that their absence will, as "a practical matter[,] impair or impede [their] ability to protect [their] interest" in the original judgment because their position as judgment creditors is identical to the position of the other defendants in this action, who can competently represent the entire group. This point is further demonstrated by the fact that Strachman currently acts as counsel to all of the defendants -- confirmation of an identity of interests. Were it otherwise, Strachman could not ethically represent competing judgment creditors against the same asset.

In a case that presented a similar situation, the district court held "that as a practical matter the nonjoined [persons] [would] not be prejudiced." *Isdaner*, 53 F.R.D. at 5. There, the plaintiffs brought a diversity suit under their employment contracts against various partners of an accounting firm. *Isdaner*, 53 F.R.D. at 5. The defendants argued that nonjoined partners, as joint obligors on the contracts, were indispensable parties and moved to dismiss. *Id.* The court found that joint obligors should be joined if feasible, but their inclusion would deprive the court of diversity jurisdiction. *Id.* Applying the first factor of Rule 19(b), the court noted that the same leading law firm that represented the joined partners would also have represented the other partners if they were joined and that there was no conflict between the interests of the various partners. *Id.* at 6 ("There is no conflict between the various partners' interests and counsel . . . will act as diligently and its advocacy will be just as sagacious whether it represents four partners or all of the partners."). The court found that "as a practical matter," the partners who were not

joined would not be prejudiced because the defendants would adequately represent them in court. *Id.* So too, the other eight Ungar defendants can adequately represent the interests of the Administrator and Amichai Ungar if their presence would destroy diversity.

## V. **LeBoeuf Has Standing.**

Having threatened LeBoeuf with a $350,000,000 RICO suit if LeBoeuf acts consistent with its professional responsibility by making any filings on behalf of the PIF, the Administrator now claims that LeBoeuf lacks standing. While the rights of the PIF also are affected by the declaratory judgment sought herein, there can be no question that the key, threshold question before the Court is whether LeBoeuf has been discharged by the PIF.

The Administrator asserts that there is no allegation that the PIF disputes the transfer of ownership, the dismissal of its officers and directors, or the dismissal of LeBoeuf. Administrator's Br. at 14. The accompanying Declaration of Dr. Mohammed Mustafa puts that contention to rest. *See* Mustafa Declaration, ¶¶ 6, 7, 9, 11, 12. Obviously, LeBoeuf is not seeking court rulings without a good faith basis for believing that the PIF wants LeBoeuf to represent the PIF. This fact is fairly understood from reading the Complaint as a whole. Beyond RICO, the Administrator accuses LeBoeuf of fraud if it continues to represent the PIF: "your claim to continue to represent the PIF is absolutely fraudulent." Accordingly, LeBoeuf itself -- not the PIF -- has been accused of fraud and RICO violations. The law firm has standing to challenge those charges leveled against it.

The clearest indicator that it is the Administrator who is improperly asserting ownership of the PIF is evidenced by his complete inability to control the PIF and its assets -- which are not located in Rhode Island. In other words, if the Administrator truly controlled the PIF, and if the directors and officers truly wanted the lawyer who is suing the PIF (Tolchin) to now represent

the PIF, then there would be no need for litigation. Presumably, the Ungars, who purport to own the PIF, could simply write themselves a PIF check for the full amount of their outstanding judgment. They do not do so because they do not own or control the PIF.

As set forth in the accompanying Declaration of Dr. Mohammed Mustafa, the PIF has requested that LeBoeuf represent the PIF and continues to want LeBoeuf to represent the PIF. Indeed, because of the Administrator's counsel's aggressive actions, the PIF sought, and obtained, an Order from a Palestinian court declaring, among other things the following:

> I also order that the Law Firm of LeBoeuf, Lamb, Greene and MacRae of New York, which has been retained by the claimant – the Palestine Investment Fund Public Shareholding Company, shall be considered as the legal representative that represents it and undertakes the defense of its rights and assets in the United States of America.

Order of the Ramallah Court of First Instance, dated November 7, 2006 attached to Mustafa Declaration in original Arabic and translation as Exhibits B and C, respectively.

