# EXHIBIT 17

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

ESTATE OF YARON UNGAR, et al.

Plaintiffs – Judgment Creditors

v. 3:05mc208 (PCD)

THE PALESTINIAN AUTHORITY, et al.

Defendants – Judgment Debtors

**PLAINTIFFS' MEMORANDUM IN OPPOSITION TO THE MOTIONS TO DISMISS ON JURISDICTIONAL GROUNDS AND/OR FOR A BOND FILED BY THE CANAAN ENTITIES AND THE INSURANCE AND PENSION FUND**

## Preliminary Statement

On August 25, 2005, plaintiffs–judgment creditors ("Ungars") caused a writ of execution issued by this Court to be served on Canaan Equity Offshore C.V., Canaan Equity II Offshore C.V., Canaan Equity III Offshore C.V., Canaan Offshore Management N.V. and Canaan Partners (collectively hereinafter: "Canaan") at their Rowayton offices.

The writ of execution levies on partnership interests in Canaan Equity Offshore C.V., Canaan Equity II Offshore C.V., Canaan Equity III Offshore C.V. owned by defendant–judgment debtor Palestinian Authority ("PA").

On September 1, 2005, Canaan filed a Claim for Determination of Interests in Disputed Property pursuant to Conn. Gen Stat. §52-356(c) ("Canaan's Claim for Determination").

On September 13, 2005, the Insurance and Pension Fund ("IPF") a pension fund operating in the Gaza Strip, filed its own Claim for Determination of Interests in Disputed Property pursuant to Conn. Gen Stat. §52-356(c) ("IPF's Claim for Determination").[1]

The Ungars began preparing a response on the merits to Canaan's Claim for Determination and the IPF's Claim for Determination, including appropriate motions for effectuating turnover of the assets at issue.[2]

Canaan then suddenly changed course,[3] however, and filed (prior to the Ungars' time to respond to the claims for determination of interests) a Motion for "Trifurcation of This

[1] Although the IPF itself openly states that its statutory legal name is "The Insurance and Pension Fund" and refers to itself as such throughout its papers, it has misleadingly captioned its papers in this matter in the name of its claimed alias (the "Palestinian Pension Fund for the State Administrative Employees of the Gaza Strip") rather than in its admitted legal name ("The Insurance and Pension Fund"). Rules 10, 11 and 17 of the Federal Rules of Civil Procedure require papers to be captioned in a party's legal name, not its claimed alias.

As discussed below, the IPF has intentionally miscaptioned its papers in a transparently bad-faith effort to "support" its claim that it is also known by the alias "Palestinian Pension Fund for the State Administrative Employees of the Gaza Strip" – as if captioning its papers such would make it so. In fact, and as the Ungars maintain, the name "Palestinian Pension Fund for the State Administrative Employees of the Gaza Strip" is an alias not of the IPF but of defendant–judgment debtor PA, and the partnership interests at issue here are owned by the PA.

[2] As discussed below, the assets at issue consist of (a) the underlying partnership interests valued at several million dollars and (b) several hundred thousand dollars in cash distributions. Though the Ungars intend to file a simple motion for turnover of the cash distributions, they believe that execution on the partnership interests should be carried out by appointment of a receiver, who would both ensure that the sale of the partnership interests yields maximum value and coordinate the mechanics of the sale with Canaan.

[3] This was actually the second time that Canaan suddenly reversed course in this litigation, for no apparent reason. In its Claim for Determination of Interest, Canaan stridently demanded that proceedings in this Court be stayed in favor a motion for clarification it had filed in Rhode Island. Yet, a mere one week later, on September 8, 2005, Canaan sent a letter to the Court withdrawing its request "upon further reflection" and agreeing that the interests of all "will be best served by litigating the relevant issues in a single forum, this Court". See Letter from Robert F. Maslan Jr., Esq. to District Judge Ellen Bree Burns, September 8, 2005, Exhibit A.

Canaan's repeated zigzags have unnecessarily inflated the scope of this litigation, and thus completely undermine Canaan's demand for a bond. Indeed, if anyone should post a bond it is Canaan, whose erratic conduct has significantly increased the burden and expense of this proceeding for the Ungars.

