over a judgment creditor's fraudulent conveyance claims against third persons not parties to the underlying action because judgment creditor "seeks only to disgorge from them, as alleged fraudulent transferees, the property Buster wrongfully transferred to them. Because Thomas, Head is not attempting to establish the Johnson parties' liability for the original judgment, we find Peacock inapposite."); Aaron v. Mattikow, 225 F.R.D. 407, 415 (E.D.N.Y. 2004) (holding that ancillary action by judgment creditor to reach stock titled to judgment debtor's wife "is proper under both Peacock and Epperson, for this Court's exercise of ancillary jurisdiction" and denying motion to dismiss for lack of subject-matter jurisdiction); Securities & Exchange Comm'n v. Antar, 120 F. Supp.2d 431, 440 (D.N.J. 2000) (holding a proceeding seeking "to reach assets belonging to the judgment debtor but found in the hands of" third parties is "is exactly the sort of claim approved in Peacock"); Merrell v. Miller, 1998 WL 329264, at * 2 (E.D. Va. 1998) (permitting claim to proceed on basis of Peacock since "plaintiff does not allege that he should be able to satisfy his judgments by reaching Ms. Deal's assets or Ms. Locher's assets; rather, he alleges that the assets in question rightly belong to defendant Miller.").

Since the Ungars assert only that the assets in question belong to the PA itself (and are merely nominally titled under the names of the PIF, Becont and the Palestinian Pension Fund) and are not seeking to hold any other person or entity liable for the judgment (as an alter ego or otherwise), the instant proceedings are clearly within this Court's subject-matter jurisdiction as defined by Peacock, Epperson and their progeny cited above.

Significantly, the IPF itself expressly admits that under Epperson, this Court "properly may exercise ancillary jurisdiction over an enforcement proceeding involving a third party alleged to hold the assets of a judgment debtor or to whom the judgment debtor is alleged to have fraudulently conveyed assets to avoid the judgment." IPF Memo at 25-26. But the IPF then proceeds to argue that this rule is irrelevant in the instant case, because the Ungars "cannot

reasonably contend" that the assets at issue are the product of a fraudulent conveyance. Id. footnote 17.

This argument fails, in the first place, because "fraudulent conveyance" is only one of several doctrines that can be asserted to support a claim that assets titled to and/or held by a third party are the legal property of a judgment debtor. The doctrines of "constructive trust" and "resulting trust," where applicable, achieve the identical result. See generally Restatement (Second) of Trusts §§404, 440. And indeed, the Ungars believe that the doctrines of constructive trust and resulting trust (particularly the latter) are highly applicable to the assets at issue, and will assert those doctrines (among others) in their moving papers.

Moreover, IPF's claim that the Ungars cannot prevail on a claim of fraudulent conveyance (which they intend to do) assumes the answer to the very merits questions of the case, and therefore cannot constitute grounds for dismissal. Even if a claim of fraudulent conveyance could not possibly be made regarding assets purchased before the filing of the Ungars' suit in 2000 (IPF points to the Canaan Equity II interest purchased by the Palestinian Pension Fund in 1999) such a claim could certainly be made regarding the Canaan Equity III interests which were purchased in 2001. See A-Franji Decl. §29). Thus, even IPF would have to admit that this Court has subject-matter jurisdiction over fraudulent conveyance claims against the Canaan Equity III assets. (Additionally, of course, claims of constructive trust and resulting trust can be asserted regarding any and all assets, irrespective of purchase date).

But by far the most serious defect in the IPF's subject-matter jurisdiction argument – indeed, in its papers as a whole – is that the assets it claims to own are not even titled to the "Insurance and Pension Fund" but rather to "The Palestinian Pension Fund of the State Administrative Employees." As discussed, supra, IPF's claim to own these assets is based on the unsupported assertion by counsel that, in addition to its legal, statutory name (The Insurance and Pension Fund) it is also known by the aliases "Palestinian Pension Fund for the State

Administrative Employees of the Gaza Strip" and "Palestinian Pension Fund of the State Administrative Employees." See IPF Memo at 7, footnote 6.

