UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

LEBOEUF, LAMB, GREENE & MACRAE LLP,

Plaintiff,

v. C.A. No. 06-501-L-DLM

DAVID STRACHMAN, as the Administrator of the Estate of Yaron Ungar, et al.,

Defendants.

**REPLY IN FURTHER SUPPORT OF DEFENDANTS' MOTION PURSUANT TO FED.R.CIV.P 12(b) TO DISMISS THE COMPLAINT**

**INTRODUCTION**

Plaintiff LeBoeuf proudly leads off its Memorandum in Opposition to the Ungars' Motion to Dismiss ("Plt. Memo") by quoting Robert Tolchin (counsel for the PIF and New York counsel for the Ungars) as stating that "[I]f anyone has a gripe about what Judge Lagueux ordered, that gripe should be taken, in the first instance, to Judge Lagueux." Plt. Memo at 1.

LeBoeuf evidently believes that this statement by Mr. Tolchin is somehow contradicted by the Ungars' instant motion to dismiss LeBoeuf's action. In fact, however, on the very same page of the transcript (selectively) quoted by LeBoeuf, Mr. Tolchin expressly stated that:

> LeBoeuf, Lamb has no standing, it has no horse in this race …

See Transcript, Nov. 29, 2006, in Ungar v. Palestinian Authority, No. 05mc208 (PCD) (D.Conn), attached as Exhibit I to the Memorandum in Support of Defendants' Motion Pursuant to Fed.R.Civ.P 12(b) to Dismiss the Complaint ("Defs' Memo"), at 80.

Indeed, the Ungars moved to strike LeBouef's motion to intervene in Connecticut, specifically arguing that:

> [T]he identity of the PIF's law firm <u>is merely a function</u> of the identity of the PIF's ownership and management.
>
> But LeBoeuf utterly lacks any standing to challenge the Ungars' ownership and control over the PIF as a matter of law, because it is not the real party in interest. FED. R. CIV. P. 17(a) provides that "[e]very action shall be prosecuted in the name of the real party in interest." *Id.*
>
> The only party that, hypothetically, could even *attempt* to make such a challenge is the former owner of the PIF, i.e. the PA, and the only place such challenge could hypothetically be made is in the Rhode Island federal court.[3]
>
> [3] Needless to say, the Ungars believe that the PA can neither make nor succeed in any such challenge.
>
> Who, then, is the LeBoeuf law firm to challenge in this Court what the PA itself has not attempted to challenge in Rhode Island, or for that matter in this Court or in any other forum?!

<u>See</u> Memorandum in Support of Motion by Plaintiffs and Palestine Investment Fund to Summarily Strike or Deny and for Related Relief, in <u>Ungar</u>, (D.Conn), dkt. #83 (emphasis in the original).

Thus, from day one, the Ungars' position has been and remains perfectly consistent: First, LeBoeuf is not a real party in interest and has no standing whatsoever to challenge the Ungars' ownership and management of the PIF; second, any such challenge (made by a real party in interest with standing), can and should be made only in this Court.[1]

---

[1] As discussed in the Ungars' motion papers, the federal courts in Connecticut and New York agreed with this proposition. <u>See</u> Defs' Memo at 10-11.

The instant motion is therefore entirely consistent with the Ungars' position.

Nor are the Ungars shying from a determination on the merits regarding their ownership and management of the PIF. On the contrary, the Ungars stressed repeatedly throughout their motion papers that once this action is dismissed, their motion to modify the confidentiality stipulation and sealing order previously entered regarding PIF documents produced by Canaan (docket #385-1) – which will require a determination on these very same merits issues and is unquestionably within the Court's jurisdiction – should proceed. See Defs' Memo at 9 and 11, fn. 6.

At bottom, this entire suit is nothing but an egregious and shocking abuse of process dreamed up by LeBoeuf in an effort to prevent its clients – the dismissed directors and managers of the PIF, who (as discussed below) are appointees and agents of the PA itself – from placing themselves before the Court. Though he has now come to regret it, LeBoeuf partner Thomas Rohback Esq. admitted to exactly such a stratagem during the hearing in Connecticut. See Transcript, Nov. 29, 2006, in Ungar, (D.Conn), Exhibit I to Defs' Memo, at 37-38.

As shown below, LeBoeuf's opposition to the instant motion is entirely without merit. Accordingly, the Court should dismiss this action with prejudice. Once this action is dismissed, the Ungars' motion to modify in respect to Canaan should proceed.[2]

## RELEVANT FACTUAL BACKGROUND

The facts relevant to the instant motion were set forth in the Ungars' opening motion papers.

---

[2] Since Canaan has adopted LeBoeuf's arguments by reference, LeBoeuf should have no objection to that.