To the extent that the Administrator asserts that the PIF, as opposed to LeBoeuf, has standing, that argument begs the question of what law firm would represent the PIF. The cases cited by the Administrator are off point. Those cases dealt simply with financial transactions of some type. Here, the paramount question for LeBoeuf is its professional responsibility to represent its client, the PIF. Here, the Administrator has directly threatened -- not the PIF-- but LeBoeuf with charges of fraud and RICO. To quote the same language the Administrator used concerning the Ungars, LeBoeuf "cannot take such threats lightly." Administrator's Br. at 7 n.4.

In a final display of overreaching, the Administrator has incorrectly asserted that LeBoeuf is not the real party in interest based on an excerpt which the Administrator has taken far out of its proper context. Administrator's Br. at 19. As the record before Judge Dorsey makes clear, LeBoeuf expressed its concerns about the Administrator's threats:

> MR. ROHBACK: * * * We have been told by Mr. Tolchin - - Mr. Tolchin, by the way, is counsel to the Ungars, in these cases that are all - -
>
> THE COURT: I understand.
>
> MR. ROHBACK: We've been told, under threat of --
>
> THE COURT: I don't pay any attention to that, you know, --
>
> MR. ROHBACK: dire consequences.
>
> THE COURT: I see threats all the time but I don't pay any attention. Of course, --
>
> MR. ROHBACK: That --
>
> THE COURT: -- having the robe, I don't have -- I'm insulated from them, but on the other hand, --
>
> MR. ROHBACK: And I have no robe, Your Honor.
>
> THE COURT: -- both in reality and as a practical matter, I don't pay any attention to threats.
>
> MR. ROHBACK: I appreciate that, Your Honor. I don't have that type of immunity, nor does my firm.

Transcript of November 29, 2006 Status Conference in Connecticut action, attached as Exhibit I to Administrator's Br. at 30-31. In another portion of that hearing, this exchange occurred:

> MR. ROHBACK: Absolutely, and I don't say that lightly in our papers, that once we agreed to undertake that representation, we can't just stand aside and say, "Well, fine, Mr. Tolchin, you've threatened us. We'll walk away. Good luck."
>
> THE COURT: That's true because Mr. Tolchin is not your malpractice carrier.
>
> MR. ROHBACK: No, he's not, and it's also -- Beyond malpractice, it is - -
>
> THE COURT: Well, I mean, if you abandon it, you might be facing a malpractice claim.

MR. ROHBACK: That's correct.

*Id.* at 36-37. As to any supposed "admission," the transcript is clear that LeBoeuf was explaining to the Court its need to raise the representation issue promptly without having had the time to determine what defenses the PIF might want to assert, including a lack of personal jurisdiction. More telling is the statement at that hearing by Tolchin: "The question is, who represents the PIF? Is it me or is it him?" Transcript in Connecticut action at 79 (Exhibit I to Administrator's Brief). That is the question, and LeBoeuf is the real party in interest as to that question.

## CONCLUSION

For the reasons set forth above, LeBoeuf respectfully requests that the Court enter an Order denying Defendants' Motion to Dismiss LeBoeuf's Declaratory Judgment Complaint and awarding LeBoeuf such other and further relief as the Court deems just and proper. LeBoeuf respectfully requests that the Court permit LeBoeuf to take discovery, including depositions, in further support of its opposition to Defendants' Motion to Dismiss LeBoeuf's Declaratory Judgment Complaint and requests that the Court hold an evidentiary hearing on Defendants' Motion to Dismiss LeBoeuf's Declaratory Judgment Complaint.

Respectfully submitted,

Dated: Providence, Rhode Island
May 9, 2007

/s/ Matthew F. Medeiros
Matthew F. Medeiros (#1856)
Little, Medeiros, Kinder, Bulman &
Whitney, P.C.
72 Pine Street
Providence, Rhode Island 02903
Telephone: 401-272-8080
Fax: 401-521-3555
mfm@lmkbw.com

Counsel for Plaintiff LeBoeuf, Lamb,
Greene & MacRae LLP

**CERTIFICATE OF SERVICE**

I hereby certify that on this 9th day of May, 2007, a true copy of the within Plaintiff Leboeuf, Lamb, Greene & Macrae Llp's Memorandum Of Law In Opposition To Defendants' Motion To Dismiss The Complaint as sent via ECF to counsel of record:

David J. Strachman, Esq.
McIntyre Tate & Lynch, LLP
321 South Main Street
Suite 400
Providence, RI 02903
Telephone: 401-351-7700
Fax: 401-331-6095
djs@mtlhlaw.com

/s/ Matthew F. Medeiros