Proceeding" requesting, as a threshold matter and prior to proceeding to the merits, that the Court require the Ungars to post a bond.

Canaan's motion to trifurcate left the parties uncertain how to proceed, and counsel jointly agreed to request a briefing schedule and a conference with the Court.[4] A conference with P.J.O. Igor Sikorsky was held on November 29, 2005, and on January 4, 2006, the Court issued an electronic order stating "per recommendation of P.J.O. Igor Sikorsky: Motions as to jurisdiction and/or bond shall be filed by January 30, 2006, compliant with the Supplemental Order."[5]

Effectively, then, the Court's order of January 4, 2006, grants Canaan's motion to trifurcate in part insofar as it requires that the issue of a bond (as well as Canaan's and the IPF's jurisdictional claims) be disposed of before proceeding to the merits.

Accordingly, on January 30, 2006, the IPF filed a Motion to Dismiss, or in the Alternative, for a Bond. For its part, Canaan notified the Court on January 30, 2006, that it would rest its jurisdictional claims and request for a bond on the arguments contained in Canaan's Claim for Determination filed on September 1, 2005.

For the reasons stated below, the Ungars respectfully request that the Court deny Canaan's and the IPF's jurisdictional motions and requests for a bond, and permit the Ungars to file their papers on the merits of this turnover proceeding.

---

[4] See Exhibits H and I to the Ungars' Response To The "Certificate Of Compliance With Electronic Order (Docket Entry No. 31)" Filed By The Canaan Entities. Dkt. #40.

[5] The Ungars' counsel inquired of the Court as to whether a "supplemental order" was ever issued and was informed that in fact no such order was issued and that the reference was in error.

## I. RELEVANT BACKGROUND

Plaintiffs–judgment creditors are the orphaned children, parents, siblings and administrator of the Estate of U.S. citizen Yaron Ungar, who was murdered along with his pregnant wife Efrat in a terrorist machine-gun attack on June 9, 1996 in Israel. A 25 year-old New York native, Yaron was a schoolteacher studying for rabbinical ordination when he was murdered. The Ungars were ambushed while returning from a wedding. Efrat shielded their ten month-old son Yishai from the bullets and he survived the attack. The Ungars' other son Dvir, then two years old, was not in the vehicle.

In March 2000, the Ungar family filed suit against the Palestinian Authority and the Palestine Liberation Organization in the District Court for the District of Rhode Island under the Antiterrorism Act ("ATA") 18 U.S.C. §2331 *et seq.*[6] Ungar et al. v. The Palestinian Authority et al., 00-105L (D.R.I.).

On July 13, 2004, the Rhode Island federal court entered final judgment for the Ungars and against the PA and PLO, jointly and severally, in the amount of $116,409,123 in damages, that judgment has been affirmed by the First Circuit. Ungar v. Palestinian Authority, 325 F. Supp.2d 15 (D.R.I. 2004) aff'd 402 F.3d 274 (1st Cir. 2005) cert. denied 126 S.Ct. 715 (2005).

The PA and PLO have refused to voluntarily satisfy the Ungars' judgment, and have moreover informed the Ungars' counsel that they "will never pay" the judgment. This contumacious refusal is merely the encore to years of intentional delay created by the PA and PLO during the underlying suit. Ungar, 325 F. Supp.2d at 26, 62 (finding that the PA and PLO took "deliberate actions to delay the completion of this litigation" and "sought to delay these proceedings as long as possible" and imposing sanctions.).[7]

---

[6] Section 2333(a) of the ATA creates a cause of action for a U.S. national, or his estate, survivors and heirs, injured by reason of an act of "international terrorism" as defined in § 2331 of the ATA.

[7] This conduct is part of a deliberate policy of intransigence employed by the PA and PLO in all civil actions pending against them under the Antiterrorism Act, for which they have been repeatedly

Thus, after over five years of intensive litigation, the Ungars have been compelled to initiate burdensome and expensive proceedings to discover and execute against the assets of the PA and PLO across the country and around the globe.