The Ungars strongly dispute this baseless claim, and maintain – on the basis of hundreds of documents in their possession and interviews with numerous witnesses including former financial advisors to the PA – that "The Palestinian Pension Fund of the State Administrative Employees" (and similar permutations thereof) are merely aliases for the PA itself.

Thus, the IPF's entire point of departure here is completely backwards. Before the Court can even entertain the IPF's arguments, the IPF must make a showing that it is "The Palestinian Pension Fund of the State Administrative Employees." The Court will note that a careful reading of the IPF's papers and supporting affidavits shows that it has adduced no evidence in this regard. The IPF is therefore in the position of John Smith claiming, on his own say-so, to own assets titled to Fred Jones. Mr. Smith's counsel can file papers captioned "*Motion of Fred Jones*," employ misleading drafting techniques such as "*Smith (hereinafter: 'Jones')*" and even insert a footnote claiming that "*Smith has also been referred to from time-to-time as Jones*," as the IPF has done here, but that will not prove that Mr. Smith is Mr. Jones.

Indeed, the IPF has hoisted itself by its own petard in this respect, arguing heatedly that title creates a presumption of ownership.[16] IPF Memo at 24, footnotes 14, 15. Since the assets it claims to own are not titled to the IPF, but to The Palestinian Pension Fund of the State Administrative Employees (see Exhibit G) the IPF enjoys no presumption whatsoever. In fact, unlike the PIF and Becont (which in any case have not appeared), the IPF has no standing whatsoever in this proceeding.

Therefore, in respect to the assets titled to The Palestinian Pension Fund of the State Administrative Employees, the Ungars do not even have to resort to theories such as fraudulent

[16] Of course, such a presumption can be overcome, even when it obtains, by application of doctrines such as fraudulent conveyance, constructive trust and resulting trust.

conveyance, constructive trust and resulting trust (over which the Court in any case clearly has subject-matter jurisdiction), because they will demonstrate that "The Palestinian Pension Fund of the State Administrative Employees" is simply a fictitious alias – a "d/b/a" – for the PA itself. Thus, these assets are not even in the hands of a "third party."

In sum, under Peacock and Epperson (and their progeny) this Court clearly has subject-matter jurisdiction over the Ungars' enforcement proceedings.

## IV. THE COURT HAS JURISDICTION OVER THE ASSETS AT ISSUE

There are two categories of assets at issue here: (a) the underlying partnership interests and (b) cash distributions totaling several hundred thousand dollars currently held by Canaan and nominally owed to the PIF, Becont and The Palestinian Pension Fund of the State Administrative Employees. See Exhibit H.

The IPF seeks to vacate the writ of execution and dismiss these proceedings on the grounds that the partnership interests are located outside of the United States and so are beyond the jurisdiction of this Court. IPF Memo 27-30.

As an initial matter the Ungars note that IPF does not argue (because it cannot even attempt to do so) that the cash distributions are beyond the Court's jurisdiction. It is therefore undisputed that the writ should remain in force and these proceedings continue in regard to the cash distributions, even assuming *arguendo* that there was some merit—and there is not—to the IPF's claims regarding the partnership interests.

The IPF's argument regarding the partnership interests fail because these assets are intangible rights that have no physical situs.[17] The Canaan limited partnership agreements create intangible obligations and debts vis-à-vis the limited partners, and it is long and well established

---

[17] The citations by the IPF to authority dealing with attachment of tangible property located out-of-state are therefore inapposite. Even more irrelevant is IPF's citation to Fidelity Partners, Inc. v. Philippine Export and Foreign Loan Guarantee Corp., 921 F.Supp. 1113 (S.D.N.Y. 1996), a case decided on the basis of the Foreign Sovereign Immunities Act (inapplicable here) and the "separate entity" rule (which applies only to bank accounts and thus also inapplicable).

that debts and obligations are intangible and have no fixed situs. They are located for jurisdictional purposes wherever a court has jurisdiction over the debtor or obligor. The leading case establishing this principle is Harris v. Balk, 198 U.S. 215 (1905). As one federal court explained:

> [F]or purposes of determining the amenability of property to garnishment or other collection process, the location, or situs, of an intangible, or more specifically, a "debt," is a concept which is different from that of the location of tangible property. The location of the latter is its actual physical location, while the former has no material existence, and, therefore, has no physical location. A debt is considered located in any (and every) state where the garnishee may be sued, i.e., where personal jurisdiction over the garnishee may constitutionally be exercised. *Harris v. Balk,* 198 U.S. 215, 223, 25 S.Ct. 625, 626-27, *overruled on other grounds by Shaffer v. Heitner,* 433 U.S. 186, 97 S.Ct. 2569 (1977).