Moreover, LeBoeuf's clients, the former directors and officers of the PIF dismissed by the Ungars, are free to intervene in the Canaan proceeding as individuals and/or to file an amicus brief.

LeBoeuf's memorandum in opposition to the instant motion contains a lengthy recitation of alleged facts riddled with inaccuracies, most of which are surplusage irrelevant to the instant motion.

However, the Ungars are constrained to correct here two of the misrepresentations[3] contained in LeBoeuf's memorandum:

LeBoeuf claims that the Ungars replaced the directors of the PIF "after seeing the Rohback letter of October 16, 2006" (Plt. Memo at 5) implying that the directors of the PIF were replaced as a reaction to the Rohback letter.

This claim is baseless. The replacement of the PIF board was planned and prepared for many weeks in advance as the natural and logical next step after the Ungars were assigned ownership of the PIF by this Court.

LeBoeuf also asserts that the Ungars filed papers in the Ungar v. Orascom matter stating that the PIF has no separate legal personality. Plt. Memo at 7-8. This claim, too, is false.

The complaint filed in the Orascom matter (nine months ***before*** judgment entered on defendants' Creditor's Bill) did indeed allege alternatively (as permitted by Fed.R.Civ.P. 8(e)(2)) both that the PIF has, and does not have, separate legal personality. These alternative allegations reflected the fact that the PIF was originally established and operated as an unincorporated entity long before it was incorporated.

Moreover, precisely contrary to LeBoeuf's claim, the Answer filed by Mr. Tolchin on behalf of the PIF in October 2006 expressly stated that "as matter of fact, the PIF and the PCSC

---

[3] Inter alia, LeBoeuf misstates the chronology and substance of the resolutions issued by the Ungars and the new board of directors, as well as various provisions of the PIF's Articles of Association. Plt. Memo at 5. Similar misstatements are contained in the complaint. However, since these issues are irrelevant to the instant motion, the Ungars will not address them here.

have been registered as corporations by the Palestinian Authority, but … their corporate form can be disregarded, if necessary, as a matter of law." Id. at ¶ 51.[4]

Thus, LeBoeuf's attack on the Ungars and their counsel for purportedly taking inconsistent positions in respect to the PIF is frivolous and misleading.[5]

## ARGUMENT

### I. THE ISSUE OF LEBOEUF'S RICO LIABILITY WAS NOT PLEAD IN THE COMPLAINT AND IS NOW MOOT

Keenly aware that the grounds for subject-matter actually asserted in its complaint are baseless, LeBoeuf now argues at length that what it is ***really*** seeking in this action is a declaration that it will not be held liable to the Ungars under RICO. See Plt. Memo at 15-19, and *passim*.

This is pure wishful thinking. LeBoeuf's complaint in this action mentions RICO once in passing in its "Facts" section, and nothing in the complaint ***so much as hints*** that LeBoeuf is seeking a determination regarding its RICO liability. See Complaint, *passim*.

LeBoeuf's eleventh-hour attempt to base jurisdiction on the issue of its RICO liability simply has no support in the language of its complaint. That is just not what LeBoeuf sued for here. The complaint therefore must be dismissed for lack of subject-matter jurisdiction.

In any event, the issue of LeBoeuf's RICO liability is now moot. Based on statements made in and exhibits filed with LeBoeuf's opposition papers, and on other information obtained by them through third-party discovery, the Ungars have concluded that LeBoeuf is no longer interfering with the Ungars' enforcement proceedings solely on its own initiative, but rather

[4] LeBoeuf also falsely claims that undersigned counsel "represented to this Court that the PIF was not a separate legal entity." Plt. Memo at 21. This is pure fiction. We cannot even guess what LeBoeuf imagines it is referring to by this statement.

[5] LeBoeuf seems to believe that Mr. Tolchin has some conflict of interest representing both the Ungars and the PIF. That belief is baseless: since the Ungars are the sole owners of the PIF, no such conflict can arise.

pursuant to the instructions of its clients who are certain former directors and officers of the PIF and agents of the PA.

Accordingly, on June 12, 2007, counsel for the Ungars and the PIF informed LeBoeuf in writing that while the Ungars will hold LeBoeuf's clients (i.e. certain dismissed directors and officers of the PIF) liable for their unlawful interference with the Ungars' rights, LeBoeuf itself will be held harmless. See Exhibit A.

As LeBoeuf itself expressly recognizes, once a warning of a lawsuit is "withdrawn" by the putative defendant in the declaratory judgment action, any federal question jurisdiction that existed as a result of such warning evaporates. *See* Plt. Memo at 18 (citing Hudson County News Co. v. Metro Assocs., Inc., 141 F.R.D. 386 (D. Mass. 1992)).