On May 5, 2005, the U.S. District Court in Rhode Island issued an open-ended Injunction finding inter alia that the PA and PLO "do not intend to honor the judgment of the Court in this action" and broadly prohibiting any transfer of PA and PLO assets or funds subject to U.S. jurisdiction. Exhibit B.

Similarly, the U.S. District Court for the Southern District of New York recently found that the Ungars are faced with "an elusive and amorphous judgment debtor." Ungar v. Palestinian Authority, -- F. Supp. 2d. --, 2006 WL 225839, at *6 (S.D.N.Y. Jan. 5, 2006).

The elusiveness and amorphousness of judgment-debtors PA and PLO are reflected in the fact that for decades, the PA and PLO have held and managed their assets under various fictitious names and aliases in order to hide their involvement in financial activities from parties who would not otherwise do business with them, and to shield the financial activities and assets of the PA and PLO from law-enforcement and tax authorities and from creditors such as the Ungars.

Worse still, the fictitious names and aliases used by the PA and PLO to shield their assets are specifically designed to create an impression of legitimacy, respectability and innocence, and include, for example, names falsely connoting charities, social service/welfare funds, or prestigious commercial enterprises. Thus, for example, the PA and PLO have hidden their assets

sanctioned and castigated by the federal courts. See e.g. Knox v. Palestine Liberation Organization, 229 F.R.D. 65, 70 (S.D.N.Y. 2005) (Finding that the PA and PLO had intentionally "generat[ed] more than a year's delay and thousands of dollars in legal expenses," imposing monetary and estoppel sanctions and warning the PA and PLO that "The Court will not tolerate such practices in the future, and will consider any unexplained repetition of them sufficient grounds for imposition of sanctions on Defendants' counsel personally as well as on Defendants . . . "). Id.

under names such as the "Palestine Martyrs Works Society"[8] or the "Palestine Commercial Services Company."[9] Contrary to their charitable or business-like connotations, the funds held under these names are nothing but PA and PLO slush funds.

Most or all of these PA and PLO assets are managed and controlled by Mohammed Rashid (a/k/a Mohammed Rachid or "Khaled Salaam") who has handled the covert and overt assets of the PA and PLO for decades.

Thus, in virtually all of the proceedings brought by them to enforce their judgment, the Ungars face the daunting task of peeling back the deceptive façade carefully laid by the PA and PLO, and demonstrating that the assets in question belong not to widows, orphans or legitimate businesses, but to the PA and/or PLO themselves.

## II. THE ASSETS AT ISSUE

The assets at issue here are partnership interests in Canaan Equity Offshore C.V. ("Canaan Equity"), Canaan Equity II Offshore C.V. ("Canaan Equity II"), Canaan Equity III Offshore C.V. ("Canaan Equity III") owned by the PA and nominally held under the names of "The Palestine Investment Fund," "Becont Ltd." and "The Palestinian Pension Fund of the State Administrative Employees."

The Palestine Investment Fund ("PIF") was created several years ago for the purpose of holding and managing the PA's assets and investments. See generally PIF webpage "About Us"

---

[8] For example, the Israeli Supreme Court found that a building nominally registered under the name of a putative charity called the "Palestine Martyrs Works Society" in fact was the legal property of the PLO. This "charitable" property was used by the PLO as a weapons depot. See H.C.J. 574/82 Al-Nawar v. Minister of Defense, Israel Supreme Court Decisions Vol. XXXIX(3) 449 (discussing the PLO's practice of holding assets under aliases).

[9] See also order of Judge C. Kollar-Kotelly in International Technologies Integration v. Palestine Liberation Organization and Palestinian National (sic) Authority, 98-756 (July 2, 1999) restraining assets held in a laundry list of PA and PLO fictitious names and aliases. (Exhibit C)

at www.pa-inv-fund.com/About.aspx. The CEO and Managing Director of the PIF is Mohammed Rashid.

Soon after the establishment of the PIF, Standard & Poors and the Democracy Council were retained to analyze and value the PA's investment portfolio, and in they 2003 issued an "Initial Report on Valuation and Transparency as of January 1, 2003" listing 79 commercial assets owned by the PA, and containing an analysis of ten of those assets ("Initial Report").[10] A "Full Listing of Assets" managed by the PIF was attached to the "Initial Report" as Appendix C. Exhibit C.