In re McAllister, 216 B.R. 957, 974 n.12 (N.D.Ala. Bkrtcy. 1998). See also Champion Intern. Corp. v. Ayars, 587 F. Supp. 1274, 1275 n. 1 (D.Conn 1984) ("Under Supreme Court and Second Circuit cases, the Harris v. Balk case is valid to the extent that when debtor is sued in court with personal jurisdiction of the debtor, debt has its situs in that jurisdiction."); Millard v. U.S., 916 F.2d 1, 7 (Fed. Cir. 1990) (" . . . the nebulous concepts surrounding the situs of a debt are irrelevant in this case where garnishment is issued to enforce an existing judgment. The court issuing a garnishment order for enforcement of its own judgment need only acquire jurisdiction over the garnishee.")

In this case, the debtors/obligors are Canaan Equity, Canaan Equity II and Canaan Equity III, all of which are subject to the personal jurisdiction of this Court for the simple but dispositive reason that they have filed a Claim for Determination of Interests in Disputed Property pursuant to Conn. Gen Stat. §52-356c.[18] The Claim for Determination of Interests seeks affirmative relief

---

[18] Significantly, the claim for determination was also filed by the General Partner of the Canaan Equity funds, Canaan Offshore Management N.V. See Statement in Support of Canaan's Claim for Determination of Interests, at 1 and 3. Thus, to the extent that the General Partner should be considered the obligor/debtor, it too is subject to this Court's jurisdiction.

from this Court – i.e., that the Court determine the respective interests of the various claimants in the partnership interests, including Canaan's own rights (e.g. to oppose turnover, to dilute, to receive capital calls, etc.) in respect thereto. See Canaan's Claim for Determination at 12-13. Indeed, Conn. Gen Stat. §52-356c(b) expressly provides that a Claim for Determination of Interests constitutes an "appearance." Moreover, after first demanding that these proceedings be stayed in favor of a proceeding in Rhode Island, the Canaan partnerships then withdrew that demand and informed the Court that "upon further reflection" and they agree to "litigat[e] the relevant issues in a single forum, this Court." See Exhibit A.

The Canaan partnerships have therefore appeared and submitted themselves to the personal jurisdiction of this Court, and the intangible debts and obligations of the Canaan partnerships are thus under the jurisdiction of this Court. Champion Intern, 587 F. Supp. at 1275 ("when debtor is sued in court with personal jurisdiction of the debtor, debt has its situs in that jurisdiction."). Indeed, the Canaan partnerships have expressly requested that this Court determine the competing claims to those very intangibles.

The fact that the Canaan partnerships are registered in the Netherlands Antilles, and that those debts and obligations arise from contracts governed by Netherlands Antilles law, as the IPF argues, is completely irrelevant to Canaan's submission of those debts and obligations this Court's jurisdiction. The result would be the same if a California partnership filed a claim for determination of interests in this Court. The issue is not the scope and substance of the partnerships' obligations to the Palestinian partners, but the Ungars' right to execute against those obligations – whatever their scope and substance might be under Netherlands Antilles law.[19]

---

[19] Notably, performance of the obligations by the Canaan partnerships – i.e. payment of distributions to the Palestinian partners – is not linked in any way to the Netherlands Antilles. Payment of the partnership

This Court therefore has jurisdiction over the partnership interests at issue.