Indeed, in Hudson County the declaratory judgment defendant did not ***expressly*** withdraw the threat of a RICO suit, but merely filed an action without asserting a claim under RICO. Id. at 392. The court found that this passive conduct by the defendant eliminated the "requisite substantial showing of reasonable apprehension" of a RICO suit and that "Without the RICO dispute, there is no federal question in this case." Id.

Here, by contrast, the warning of a RICO suit has been ***explicitly*** withdrawn, and thus even assuming *arguendo* that LeBoeuf ever had a "reasonable apprehension" of a RICO suit entitling it to bring a declaratory judgment action regarding its RICO liability (which, as noted, its complaint in this action most certainly does ***not*** do), that apprehension has been mooted. See Sanger v. Reno, 966 F.Supp. 151, 161 (E.D.N.Y. 1997) (Where Attorney General "made an explicit and public statement that she will continue the Department of Justice's traditional policy of non-enforcement" of law, declaratory judgment action challenging constitutionality of law was unripe.).

While Hudson County and Sanger dealt with ripeness, the identical conclusion is required under the related doctrine of mootness:

> Simply stated, a case is moot when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome. The Supreme Court has described mootness as the doctrine of standing set in a time frame: The requisite personal interest that must exist at the commencement of the litigation (standing) must continue through its existence (mootness).

D.H.L. Associates, Inc. v. O'Gorman, 199 F.3d 50, 54 (1st Cir. 1999) (internal quotations and citations omitted).

Since LeBoeuf no longer faces RICO liability for its past or future conduct, it is pellucid that there is no "live" controversy before the Court (if there ever was one) and that LeBoeuf has no interest whatsoever in determining the purely academic question of whether it ***could*** have been held liable under RICO (a question which is not presented by its complaint in any event).

## II. LEBOEUF HAS FAILED TO SHOW THAT IT HAS STANDING AND THAT IT IS THE REAL PARTY IN INTEREST

The Ungars' motion demonstrated at length that LeBoeuf does not have standing and is not the real party in interest. *See* Defs' Memo at 13-21.

LeBoeuf's opposition memorandum fails to refute any of the Ungars' arguments in this regard:

### a. The Complaint Remains Defective

The instant motion shows that LeBoeuf's complaint fails to even ***allege*** that the PIF and/or its former directors or officers ever disputed the assignment of the ownership of the PIF to the Ungars, the dismissal of the directors and officers, or the dismissal of LeBoeuf as counsel. Defs' Memo at 14-15.

In a tardy and ineffective attempt to remedy this glaring lacuna on the face of the complaint, LeBoeuf has submitted the Declaration of Dr. Mohammed Mustafa and what purports to be an order from a court in Ramallah operated by judgment-debtor PA. Plt. Memo at 28-29.[6]

According to LeBoeuf, the Mustafa Declaration and the PA order demonstrate that the PIF and its former directors and officers do indeed contest the assignment of the PIF to the Ungars and the subsequent dismissal of the directors and officers and LeBoeuf as counsel, and consider LeBoeuf to be their counsel, thereby curing the defects in LeBoeuf's complaint:

> The Administrator asserts that there is no allegation that the PIF disputes the transfer of ownership, the dismissal of its officers and directors, or the dismissal of LeBoeuf. The accompanying Declaration of Dr. Mohammed Mustafa puts that contention to rest.

Plt. Memo at 28.

LeBoeuf is mistaken. Its failure to include any of these allegations in the complaint is not "put to rest" or otherwise cured by its subsequent filing of the Mustafa Declaration or the PA order. The complaint was and remains defective, because these allegations are absent. Accordingly, it must be dismissed.

In any event, the document purporting to be an *ex parte* PA court order (Exhibit B to the Mustafa Declaration) has expired ***on its face***. It states that, "I also order … the claimant to bring suit within a period of eight days; otherwise, the order issued in this claim shall be considered null and void." Id., final sentence.

[6] Neither Ungars nor their counsel have ever been served with this "order" or the underlying papers in the PA proceeding (assuming any such papers exist or such a proceeding actually took place), and first learned of the alleged proceeding and "order" when they received LeBoeuf's opposition papers on the instant motion.

LeBoeuf has not asserted much less shown that such a suit was brought (and the Ungars are certainly unaware of any such suit) and the "order" is therefore nugatory even on its own terms.[7]

Nor is the Mustafa Declaration entitled to any weight. As he admits, Dr. Mustafa was dismissed from his positions at the PIF. *See id*. at 8. He is therefore without authority to act or speak on behalf of the PIF. His sole claim ***not*** to have been fired rests on the *ex parte* order of a court operated by judgment debtor PA, which expired on its face some 8 months ago.[8]

Thus, LeBoeuf complaint remains facially defective and must be dismissed.