It is incontrovertible that the assets nominally held by the PIF are the assets of the PA itself. Indeed, in at least ten sworn affidavits submitted by the PA in civil proceedings pending in Israeli courts (copies of which are in plaintiffs' possession) the PA has specifically identified the assets listed in the "Full Listing of Assets" (Exhibit D) as assets owned by the PA and available for the satisfaction of judgments against the PA. Indeed, copies of the "Full Listing of Assets" were attached to these affidavits. See Declaration of Avraham Colthof, Exhibit E.

Among the PA assets listed in the "Full Listing of Assets" are investments totaling $4.6 million in the "Canaan Equity II" and "Canaan Equity III" funds. See Exhibit D.

Thus, in short, the PA has several million dollars invested in the Canaan Equity II and Canaan Equity III funds under the name of the PIF, which the PA itself has identified in sworn affidavits as PA property available for satisfaction of judgments against the PA.[11]

---

[10] A copy of the Initial Report is attached as Exhibit C to the Ungars' Response To The "Certificate Of Compliance With Electronic Order (Docket Entry No. 31)" Filed By The Canaan Entities. Dkt. #40. Because of its bulk (several hundred pages) the Ungars have refrained from attaching another copy of the entire Initial Report as an exhibit to the instant memorandum, and instead attach hereto as Exhibit D only "Appendix C" of the Initial Report.

[11] As discussed in the Colthof Declaration (Exhibit E) the PA submitted these affidavits in support of successful motions filed by the PA in the Israeli courts to vacate or reduce the amount of prejudgment attachments that had been imposed on the PA by the Israeli courts in dozens of civil suits filed by victims of terrorist attacks perpetrated by the PA. These affidavits therefore both estop the PA from contesting turnover of these assets (under the doctrine of judicial estoppel) and constitute dispositive admissions.

Becont Ltd. is the nominal holder of limited partnership interests in Canaan Equity, Canaan Equity II and Canaan Equity III. See Statement in support of Canaan's Claim for Determination, at 4.

Becont Ltd. is an Isle of Man corporation, with nominee directors and shareholders, which is controlled (by means of a power of attorney) by Walid Najjab, a close associate of Mohammed Rashid. Exhibit F. Becont's operating structure – i.e. the use of nominee shareholders and directors, with actual control exercised by power of attorney given to an outside person – is typical of offshore corporations desirous of concealing their assets and activities from tax and/or law enforcement authorities and/or creditors, and has no legitimate commercial purpose. Documents obtained by the Ungars from Canaan and from Interaudi Bank in New York (where Becont maintains an account) demonstrate that Becont is yet another Rashid-controlled PA slush fund, and that the assets nominally titled to Becont belong to the PA.

The "Palestinian Pension Fund of the State Administrative Employees" is the nominal holder of limited partnership interests in Canaan Equity II and Canaan Equity III. See Statement in support of Canaan's Claim for Determination, at 4, and Exhibit G.

After several months of careful and extensive research in both the United States and Israel,[12] the Ungars' have concluded that that the name and "Palestinian Pension Fund of the State Administrative Employees" (or "Palestinian Pension Fund for the State Administrative

---

The PA/PIF are hereby cautioned that if they file papers in this matter contradicting the sworn affidavits filed by the PA in the Israeli proceedings, the Ungars will (1) seek all available sanctions under Fed.R.Civ.P. 11 and (2) deliver copies of such contradictory papers to the chambers of the Israeli judges before whom the PA filed the sworn affidavits. The Ungars have suffered through five years of contumacious and devious litigation conduct by the PA and PLO and will not tolerate no more. See Ungar, 325 F. Supp.2d at 62 (finding that the PA and PLO took "deliberate actions to delay the completion of this litigation" and "sought to delay these proceedings as long as possible," and imposing sanctions for their bad-faith conduct).

[12] At great expense, the Ungars' counsel and researchers in the United States and in Israel have reviewed thousands of documents, in English, Hebrew and Arabic, and interviewed numerous relevant witnesses, including senior past and current Israeli officials and financial advisors to the PA who possess direct, detailed knowledge of the assets at issue.