## V. THE PIF, BECONT AND THE PALESTINIAN PENSION FUND OF THE STATE ADMINISTRATIVE EMPLOYEES ARE ENTITLED TO NOTICE

Canaan asserts that the Palestinian limited partners should be joined as indispensable parties to this proceeding or, if they cannot be joined, the proceeding should be dismissed under Fed.R.Civ.P. 12(b)(7) and 19(b). Canaan's Statement in support of Claim for Determination, 9-11.

Canaan's argument ignores the plain language and command of Conn. Gen Stat. §52-356c, which provides that:

> On filing of the claim, the clerk of the court shall assign the matter for hearing on a date certain and order that notice of the hearing be served by the claimant on all persons known to claim an interest in the disputed property.

Conn. Gen Stat. §52-356c(c) (emphasis added).

Thus, Connecticut law (made applicable here by Fed.R.Civ.P. 69) expressly provides that prior to a hearing on the merits of this proceeding, notice be provided to interested parties – in this case the PIF, Becont and The Palestinian Pension Fund of the State Administrative Employees. [20]

Likewise, the Constitution requires only that parties with an interest in property receive notice and an opportunity for a hearing before being deprived thereof. See e.g. Mullane v.

---

distributions was to be made to bank accounts in New York, Zurich and Cairo, further illustrating that the partnership obligations have no situs. See Exhibit I.

[20] Although the IPF claims that the "Palestinian Pension Fund of the State Administrative Employees" is an alias for the IPF (which has appeared), the Ungars dispute that claim and maintain that that name is an alias for the PA itself. The Ungars therefore believe that notice should be given to the "Palestinian Pension Fund of the State Administrative Employees" at the address of record used for it by the PA. When the time comes to send notice, the Ungars will submit details regarding the address and seek appropriate instructions from the Court.

Central Hanover Bank & Trust Co., 339 U.S. 306 (1950); Dusenbery v. U.S., 534 U.S. 161 (2002).

Thus, notice to the Palestinian partners is statutorily sufficient under Connecticut law as well as under Due Process requirements.

Moreover, it has long been recognized that notice is an adequate substitute for joinder under Rule 19 itself. See e.g. Henri's Food Products Co., Inc. v. Home Ins. Co., 474 F. Supp. 889 (E.D.Wis. 1979) (Where only obstacle to involuntary appearance by nonresident corporation in action in federal district court sitting in Wisconsin was lack of jurisdictional contacts with Wisconsin, such problem could be alleviated by notice to such nonresident corporation giving it leave to intervene.); Hamilton v. Bradford, 502 F. Supp. 822 (S.D.Miss. 1980) (In purchaser's action for specific performance of realty contract, even though granting of equitable relief requested by purchaser would, in effect, abrogate any possible contractual rights of nonparty who had later contracted to purchase same realty, nonparty was not indispensable or necessary party to action and it was not unjust to proceed without his being a party, where it appeared that he knew of plaintiff's contract when he negotiated second sale, shortly thereafter plaintiff filed writ of attachment which constituted lien that by law was notice to all prospective purchasers, and the non-party did not move to intervene.); Degregorio v. O'Bannon, 86 F.R.D. 109 (E.D.Pa. 1980) (It was not necessary that the former Department of Health, Education and Welfare be joined as a party defendant in suit; district court would invite the Department to submit an amicus brief on issues in case that affected it, an invitation which would at least put the Department on notice of suit so as to afford it an opportunity to move to intervene if it wished.); GTE Sylvania, Inc. v Consumer Product Safety Com., 598 F.2d 790 (3rd Cir. 1979) aff'd 447 U.S. 102 (In suit brought by television manufacturers seeking to enjoin Consumer Product Safety

Commission from disclosing to public certain documents obtained under its statutory information-gathering authority, non-joinder of data requesters as defendants pursuant to Rule 19 would not require vacation of permanent injunction; although joinder of data requesters would have been desirable, data requesters had adequate notice of action prior to commencement of their own lawsuit and they could have intervened without significant burden.).

Thus, there is no conflict between the notice requirement contained in §52-356c(c) and Rule 19; on the contrary and as demonstrated by the cases cited above, the notice to be provided under §52-356c(c) is an adequate substitute for any joinder that might be otherwise necessary under Rule 19.