**b. The PIF Itself Has No Standing, All the Less So LeBoeuf**

LeBoeuf has repeatedly attacked this Court for assigning the PA's rights in the PIF to the Ungars, in a proceeding to which the PIF was not a party. See e.g. Complaint ¶¶19, 60; Objections at 2 ("LeBoeuf alleges that the provision of the Final Judgment that purported to assign to the Ungars ownership of a foreign corporation that was neither a party to the action nor within the Court's jurisdiction exceeded the Court's authority under Article III of the United States Constitution"); Plt. Memo at 3, 20-21.

---

[7] Because this *ex parte* "order" has facially expired, the Ungars will not waste the Court's time addressing the putative legal force of decisions issued by PA courts. If it becomes necessary in the future, the Ungars can and will demonstrate that the courts of the PA have no subject-matter or personal jurisdiction to hear any dispute involving the Ungars, and moreover that no decision of a PA court regarding the matters at issue here would be entitled to recognition or effect in a United States court because, *inter alia*, the Ungars would not obtain a fair hearing (even if they could attend such a proceeding without immediate risk to their lives, which they cannot). Indeed, PA courts are known to indict, "try" and execute – all in one day – ***Palestinians*** suspected of "cooperating with the Jews." It is thus easy to imagine what type of "justice" would be meted out to the Ungars in a PA court. See e.g. Bank Melli Iran v. Pahlavi, 58 F.3d 1406, 1410-1413 (9th Cir. 1995) (citing numerous cases for the rule that United States courts will not give effect to a foreign judgment that "was rendered under a judicial system that does not provide impartial tribunals or procedures compatible with due process of law").

[8] Mustafa's claim that the PA court had jurisdiction over the PIF (*id*. at ¶ 9) is meaningless because: (a) he is not qualified to offer a legal opinion; (b) the PA court has no jurisdiction over the Ungars (or the other new directors of the PIF named in the order); and (c) the PIF was the purported claimant, not respondent, in the PA proceeding, and the relevant question is whether the court has jurisdiction over the respondents (which it does not).

Indeed, Mr. Rohback complained extensively about this issue to Judge Dorsey in Connecticut. <u>See</u> Transcript, Nov. 29, 2006, Exhibit I to Defs' Memo, at 33-34 ("The PIF was not a party to the Rhode Island proceeding. It was not on notice of what was going on in Rhode Island, and what happened there … Judge Lagueux … went too far. That is an improper order…).

The Ungars responded in detail to this argument in their motion to dismiss, and demonstrated on the basis of wall-to-wall authority that ***the PIF had no standing or right whatsoever to object to the transfer of the PA's rights to the Ungars***, and that this Court's judgment assigning those rights to the Ungars was therefore entirely valid and appropriate. <u>See</u> Defs' Memo at 15-16. Accordingly,

> Since the PIF <u>itself</u> had no standing to oppose the assignment of the PA's ownership rights to the Ungars, it is pellucid – *a fortiori* – that Lebeouf has no such standing.

Defs' Memo at 16.

**Notably LeBoeuf's opposition papers provide no refutation whatsoever of the authority cited by the Ungars. In other words, after all its sound and fury, and its repeated lambasting of this Court in its papers and before other federal judges, LeBoeuf cannot provide one iota of support for its thesis that a corporation has standing to oppose the assignment of its shares to a new owner.**

LeBoeuf has provided no support for its claims because none exists: a corporation has no more standing to object to its assignment to new owners as part of a judgment enforcement proceeding than does a house, a car or a horse. The corporation is merely the object of the ownership rights, the thing owned, and it has no say as to whether and to whom those rights may be assigned.

Because there is no authority for its theory that the PIF was deprived of some right by the judgment entered on the Creditor's Bill, LeBoeuf resorts in its opposition to mischaracterizing the Ungars' position. Specifically, LeBoeuf falsely states that "*the Administrator argues that the PIF, and not LeBoeuf, is the real party in interest*" (Plt. Memo at 13) that "*the Ungars argue that only the PIF … and not LeBoeuf can challenge the constitutionality of the Order*" (id. at 15) and that "*To be sure, the Administrator has argued that the PIF is the only party with standing to contest that ruling.*" Id. at 21.

In fact, however – and as LeBoeuf knows full well – the Ungars explicitly assert, on the basis of the numerous authorities cited in their motion papers, that "the PIF itself had no standing to oppose the assignment of the PA's ownership rights to the Ungars." Defs' Memo at 16.

Since the PIF had no standing to oppose the assignment of the PA's rights, it is patently obvious that neither does LeBoeuf. Accordingly, LeBoeuf's complaint must be dismissed with prejudice.