Employees of the Gaza Strip" or similar permutations thereof) do not denote entities with legal, juridical or factual existence.

On the contrary, the Ungars' research indicates that (consistent with the PA's and PLO's *modus operandi*) these names are innocent-sounding fictitious names invented and used by the PA to hold and manage PA-owned assets, and to shield those PA assets from creditors, law enforcement agencies and tax authorities, and to mislead banks, brokerages and other financial and/or investment institutions which would not otherwise hold, handle or invest PA assets.

The Ungars' research, and the documents produced by Canaan pursuant to the Ungars' subpoena, further indicate that partnership interests in the Canaan funds held under the fictitious name "Palestinian Pension Fund of the State Administrative Employees" were purchased in whole or part using PA funds held in PA accounts at a Zurich branch of Credit Suisse Asset Management and/or Credit Suisse First Boston. Notably, Rashid was directly involved in the purchase of the Canaan investments. See Exhibit G.

In its filings to this Court, the IPF asserts that it is a pension and insurance fund established by and operating pursuant to an Egyptian statute (as subsequently modified by Israeli military orders and enactments of the PA) in areas under the jurisdiction of the PA.

The IPF claims that it (and not the PA) owns the partnership interests in Canaan nominally titled to the "Palestinian Pension Fund of the State Administrative Employees."

The IPF bases its claim to ownership of the Canaan funds on the unsupported *ipse dixit* assertion by counsel that, in addition to its legal, statutory name "The Insurance and Pension Fund," it is also known by the alias "Palestinian Pension Fund for the State Administrative Employees of the Gaza Strip" and by the alias "Palestinian Pension Fund of the State Administrative Employees," and that these three names are fully interchangeable synonyms and all refer to the IPF. See IPF Memo at 7, footnote 6.

In a crude attempt to "front-load" its alias claim – and despite the fact that the IPF itself expressly states that its statutory legal name is "The Insurance and Pension Fund" (id.) and refers

to itself as such throughout its papers – the IPF unlawfully captioned its papers in this action in the name of its claimed alias (the "Palestinian Pension Fund for the State Administrative Employees of the Gaza Strip") rather than in its admitted legal name ("The Insurance and Pension Fund"). Aside from being embarrassingly transparent, this pointless ruse violates Fed.R.Civ.P. 10, 11 and 19, which require that pleadings be captioned in a party's legal name, not its claimed alias.

The Ungars maintain, based upon their extensive research, that the IPF is not and never has been known by the names "Palestinian Pension Fund for the State Administrative Employees of the Gaza Strip" or "Palestinian Pension Fund of the State Administrative Employees," and that the IPF has no rights whatsoever to the Canaan assets.[13]

In short, the Ungars believe that the IPF's claims are utterly false, and essentially a case of attempted identity theft.

Unfortunately, this is not the first time that the PA has made false assertions in a U.S. federal court in an effort to defeat the Ungars' proceedings. For example, the PA attempted to dismiss the underlying action in Rhode Island federal court on grounds of ineffective service of process and lack of personal jurisdiction, and in support of those claims submitted a declaration (sworn under penalty of perjury) from Hasan Abdel Rahman, the top Palestinian official in the United States, asserting that he was not a representative of the PA (but only of the PLO). Ungar, 325 F.Supp.2d at 56. The PA's counsel repeated these assertions to the federal court, on the

[13] Thus, there is no dispute that the name in which these assets are titled, "The Palestinian Pension Fund of the State Administrative Employees," is an alias – the question at issue here is whether that name is an alias for the IPF (as the IPF asserts) or for the PA (as the Ungars assert).