In sum, the PIF, Becont and the Palestinian Pension Fund are entitled to notice, but there are no grounds to diverge from the provisions of §52-356c(c) (which in any case satisfy Rule 19) and to join them as actual parties.[21]

The Ungars have inquired of the Clerk as to the status of the notice procedure. Exhibit J. While we have not yet received a reply to this inquiry, notice should and presumably will be given once a hearing date is set on the merits (that appears to be the procedure envisioned by §52-356c(c)). Of course, earlier notice could be provided, whenever and in whatever manner the Court deems appropriate.

[21] Canaan states further that it "does not know whether joinder of the Palestinian Limited Partners is feasible under Rule 19", but that if joinder is not feasible the proceeding should be dismissed. Statement at 11. Since Canaan has not taken a position, articulated an argument or made a showing about whether joinder is feasible, the Court cannot practically determine the feasibility of joinder (assuming it rejects the Ungars' argument that joinder is unnecessary) on the present record, and further briefing would be necessary.

## VI. NO BOND SHOULD BE REQUIRED

Both Canaan and the IPF have demanded that the Ungars post a bond. Canaan and the IPF know full well that the Ungars have no resources to put up a bond, and it is pellucid that their only purpose in demanding a bond is to extinguish these proceedings at the starting line. The Ungars respectfully ask the Court to bear in mind when considering the bond issue that imposing a bond would effectively end to the Ungars' opportunity to seek these assets, without allowing them to ever reach the merits. That would be an unjust result, particularly considering (as discussed supra) that the PA itself has specifically identified some of the assets at issue (the PIF partnership interests) as assets of the PA amenable to satisfaction of judgments against the PA, and neither the PIF nor Becont have appeared to contest this proceeding. A bond may be a relevant consideration when the judgment creditor is a commercial actor, not where the judgment creditors are the family of a terrorism victim, as here. Significantly, §52-356c(e) expressly treats the imposition of a bond as discretionary.

In any case, the demands for a bond here are wholly unsupported and frivolous, and can and should be rejected by the Court on the "merits:"

First, a threshold condition for the Court to even consider a bond must be some showing of actual or potential harm. But neither Canaan nor the IPF even attempt to make a showing of harm, and instead ask the Court to make a preliminary determination in principle that there should be a bond, and then allow Canaan and the IPF to show their harm or potential harm. This approach is absurd. Absent some evidence of harm – and vague, self-serving proclamations by counsel are not evidence – why should the Court even entertain a motion for a bond? Notably, IPF and its counsel have boundless energy to ply the Court with reams of affidavits and documentation chronicling the wholly irrelevant history of the IPF, but here – when it comes to

actually backing up counsel's somber claims of harm with some empirical proof – the IPF cannot scrape together a single crumb of evidence, documentation or affidavit testimony.

Moreover, the bond arguments presented by Canaan and the IPF are meritless even on their face. Indeed, Canaan articulates literally no argument whatsoever in favor of a bond, but baldly asks the Court for an opportunity to be heard on this issue in the future. Thus, simply put, there is nothing for the Court to even consider.[22]

Likewise, the IPF demands imposition of a bond on the laughable ground that the Ungars should effectively be punished for refusing to take at face value and on its counsel's say-so the IPF's self-serving and unsupported claim to be the "Palestinian Pension Fund of the State Administrative Employees." Aside from the fact (discussed above) that the PA, its officials and its affiants have already been found by the Rhode Island federal court to be shameless perjurers, the Ungars hold hundreds of documents demonstrating that the "Palestinian Pension Fund of the State Administrative Employees" is an alias for the PA and has nothing to do with the IPF (indeed the IPF's name appears nowhere in any of the documents received from Canaan and Smith Barney) and have received confirmation of that fact from an Israeli official and former financial advisor to the PA. For the IPF to demand a bond because the Ungars "dared" to dispute the IPF's version of events is itself the apogee of temerity.