**c. LeBoeuf Cannot Assert Derivative Claims**

The Ungars' motion papers assert that, even assuming, *arguendo*, the PIF had standing to oppose either the assignment of the PA's rights to the Ungars or the replacement of PIF's directors and officers, LeBoeuf would still have no standing to bring this action, and would not be the real party in interest, because its claims would be entirely derivative of those of the PIF. Defs' Memo at 16-21.

In response, LeBouef does not dispute that it has no standing to assert derivative claims, but argues that its claims are not derivative because what it is ***really*** seeking is a determination that it is not liable to the Ungars under RICO. Plt. Memo at 29-31.

As discussed above in Part I, however, LeBoeuf's complaint nowhere seeks a determination of its RICO liability. Moreover, the RICO issue has been mooted.

Therefore, the claims ***actually*** set forth in LeBoeuf's complaint, which (as LeBoeuf has effectively conceded) are entirely derivative, must be dismissed.

## III. LEBOEUF PRESENTS NO CONSTITUTIONAL CHALLENGE TO THE JUDGMENT ENTERED ON THE CREDITOR'S BILL

LeBoeuf argues that a challenge to a federal judgment, particularly a constitutional challenge, is a "federal question" and that its complaint asserts a constitutional challenge to the judgment entered on the Ungars' Creditor's Bill. Plt. Memo at 19-21. Specifically, LeBoeuf claims that its complaint alleges that that judgment is unconstitutional because (a) the PIF was not a party to the Creditor's Bill proceeding and (b) the judgment awards the Ungars an asset (the PIF) the value of which exceeds the amount of their judgment. Id. at 21.

These arguments fail on multiple grounds:

First, LeBoeuf is a stranger to the case and has no standing whatsoever to challenge the Court's judgment, as discussed above, even if it could articulate a constitutional (or other) challenge (which it cannot).

Second, as discussed above and in the Ungars' motion papers (Defs' Memo at 15-16) ***as a matter of law*** the PIF had no right or standing whatsoever to participate in the Creditor's Bill proceeding. That proceeding and the judgment entered thereon affected only the rights and assets of the PA, not the PIF, and therefore the only party that had standing to oppose the Creditor's Bill, or to appeal the judgment, was the PA itself. But the PA intentionally defaulted the Creditor's Bill and failed to appeal the judgment thereon.

A party cannot create subject-matter jurisdiction out of thin air by labeling its claims a "constitutional challenge" when, as a matter of law, no constitutionally or legally protected rights are implicated. That is precisely what LeBoeuf is attempting to do here.[9]

Third, it has already been established as a matter of law that the net value of the PIF is ***less*** than the amount of the Ungars' judgment. The Creditor's Bill expressly alleged that:

> At one time, the value of the PA assets held by the PIF and the PCSC exceeded the amount of the PA's judgment debt to the Ungars; however, the PA has recently encumbered over $500 million of these assets as collateral for loans, and upon information and belief ***the net unencumbered value of the remaining assets is now less*** than the amount of the Ungars' judgment.

Creditor's Bill at ¶ 17 (emphasis added).

The Ungars' supported this allegation with evidence. See Exhibit H to the Creditor's Bill.

The PA – at that time the owner of the PIF – did not dispute this allegation, and defaulted the Creditor's Bill. There is no question that once default enters, "each of [the plaintiff's] allegations of fact must be taken as true and each of its ... claims must be considered established as a matter of law." Brockton Sav. Bank v. Peat, Marwick, Mitchell & Co., 771 F.2d 5, 13 (1st Cir. 1985).

---

[9] LeBoeuf also states without further elaboration that the Court did not have the authority to assign PA's ownership of the PIF to the Ungars because the PIF was "not within this Court's jurisdiction." Plt. Memo at 21. But this argument both ignores the fact that this Court has personal jurisdiction over the PA and misunderstands the nature of a creditor's bill under Rhode Island law. Section §9-28-1 of R.I.G.L permits this Court to reach all legal and equitable rights and interests of judgment debtor PA. See e.g. Howe v. Richardson, 232 Bankr. 534 (Bankr. 1st Cir. 1999), aff'd, 193 F.3d 60 (1st Cir. 1999) (Expansive language of §9-28-1 and statute's inclusion of "chose in action" permits judgment creditors to "tak[e] over debtors' legal claims against third parties" even when not subject to attachment under common law). Among the rights and interests subject to §9-28-1 are a judgment debtor's interests in a corporation. See Rhode Island Hospital v. Collins, 117 R.I. 535, 537, 368 A.2d 1225, 1227 (1977) (Pursuant to §9-28-1 a judgment creditor may "bring an independent civil action to reach and apply [judgment debtor's] interest in [a] corporation" owned by judgment debtor.).