Because it has no evidence to support its alias claim, IPF proffers none. Instead, in a transparent effort to distract the Court from the central question here (i.e. in whose alias are the assets titled?) the IPF has treated the Court and the parties to a lengthy dissertation on the history and legal status of the Insurance and Pension Fund. Though edifying, the annals and inner workings of the IPF are wholly irrelevant, since the IPF does not own these assets.

record. Id. Yet, the court found that these assertions by PA under oath and representations by its counsel on the record were in fact blatant falsehoods, since (*inter alia*) Mr. Rahman had identified himself in own biography, and in submissions personally signed and submitted by him to the Department of Justice, as the Chief Representative of the PA in the United States. Id. See also id. at 57 ("Given what the recently submitted documentary evidence has revealed regarding Mr. Abdel Rahman's status and the veracity of his declaration . . . the court dismisses [the PA's and PLO's] arguments as unworthy of discussion."); Id. at 59 (Noting the "apparent falsity of Mr. Abdel Rahman's declaration"). Cf. id. at 24 (finding other assertions of the PA and PLO to be "disingenuous").

Thus, the sad fact is that the PA, and its officials and affiants, have no fear of brazenly misleading a federal court. The papers filed by the Insurance and Pension Fund in this Court constitute just one more "disingenuous" effort by the PA to prevent the Ungars from receiving redress for the murder of Yaron and Efrat Ungar at the hands of the PA and its agents.

The Ungars would respectfully emphasize that the above overview of the assets at issue here is intended purely to provide the minimum factual background necessary for the instant memorandum.[14]

## III. THE COURT HAS SUBJECT-MATTER JURISDICTION OVER THIS PROCEEDING

The IPF moves to quash the Ungars' writ of execution and dismiss this proceeding for lack of subject-matter jurisdiction. The fundamental – and fatal – problem with the IPF's motion is that it is based on a classic textbook example of a "straw man" argument:

The IPF first asserts *ipse dixit* that the Ungars are seeking to hold the IPF liable for the underlying judgment against the PA on an alter ego theory, and then takes the Court on a forced

[14] A full treatment of the merits of this matter – i.e. the proof that the assets at issue belong to the PA – runs to dozens of pages of briefing and will require the submission of many hundreds of pages of exhibits. But for Canaan's motion to trifurcate and the scheduling order of January 4, 2006, the Ungars would have filed their papers on the merits long ago, and they are anxious to be permitted to do so as soon as the instant motions on jurisdiction and a bond are denied.

march through pages upon pages of argumentation proving that (a) a federal court does not have ancillary subject-matter jurisdiction to hold a third party liable for a judgment and (b) even if the Court had jurisdiction to hear an alter ego claim, the IPF is separate entity and not the alter ego of judgment debtor PA.

Unfortunately for the IPF, this entire exercise is perfectly irrelevant, because the Ungars are not seeking in this Court to hold the IPF (or anyone else) liable for the underlying judgment. Indeed, the Ungars are well aware that this Court's ancillary enforcement jurisdiction does not extend to "new actions in which a federal judgment creditor seeks to impose liability for a money judgment on a person not otherwise liable for the judgment." Epperson v. Entertainment Express, Inc., 242 F.3d 100, 104 (2nd Cir. 2001) (emphasis added) (quoting Peacock v. Thomas, 516 U.S. 349, 351 (1996)).

Rather, what the Ungars do assert (and as their papers on the merits will demonstrate)[15] is that the partnership interests at issue, nominally titled to the PIF, Becont and the Palestinian Pension Fund, are in law and in fact assets of judgment-debtor PA. The Ungars' position conforms fully with the long-standing rule that the ancillary enforcement jurisdiction of the federal courts includes proceedings to reach "assets of the judgment debtor even though the assets are found in the hands of a third party." Epperson, 242 F.3d at 106 (emphasis added). See also e.g., Dulce v. Dulce, 233 F.3d 143, 147 n. 5 (2nd Cir. 2000) ("Subsequent proceedings necessary to enforce a judgment may be held involving persons not party to the original lawsuit. The primary limit on the exercise of such ancillary jurisdiction is that it may not be used 'to impose an obligation to pay an existing federal judgment on a person not already liable for that judgment.'") (quoting Peacock) (internal cite omitted); Thomas, Head, & Greisen Employees Trust v. Buster, 95 F.3d 1449, 1454 (9th Cir. 1996) (holding that enforcement jurisdiction existed

[15] By insisting that they be allowed to file jurisdictional motions before the Ungars file their papers on the merits, the IPF and Canaan were too clever by half: the IPF now finds itself in the position of "refuting" arguments that the Ungars have not made and will not make, and wasting the Court's time in the process.