---

[22] The Ungars note (purely out of an abundance of caution) that although Canaan has elsewhere complained that the instant proceedings prevent it from exercising its right to dilute the partnership interests at issue for failure to comply with capital calls, this argument (which Canaan does not even raise in support of its request for a bond) cannot constitute grounds for a bond. First, the Ungars have made clear to Canaan that exercise of any rights it may have to dilute is a matter between Canaan and the Palestinian limited partners, and the Ungars take no position thereon. See Exhibit K. Canaan has acknowledged the Ungars' position in this regard. Exhibit L. Second, the Palestinian partners have delayed and defaulted their capital call obligations numerous times in the past. See Exhibit M. In fact, at least some of the current defaults predated service of the Ungars' Injunction and writ of execution. See Canaan's Memo in support of their Motion Seeking Clarification, Exhibit N, at 9. Canaan cannot with a straight face suddenly now claim that the Ungars are responsible for the latest defaults of these serial defaulters.

Indeed, here again, the IPF has got it backwards: the assets at issue are not titled in the name of the IPF and the IPF has not produced a scrap of documentation that it has any rights to these assets. The IPF therefore has no standing to demand anything – much less a bond – in these proceedings. If anything, the IPF itself, which has no demonstrated interest in these proceedings beyond the *ipse dixit* claims of counsel, should be required to post a bond.

The IPF also claims that it faces attorneys' fees. IPF Memo at 32. But if that were sufficient grounds, posting a bond would be a mandatory and not discretionary, since all enforcement proceedings involve attorneys' fees. The IPF claims further that it is being denied the distributions owed by Canaan. Id. But assets are always restrained during enforcement proceedings, and thus that cannot be grounds for a discretionary bond. Moreover, the grand total of the distributions being held by Canaan for the Palestinian Pension Fund is $82,196.60. See Exhibit H. Even at an above-market rate of 5%, the annual loss on that sum would be just over $4000. Furthermore, Canaan is presumably holding the cash deposit in an interest-bearing account (if not it can and should be ordered to do so) and in that case there would be no loss whatsoever.

Finally, the IPF argues that it is being prevented from making further capital calls. This claim is nonsense: the writ of execution does not prevent further deposits into the partnerships, and the Ungars' counsel have even notified opposing counsel that the Ungars stipulate that any payment of capital calls will be excluded from future turnover. i.e., the capital calls will be returned in the event of turnover. See Exhibit O.[23] Yet, no capital calls have been made, presumably because the IPF (and the PIF and Becont) know full well that the Ungars will prevail in these proceedings, and have no interest in preserving the value of these investments. This argument, too, is therefore nothing but a bad-faith red herring.

[23] The Ungars hereby accede to this offer being formally so-ordered by the Court forthwith.

## VII. CONCLUSION

The motions of Canaan and the IPF should be denied, and the Court should enter a briefing schedule permitting the Ungars to move forward on the merits.

Plaintiffs, by their Attorneys,

/S/ David J. Strachman
David J. Strachman
McIntyre, Tate, Lynch & Holt
321 South Main Street, Suite 400
Providence, RI 02903
(401) 351-7700
(401) 331-6095 (fax)

Stephen P. Wright
Harlow, Adams & Friedman, P.C.
300 Bic Drive
Milford, CT 06460
(203) 878-0661
(203) 878-9568 (fax)

CERTIFICATION

I hereby certify that on the 6th day of March, 2006, a true copy of the within was sent both via ECF and email to:

Robert F. Maslan, Jr.
9 Old King's Highway South
P.O. Box 37
Darien, CT 06820
(email maslan@maslanbrown.com)

Robert A. Alessi
Tamara L. Schlinger
CAHILL GORDON & REINDEL LLP
Eighty Pine Street
New York, NY 10005-1702
(email ralessi@cahill.com, tschlinger@cahill.com)

Charles L. Kerr
Mark D. McPherson
MORRISON & FOERSTER
1290 Avenue of the Americas
New York, NY 10104-0050
(email ckerr@mofo.com, mmcpherson@mofo.com)

Jeffrey J. Tinley
Erin L. Golembiewski
TINLEY, NASTRI, RENEHAN & DOST
60 No. Main Street, Second Floor
Waterbury, CT 06702
(email jtinley@tnrdlaw.com, egolembiewski@tnrdlaw.com)

/S/ David J. Strachman