Thus, LeBoeuf's claim that it is entitled to assert a Due Process challenge because the judgment on the Creditor's Bill purportedly assigns the Ungars an asset worth more than their underlying judgment fails as a matter of law. The PIF was an asset of the PA, and any "Due Process" claim could only belong to the PA.[10] But the PA has already conceded as a matter of law, by its default, that the "the net unencumbered value of" the PIF is less than the amount of the underlying judgment.

Tellingly, Dr. Mustafa, upon whose declaration LeBoeuf purports to found this claim, does ***not*** address the net unencumbered value of the PIF. Rather, he is careful to state only that:

> The PIF has more than $116 million in assets. The PIF had more than $116 million in assets on September 19, 2006 …

Mustafa Declaration at ¶ 13.

This statement is meaningless in this context. Imagine a judgment debtor who owns a house worth $200,000 which is encumbered by a mortgage in the amount of $150,000. A person holding a judgment for $60,000 is perfectly entitled to execute against that house, because the net value of the house is only $50,000.

Dr. Mustafa's coy avoidance of the ***net value*** of the PIF is not surprising. Dr. Mustafa was hand-picked and appointed to his former position as the chief executive officer and director of the PIF by the judgment debtor PA itself. *See* PIF Articles of Association, Plt. Memo Exhibit 2, at ¶¶ 1.24; 5.2(d); 6.1.

Thus, Dr. Mustafa owes his original appointment to the PA.

Furthermore, since the chief executive and the directors serve at the pleasure of the owner of the PIF (see id. at ¶¶ 5.2(d) and 6.4), and since Dr. Mustafa believes (albeit erroneously) that

[10] Notably, by raising this claim – i.e. that the PA has overpaid its judgment – LeBoeuf is in fact and effect acting on behalf of the PA itself. This is hardly surprising since, as discussed below, LeBoeuf is taking instructions in this case from Dr. Mustafa, who is an agent of the PA.

the PA still owns the PIF, Dr. Mustafa is clearly – from his own subjective perspective – completely subordinate and beholden to the PA.

Thus, Dr. Mustafa is nothing but an agent and subordinate of judgment-debtor PA, seeking to thwart enforcement of the Ungars' judgment against PA. His credibility is therefore zero. Indeed, this Court previously found a sworn declaration submitted by an agent of the PA (who denied being the chief representative of the PA to the United States) to be blatantly false. See Ungar v. Palestinian Authority, 325 F.Supp.2d 15 56, 57 n. 49 (D.R.I. 2004) (finding that the documentary evidence submitted by the Ungars "casts considerable doubt on the Palestinian Defendants' assertion that they are acting in 'good faith'" and dismissing the PA's denials "as unworthy of discussion" in light of "what the recently submitted documentary evidence has revealed regarding Mr. Abdel Rahman's status and the veracity of his declaration").

**Finally, aside from bring legally frivolous and factually unsubstantiated, the claim that the Ungars have been "overpaid" is the very epitome of temerity.** To date, nearly a year after they filed their Creditor's Bill and nine months after this Court granted judgment thereon, the Ungars have not received a *penny* as a result of that judgment (and their counsel have been forced to waste hundreds of thousands of dollars in time and thousands of dollars in out-of-pocket expenses) all due to the machinations of LeBoeuf and the former directors and officers of the PIF.

## III. DIVERSITY JURISDICTION IS NOT PRESENT AND CANNOT BE CREATED BY DISMISSAL OF THE NON-DIVERSE DEFENDANTS

### a. The Domiciles of Yaron Ungar and Amichai Ungar Have Been Proven

LeBoeuf's complaint asserted that the Estate of Yaron Ungar is domiciled in Rhode Island for diversity purposes because the administrator of the Estate, David Strachman, is domiciled in Rhode Island.

In response, the Ungars pointed out that LeBoeuf had ignored the plain command of 28 U.S.C. §1332(c)(2) that "the legal representative of the estate of a decedent shall be deemed to be a citizen only of the same State as the decedent," and that this Court has already determined in the underlying action that Yaron Ungar was domiciled in Israel at the time of his death. See Defs' Memo at 11.

In its opposition papers, LeBoeuf disputes that this Court ever determined Yaron Ungar's domicile:

> As to Yaron Ungar, it is not established that he was, in fact, domiciled in Israel … ***there is nothing in the record*** in this case or in the case cited by the Administrator, Ungar v. Palestinian Authority, 304 F. Supp. 2d 232, 262 (D.R.I. 2004), that establishes that Ungar was domiciled abroad at the time of his death. ***The case cited by the Administrator states only*** that Ungar was "an American citizen living in Israel" and that "Plaintiffs' complaint alleges that Yaron Ungar is a United States citizen." *See* Ungar v. Palestinian Authority, 304 F. Supp. 2d at 244, 248. These statements and allegations do not establish Yaron Ungar's domicile at the time of his death.

Plt. Memo at 23-24 (emphasis added).

LeBoeuf evidently did not read this Court's decision with much care, or pretends to not have done so, since that decision expressly found – on the basis of the testimony of Yaron's family – that:

> Yaron Ungar had resided continuously in Israel for twelve years prior to his death, *see* 7/12/02 Hearing

> Tr. at 100, and had not been in the United States since he was fourteen years old, *see id*. at 92, 100.
>
> ***
>
> Yaron Ungar had not been a resident of any state in this country since he was fourteen years old. *See* 7/12/02 Hearing Tr. at 92, 100.

Ungar v. Palestinian Authority, 304 F. Supp. 2d 232, 260, fn. 27, 261 (D.R.I. 2004).

Thus, precisely contrary to LeBoeuf's claims, this Court has clearly and irrefutably established that Yaron Ungar was domiciled abroad at the time of his death.

LeBoeuf also asserts that the Ungars' "challenge to the invocation of diversity jurisdiction is troubling" (Plt. Memo at 22) because in the underlying action the Ungars based venue in this Court on Mr. Strachman's Rhode Island domicile and thus according to LeBouef "the jurisdictional basis for the underlying action may be called into question." Id.

This "argument" is nothing short of ludicrous. The "jurisdictional basis for the underlying action" was federal question jurisdiction (the cause of action codified at 18 U.S.C. §2333), not diversity jurisdiction. And if what LeBoeuf means to argue here is that the ***venue*** of the underlying action in this Court was improper, its argument is no less frivolous. It is well established that for purposes of venue, "The residence . . . of an executor or administrator is determined not by the location of the estate which he administers, the district in which he was appointed, or even by the residence of the decedent. Rather, the residence of an executor or administrator for venue purposes is his personal residence." Burnham v. Fulton, 1987 WL 18872 at *1 (E.D.Pa. 1987) (citing Leonard v. Wharton, 268 F. Supp. 715 (D.Md. 1967) and Tiernan v.

Westext Transport, Inc., 243 F. Supp. 566 (S.D.N.Y. 1965)).[11] See also e.g. Smith v. Harris, 308 F. Supp. 527, 528 (E.D.Wis. 1970).

Accordingly, this Court correctly found that venue in the underlying action was properly placed in Rhode Island. See Ungar v. Palestinian Authority, 153 F.Supp.2d 76, 95 (D.R.I. 2001).[12]

Notably, by attacking the ***underlying judgment*** LeBoeuf has shown, once again, that its real goal here is not to protect its own interests but rather to frustrate in any way possible the enforcement of the judgment entered by this Court and thereby prevent the Ungars from obtaining the compensation awarded them by this Court by the murder of their decedent by the PA.

LeBoeuf also claims that the sworn declaration of Amichai Ungar (Exhibit J to Defs' Memo) is "conclusory" and so does not prove his domicile. Plt. Memo at 24. Amichai Ungar's declaration is indeed brief, but that is because the facts are simple and straightforward: during the past seven years Amichai was "resident and domiciled exclusively in Israel" and "did not reside in the United States at any time and . . .did not own or rent any real property in the United States at any time." Id. What more is there to say?

While the Ungars believe that this declaration is easily sufficient, out of an abundance of caution, and to put LeBoeuf's frivolous assertions to rest once and for all, they are submitting the Supplemental Declaration of Amichai Ungar, attached hereto Exhibit B, which further details Amichai's status as a domiciliary of Israel.

[11] Notably, in Tiernan, an action brought by an estate administrator resident in Rhode Island was transferred out of the Southern District of New York on grounds of improper venue, "for the residence of an executor or administrator for venue purposes is his personal residence rather than the district in which he was appointed", id. at 567, and was ultimately heard in this Court, see Tiernan v. Westext Transport, Inc., 295 F. Supp. 1251 (D.R.I. 1969).

[12] The PA did not subsequently raise the venue issue or appeal the Court's decision thereon.

LeBoeuf also demands jurisdictional discovery from the Ungars about the domiciles of Yaron and Amichai, "which includes written discovery and depositions, including possible third party discovery, as well as an evidentiary hearing." Plt. Memo at 24.

This Court should not even consider LeBoeuf's demand for jurisdictional discovery. Yaron Ungar's domicile has already been established by this Court on the basis of the testimony of his family – i.e. the very same testimony that LeBoeuf now seeks to elicit through discovery. Amichai's domicile has likewise been established through his two sworn declarations. To describe LeBoeuf's demand for discovery as a fishing expedition would be far too charitable. The facts are clear, and discovery would serve no purpose except to harass the Ungar family and bog down their enforcement proceedings for months or years to come.

**b. Amichai Ungar and the Estate of Yaron Ungar Are Indispensable Parties**

LeBoeuf argues at length that the non-diverse parties, Amichai Ungar and the Estate of Yaron Ungar, are not indispensable parties and so can and should be dismissed from the case in order to preserve jurisdiction. Plt. Memo at 25-28.

In support of this argument, LeBoeuf relies on Pujol v. Shearson American Express, Inc., 877 F.2d 132 (1st Cir. 1989) and Isdaner v. Beyer, 53 F.R.D. 4, 5 (E.D. Pa. 1971). Plt. Memo, id.. But this argument fails because the rule set forth in Pujol applies only to tort cases.

> The court in *Pujol* also noted that the plaintiff's claims sounded in tort and that therefore the parent and subsidiary were joint tortfeasors. *Id*. at 137. An absent joint tortfeasor is not a necessary or indispensable party. *Id*. This rule is not applicable to the present case, however, because here Plaintiffs' action is one for breach of contract. As discussed above, in breach of contract cases all contracting parties will generally be necessary and indispensable. *See Acton*, 668 F.2d at 78-79; *Rashid*, 957 F.Supp. at 74; E & E Inv., 169 F.R.D.

> at 471-72; *Travelers*, 775 F.Supp. at 527; *F & M Distributors*, 129 F.R.D. at 497- 98. The court in *Pujol* tacitly acknowledged this distinction between tort and contract cases. *See* 877 F.2d at 137 ("[O]ne might wonder why Rule 19 would treat 'joint tortfeasors' differently in this respect than, say, persons jointly liable under contract.") (emphasis in original). Because of these distinctions, the holding in *Pujol* is not applicable to the present case.

Rivera Rojas v. Loewen Group Intern., Inc., 178 F.R.D. 356, 365 (D.P.R. 1998).

Nor can Isdaner provide any support to LeBoeuf's position: that case involved a contract, and the rule in ***this*** circuit is that all parties to the contract are necessary and indispensable. See Acton Co., Inc. of Massachusetts v. Bachman Foods, Inc., 668 F.2d 76, 81-82 (1st Cir. 1982).

Indeed, precisely because – as LeBoeuf itself argues (Plt. Memo at 27-28) – the facts of the instant case are analogous to those of a contract dispute, under the law of this circuit all of the owners of the PIF are indispensable parties. See Acton Co., id.

If the diverse defendants prevail in this suit, no harm will be done. But if LeBoeuf were to prevail in whole or in part, an absurd and untenable situation would ensue in which the ownership and/or management of the PIF would be in the hands of both Amichai Ungar and the Estate of Yaron Ungar on the one hand, and the PA on the other. Plainly, that outcome would be no less unjust and unworkable than rescission of a contract in respect to some, but not all, of the parties thereto.

Courts have also held that where, as here, a claim to an asset is involved, all claimants are indispensable parties. See Poling v. K. Hovnanian Enterprises, 99 F.Supp.2d 502, 516-517 (D.N.J. 2000).

Furthermore, defendant Amichai Ungar is both an owner and a director of the PIF. See Defs' Memo, Exhibit E. As such, he is an indispensable party to this proceeding. See Prescott v.

Plant Industries, Inc., 88 F.R.D. 257, 261 (S.D.N.Y.1980) (where the issue was as to which directors were to continue to serve as directors after a contested election, all of the directors were indispensable parties).

Finally, LeBoeuf's diversity argument must fail because LeBoeuf itself is not the real party in interest in this matter, and LeBoeuf's own New York citizenship must therefore be disregarded. See e.g. Beltran Sanchez v. Wesleyan Church Corp., 218 F.Supp.2d 136, 139 (D.P.R. 2002) ("The real party in interest determines the existence of diversity jurisdiction.").

## IV. CONCLUSION

The complaint should be dismissed in its entirety with prejudice.

Ungars-Judgment Creditors,
By their Attorneys,

/s/David J. Strachman

David J. Strachman (#4404)
McIntyre, Tate, & Lynch LLP
321 South Main Street, Suite 400
Providence, RI 02903
(401) 351-7700
(401) 331-6095 (fax)
djs@mtlhlaw.com

## CERTIFICATION

I hereby certify that on June 12, 2007, a true copy of the within was sent via ECF to counsel of record:

Matthew F. Medeiros
Little, Medeiros, Kinder, Bulman & Whitney
72 Pine St.
Providence, RI 02903

/S/ David J. Strachman